# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


AHMED GAD,                    :   No. 18-3900
                              :
                Plaintiff     :
                              :
        vs.                   :
                              :
JOHN HARMAN, KYLE WENE,       :
JOHN COLARUSSO, JACKIE        :
McNAIR and JONATHAN           :
GLOVAS,                       :


DEPOSITION

WITNESS:      AHMED F. GAD

DATE:         Tuesday, July 23, 2019

TIME:         12:39 p.m.

PLACE:        Northampton County Prison
              666 Walnut Street
              Easton, PA  18042

REPORTER:     Florita C. Hobaugh, RPR
              Notary Public


KARASCH & ASSOCIATES
NATIONALLY REGISTERED PROFESSIONAL REPORTERS
(800) 621-5689

APPEARANCES:

PATRICK G. GECKLE, LLC
By:  PATRICK G. GECKLE, ESQ.
1515 Market Street
Suite 1200
Philadelphia, PA  19102
(215) 735-3326
pgeckle@pgglaw.com
-- For the Plaintiff


THE MACMAIN LAW GROUP, LLC
By:  CHARLES GILLIAM-BROWNLEE, ESQ.
433 West Market Street, Suite 200
West Chester, PA  19382
(484) 318-7106
cgilliam-brownlee@macmainlaw.com
-- For the Defendants

## INDEX TO WITNESSES

Witness                              Page


Ahmad Gad

By Mr. Gilliam-Brownlee          4, 181
By Mr. Geckle                    171, 183


## INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---------|-------------|------|
| Gad 1 | Incident Report dated June 29, 2017 | 75 |
| Gad 2 | Incident Report dated October 17, 2017 | 83 |
| Gad 3 | Incident Report dated November 17, 2017 | 100 |
| Gad 4 | Inmate Request dated December 3, 2017 | 120 |
| Gad 5 | Incident Report dated December 3, 2017 | 125 |
| Gad 6 | Incident Report dated December 1, 2017 | 130 |
| Gad 7 | Letter dated | 140 |
| Gad 8 | Investigative Report, Case No. 17-136 | 142 |

Joint Appendix 0167

1  (The deposition commenced at 12:39
2  p.m.)
3  (It is stipulated by and between
4  counsel for the respective parties that the
5  reading and signing of the deposition
6  transcript is waived, and that all objections,
7  except as to the form of the question, are
8  reserved until the time of trial.)
9  * * *
10  (AHMED F. GAD, having been duly
11  sworn, was examined and testified as follows:)
12  BY MR. GILLIAM-BROWNLEE:
13  Q.  Good afternoon, Mr. Gad.  Would you please
14  state your full name for the record.
15  A.  My name is Ahmed Feisal Gad.
16  Q.  Are you aware that you are here for a
17  deposition in the matter of Gad v. Northampton
18  County?
19  A.  Yes.
20  Q.  Have you been deposed before?
21  A.  Have I been what?
22  Q.  Deposed before?
23  A.  What's mean deposed?
24  Q.  What this is.  This is a deposition.
25  A.  No, never been like that before.

1  Q.  This is the first time you've been
2  deposed?
3  A.  Yes.
4  Q.  This is a deposition, and it's essentially
5  just a kind of a question -- answer-and-question
6  session.  I'm going to ask you a series of questions
7  under oath, and you are going to answer them for me.
8  The court reporter is going to take down
9  everything that we say.  Her job is a lot easier if
10  we are not talking over each other.  So I ask that
11  you at least allow me to finish my question before
12  you answer it.
13  Occasionally in normal conversation you
14  can kind of predict where a question is going.  For
15  the sake of making sure the record is clear, I ask
16  that you wait until you fully hear my question
17  before answering it.
18  A.  Um-hmm.
19  Q.  Second, I would ask that you answer
20  verbally.  Shaking your head yes or no, um-hmms and
21  uhn-uhns, we in the room might understand, but the
22  transcript won't really be able to reflect that.  So
23  I ask that you answer all questions either yes or no
24  or however the answer depends on it.
25  Do you understand that?

1  A.  Yes.
2  Q.  If I ask you a question that you don't
3  understand, feel free to ask me to rephrase the
4  question or ask the question in a different way.
5  But if you answer a question, I will assume that
6  you've understood my question and you've answered it
7  truthfully and honestly.  Do you understand that?
8  A.  Yes, sir.
9  Q.  If you don't recall an exact date or an
10  exact time or an exact number or anything like that,
11  it is okay to give me an estimate based on your best
12  knowledge.  But I do ask that you not guess.  We
13  want you to reflect what you actually know in this
14  deposition.
15  A.  Um-hmm.
16  Q.  And I want to remind you that you are
17  under oath, and that anything that -- your answers
18  are still subject to a charge of perjury, subject to
19  a criminal charge of perjury if they are untruthful
20  intentionally.
21  A.  Yes, sir.
22  Q.  Understand that?
23  A.  Um-hmm.
24  Q.  Okay.  How old are you?
25  A.  Forty-three right now, about to be 44 in

1  November.
2  Q.  Okay.  And do you take any drugs or
3  medication?
4  A.  Not before, just right now, because I've
5  been went to psychiatric, and they did prescribe for
6  me some mental health medication because of what
7  happened to me in Northampton County.
8  Q.  What medications are you taking?
9  A.  Zoloft right now.  It's called -- I think
10  the name is Zoloft.  I'm not sure.  But I think,
11  because I'm not -- they say it in front of me
12  several times.  So I think it is called Zoloft.
13  Q.  Is that the only medication you are
14  taking?
15  A.  Yes, it's a medication for depression
16  right now.  You are talking about right now; right?
17  Q.  Yes.
18  A.  Yes, for depression and stress and
19  something like that.
20  Q.  Is that the only drug that you are taking?
21  A.  Yes, that's what I'm taking.
22  Q.  Would that affect your ability to recall
23  or remember things accurately?
24  A.  No, I don't think so.  I don't know, but I
25  don't think so.

Page 8

1   Q.   Where did you live before you were
2 incarcerated at Northampton County Prison?
3   A.   Before I got incarcerated?
4   Q.   Yes.
5   A.   I was living in 1847 Hamilton Street,
6 Allentown, PA, 18103.
7   Q.   Who did you live with?
8   A.   I was living with several people, like a
9 girl called -- she left to I think another city, but
10 she was Amber, one of them, Amber; Jay, I don't know
11 what's his real name, but his name is Jay. Amber,
12 Jay, Armando, Samantha, I think that's all. Me and
13 Amber and Samantha and Jay.
14   Q.   And what was Amber's relationship to you?
15   A.   No, she's just a roommate, and she was
16 like a friend. All of them are friends.
17   Q.   All of them are just friends. So was this
18 kind of just like a group home?
19   A.   We were working together. We were like
20 doing some work together like, and we were friends.
21 Like I used to work part-time sometime, so I knew
22 them through my job. And the owner of the house was
23 the owner of the business. So we were all living
24 together as a friend and co-workers.
25   Q.   Okay. So Amber, Jay?

Page 9

1   A.   Samantha.
2   Q.   Samantha?
3   A.   And Armando.
4   Q.   Okay. And where did you live before you
5 lived at 1847 Hamilton Street?
6   A.   Before that address, I was living in
7 Bangor, 42 -- 42 Broadway, Bangor. I don't remember
8 the zip code.
9   Q.   And who did you live with there?
10   A.   I was living with my wife.
11   Q.   What is your wife's name?
12   A.   Eva Fisher.
13   Q.   How long did you live at 1847 Hamilton
14 Street?
15   A.   Month or two, two months I would say, two
16 months, maybe three months, I can't say exactly.
17 It's not a long time. I just -- I just moved over
18 there because I was living before there in
19 Allentown. My wife is from Allentown, and I used to
20 live in Allentown.
21    So there is incident happened in Allentown
22 or a problem happened in Allentown, and that's why I
23 moved to there. I moved to there because of this
24 problem. So I just moved for a little bit, and
25 because of this problem. You want me to tell you

Page 10

1 why? Or does it matter?
2   Q.   Well, we'll get to --
3   A.   Okay, so I didn't live there much. I
4 lived there for two months or maximum three months.
5 I don't remember exactly.
6   Q.   Okay. How long did you live at Bangor --
7 42 Broadway, Bangor?
8   A.   That's what I'm saying, two-three months
9 maximum.
10   Q.   So you lived two or three months in
11 Bangor?
12   A.   Yeah.
13   Q.   So you lived two or three months in
14 Allentown?
15   A.   No, in Allentown I was living more than
16 that. I said my wife was living in Allentown. I
17 was living in Allentown before I moved to Bangor. I
18 said I moved to Allentown from Bangor because some
19 problem happen in Allentown. There was a problem.
20 My wife was scared to live where we were living.
21 That's why I moved to Bangor.
22    My wife said that she's scared to live in
23 Allentown. That's why I moved to Bangor. But I
24 moved to Bangor for a little bit, just two or three
25 months. I don't remember exactly how much it was,

Page 11

1 but only two or three months. And then I -- you
2 hear me?
3   Q.   Yeah.
4   A.   You say about Allentown. I living in
5 Allentown for longer, longer than that, like years.
6   Q.   Okay. But I asked -- I asked you where
7 you lived right before you were arrested, and you
8 told me --
9   A.   I said in Allentown, Hamilton Street.
10   Q.   And I asked you where you lived before
11 that.
12   A.   Before, I lived in Bangor. I was living
13 in Bangor, 42 Broadway, for two-three months.
14   Q.   So how long did you live in Allentown?
15   A.   Years, all the time I was living in
16 Allentown, but not in Hamilton Street. I was living
17 in -- okay. I got what you mean. You want to
18 understand why I keep moving from Allentown to
19 Bangor?
20   Q.   I'm just trying to get a sense of --
21   A.   I understand.
22   Q.   -- how you moved --
23   A.   I will explain it to you more
24 specifically. I was living in Allentown, okay.
25 Then I knew my wife from Allentown. I married to my

Page 12

1 wife in Allentown.
2       Then what happened is that when we were
3 living in Allentown, me and my wife, there is an
4 incident happened. My wife said that she got raped
5 while I'm at work and she's scared to live in the
6 same place where we were living. So we moved from
7 Allentown to Bangor.
8       And then when we moved to Bangor, I got
9 the charge in Northampton County, which is simple
10 assault or domestic violence, because allegedly she
11 said that I slapped her, which I didn't, but
12 whatever. We got no contact between me and my wife,
13 between me and my wife, no contact.
14       So I asked my wife, do you want to --
15 there is no contact, so do you want to leave or me
16 leave? She said I can't live here because my family
17 is in Allentown. You have to take me to Allentown.
18 So I took her to Allentown.
19       And when I came back, I find the officers
20 knocking on my door saying you can't stay here. I
21 said but my wife is not here. They told me, you are
22 evacuated. The judge evacuates you from the
23 residence. That's why I moved back to Allentown and
24 my wife moved back to Allentown. Do you understand
25 me?

Page 13

1    Q. I'm trying to. So I want to go backwards.
2 So obviously since I believe June of 2017 you've
3 been at --
4       MR. GECKLE: Here.
5    Q. -- at Northampton County Prison; is that
6 correct?
7    A. June, 2017, yes, sir.
8    Q. And before that you were living at 1847
9 Hamilton Street?
10    A. Yes, sir.
11    Q. You were there for two months?
12    A. No. No.
13    Q. Two to three months?
14    A. I was there more than that. I told you.
15       MR. GECKLE: Where were you living
16    when you got picked up and arrested; or when
17    you got convicted and sent here, where were you
18    living then?
19       THE WITNESS: Oh, there is confusion.
20    When I got convicted, I was out on bail, sir.
21    I was out on bail.
22       MR. GECKLE: So where were you living
23    when you got convicted?
24       THE WITNESS: When I got convicted in
25    my trial I was living at 1847 Hamilton Street.

Page 14

1 BY MR. GILLIAM-BROWNLEE:
2    Q. And how long were you living there?
3    A. Like a year, or maybe a year,
4 approximately a year.
5    Q. And then before you were living at 1847
6 Hamilton Street, where were you living?
7    A. I was living in Bangor, 42 Broadway.
8    Q. And how long were you living there?
9    A. Two-three months when I catch my charge,
10 the domestic violence, and the judge evacuate me,
11 and no contact between me and my wife, and I have to
12 leave that address. That's why I go to Allentown.
13       MR. GECKLE: It's not clear. When
14    you got the no contact order, is that when you
15    moved to Bangor?
16       THE WITNESS: This is when I moved
17    from Bangor.
18 BY MR. GILLIAM-BROWNLEE:
19    Q. All right. When you were in Bangor you
20 were living with --
21    A. I was living with my wife.
22    Q. With Eva Fisher?
23    A. Yes.
24    Q. And at 1847 Hamilton Street you were
25 living with Amber, Jay?

Page 15

1    A. Armando and Samantha.
2    Q. Do you know any of their last names?
3    A. No. They might not be even their real
4 names, but they are friends. I don't know. They
5 call me Tom. We don't have to know each other real
6 name, you know?
7    Q. All right. Now, before you were at Bangor
8 at 42 Broadway, Bangor, where were you living?
9    A. Sorry, before I was at --
10    Q. At 42 Broadway?
11    A. Before Bangor?
12    Q. Yes.
13    A. I was living in -- I don't remember the
14 number exactly, but it's I think 347 North Jordan
15 Street. I'm not sure about the 347, but it's North
16 Jordan Street. I was living in North Jordan Street.
17       MR. GECKLE: What town?
18       THE WITNESS: In Allentown.
19 BY MR. GILLIAM-BROWNLEE:
20    Q. Who were you living with?
21    A. My wife. Eva Fisher.
22    Q. And how long were you living there?
23    A. I would say about a year.
24    Q. Okay. Was there anyone else there living
25 with you?

Page 16

1    A. No, just me and my wife in this address.
2    Q. What about in Bangor, was there anyone
3 else living with you and your wife in Bangor?
4    A. No. When I live with my wife nobody live
5 with me, just me and my wife.
6    Q. And before -- sorry, before the Jordan
7 Street, where were you living?
8    A. Before Jordan, I was living in 529 North
9 Front Street. 529 North Front Street. And that was
10 next house to my wife. She was living 527 North
11 Front Street.
12    Q. Still in Allentown?
13    A. Yeah. We were neighbors.
14    Q. How long did you live there?
15    A. In 529?
16    Q. Yes.
17    A. I can't say exactly, like years, years.
18 But how many years, I don't want to say four or
19 five, I don't want to say number and then you tell
20 me you lie. I don't want to say that.
21    Q. You can give me an estimate, if it was
22 between five and ten years?
23    A. I would say like -- an estimate is not
24 going to consider lie? I don't want to say four and
25 it's five. I don't want to say five and it's six.

Page 17

1    MR. GECKLE: Just tell him you're not
2 sure.
3    THE WITNESS: I'm not sure.
4 BY MR. GILLIAM-BROWNLEE:
5    Q. Okay.
6    A. I'm not sure. Years, but how many years,
7 I'm not sure.
8    Q. Okay.
9    A. I would say over three years, over four,
10 but I don't know, exactly. I can't say.
11    Q. So if I was to say three to four years,
12 would that be an acceptable --
13    A. Not -- I don't know exactly, I can't say.
14 It can be five, it can be six, I don't -- years.
15    Q. Were you working before you were
16 incarcerated?
17    A. I was studying and working. I was both.
18 I was doing part-time job and I was -- I'm a
19 commercial pilot, and also I'm a flight -- I was
20 already going to work as a flight instructor in
21 Gateway Aviation.
22    And what happened is that I was studying
23 to do my CFI, which is Certified Flight Instructor.
24 I finished my written test for the CFI, and for my
25 FOI, which is Fundamentals of Instruction, two

Page 18

1 written tests, and then I was going for my practical
2 test to work. After the practical test I work as a
3 flight instructor.
4    MR. GECKLE: Listen to his question.
5 He asked you if you were working before --
6    THE WITNESS: I was working
7 part-time.
8    MR. GECKLE: Let him ask the
9 questions, and then you answer the questions.
10 We'll be here all day.
11    THE WITNESS: I'm sorry.
12 BY MR. GILLIAM-BROWNLEE:
13    Q. I'll get into your educational history and
14 all that, but just --
15    A. I'm sorry.
16    Q. So the question was, were you working
17 before --
18    A. Part-time. And I give the reason why it
19 was part-time. But before that I was working full
20 time.
21    Q. And where were you working part-time?
22    A. I was working part-time with the China --
23 China King. It's a restaurant where all these
24 people were working.
25    Q. And I'm assuming that's a Chinese

Page 19

1 restaurant?
2    A. Yeah.
3    Q. How long were you working there?
4    A. Not long, like -- because I told you I was
5 studying at this time.
6    MR. GECKLE: How long were you
7 working there? You don't have to explain
8 everything.
9    THE WITNESS: Not long time. I can't
10 remember exactly. I'm not sure.
11    Q. Can you give me an estimate; a year, two
12 years, three years?
13    A. No, not that long.
14    Q. I'm not holding you to --
15    A. An estimate, it's not -- like I can't --
16 I'm not sure. I can't say exactly like how many --
17 it's not years. It's -- it's like I would say
18 months, but how many I can't exactly say.
19    Q. So less than a year?
20    A. Yeah, less than a year, but a long time.
21 No, not even six months. I was -- no.
22    Q. And where were you working before that?
23    A. Before that I -- I was just got fired from
24 my job. I was working as a limousine driver in J&J,
25 J&J Company.

And I got fired from my job over there. I don't know why. They didn't give me a reason, they just let me out. They say we have no -- we have no much work, so you can't work with us. So I said okay.

Q. How long were you working as a limousine driver?

A. Estimate too?

Q. Yeah, it's fine to give me an estimate.

A. Months. But how many months I don't -- I say a year.

Q. Okay.

A. I'm not sure.

Q. Was that full time or was that part time?

A. That was full time, that was full time, because at this time I was just working, and I was living with my wife, and I have to support her and -- sorry.

Q. And prior to -- did you work prior to the limousine company?

A. Yeah. I was working before that. I was working in a lot of places. I was working in -- I was working through a company called Job Connection.

Q. Okay.

A. This company was taking me to a lot of

places. Like sometimes they put me in work with construction. Sometimes they put me in work in medical warehouses, sometimes -- like medicine. Sometimes -- they change my job, but I been working with them for like a few -- I would say a few years, Job Connection.

Q. Is that like a temp --

A. Temporary, yeah. Temp agency.

Q. You say you were working for them for --

A. A few years, like yeah.

Q. Would that be less than seven years?

A. Yeah, less than that, like maybe two years, three years, I'm not sure. I'm not sure. I can't say exactly, because you know when you are outside in the street, you don't think exactly where I move. You just work, you just go through life, you don't put dates, you know.

Q. Okay. Prior to working with Job Connection, did you have any other employment?

A. Yeah. I've been working all my life. But if you tell me exactly how many years, how many days, I'm not going to be able to tell you.

Q. I'm just trying to pretty much go back ten years to figure out what your work history was for the last ten years.

A. Exactly. Before that, before Job Connection, I would say I was working with -- let me remember. Before Job Connection?

Q. Yeah.

A. Oh, my God. I've been working a lot of places, but I -- before -- no, I used to work -- that's through Job Connection. I used to work -- can I say like -- like -- like the place, but I don't know the sequence. Like sometimes I can say I work here, but I worked somewhere. I don't want to say I work in there, and then I work -- I don't know the sequence.

I work in Red Earth Farm. I was driving trucks to Philadelphia. I work in construction called -- I worked landscaping. But I don't remember the sequence. Which one before which one, I can't remember.

Q. Okay.

A. But I've been working all my life. I work in Red Earth Farm. I was -- I was delivering vegetables, and fruits, organic, to hospitals and to -- and to places like shelters and kids places in Philadelphia. And from here to Bath and Philadelphia and everywhere. Big job.

Q. So what was your rate of pay at China King

restaurant?

A. No, China King restaurant is not -- is not work. It was -- it was just -- I was delivering food. So it was a part-time, just next to my study. It wasn't like really pay, no. It was because I was living in his house, so it wasn't a pay. It was like kind of like -- he do me a favor, I do him a favor.

Q. So you were pretty much being paid with housing?

A. Kind of, yeah. Like living in the house and like he helped me, I help him, you know? When I have time free, I'm not studying, I go I help him. That's it.

Q. And what was your rate of pay at -- limousine driver, J&J?

A. I was making good money over there. I was making three kind of pays. I was making gratuity, which is 30 percent of each ride, and I was making tips, and I was make 11 dollar per hour, so hourly, and gratuity and tips. So I was making good money at this.

But I don't know -- it's $11 per hour, that's the thing which is on hourly. But the other things, it's a gratuity, and this is kind of I don't

Page 24

know how to say it.

Q.   And what about when you were working with Job Connection, what was your rate of pay there?

A.   I reached to 14 or 15, I'm not sure.  I'm not sure.  It was far away.  I'm not sure, but some -- depend where you work.  Sometimes you go work in some places, like they give you $14 per hour, $13.  Sometimes you work in some places, they give you are $10 per hour.  Sometimes you work in someplace they give you $11 per hour.  So they was moving me because it's a temporary agency, so I really don't remember.  It's different.

Q.   Were you working 40 hours a week with Job Connection?

A.   More than that.  I used to work -- even with J&J I used to work 60 hours, 80 hours.  I do work all the time.  Overtime, they offer me, I do it.

Q.   Okay.  So what was the reason that you left Job Connection?

A.   I got in accident.  I was working in Effort Foundry, and -- no, that's not -- that's not even the reason; I'm sorry.  I'm sorry.  No, that's not the reason.  When I get in accident, they lay me because my hand was hurting me.

Page 25

But after that, they bring me back.  But I went back to work after my hand get healed, and when I went back to work, remember when I told you my wife was scared to stay at home by herself and that's why I moved?  She used to come with me to my work most of the time, or all of the time and stay at my car.  That's why they say you can't work no more, because my wife comes with me, and your wife cannot be in the field of the work.

Q.   That was at Job Connection?

A.   Yeah.

Q.   Okay.  So you -- you were fired because your wife came to work?

A.   Stay in my car.  It's not fired; they say we have no job.  It's temporary, there's no like -- you can't say nothing to them, you know, it's temporary, we have no job for you.  You can't tell them like, why you fire me.  It's a temporary agency.  It's temporary, not permanent.

Q.   And you say that you were laid off from J&J without any explanation?

A.   No.  There is no explanation for that.  And -- and that's why I -- I -- I took a work compensation from them, and I won it, and they pay me for the time they lay me off, which is J&J.

Page 26

Q.   Okay.

A.   Because I -- I was in work compensation.  I said they fire me for no reason, and I went to Court with them, and they have either to give me job or to pay me, because I can't find a job.  So they pay me for that time.

Q.   So you went to the unemployment --

A.   Yeah, I took unemployment.

Q.   -- compensation for it?

A.   Yeah.

Q.   Did you file a claim with them?

A.   With who?

Q.   With the Unemployment Compensation Board, and that's how you were --

A.   Yeah, for J&J.

Q.   Okay.  Are you currently married?

A.   We're still married.  I didn't get any divorce papers.

Q.   How long have you been married to Ms. Fisher?

A.   From the -- we married in 2015.  So to now, it's going to be four years we've been married.  But there is no contact since 2017 or '16, '17 I think?  '16?  I'm not sure, '16, 2016, was the claim.  Yeah, there's no contact since 2016.  We

Page 27

separated since.  Supposedly we separated since 2016.

Q.   Were you married at any point prior to Ms.--

A.   Yeah, I was married in Florida to Crystal.  Her name is Crystal Gad.  She took my last name.  I don't know what is her last name.  She took my last name.  Crystal Gad, and we were divorced.

Q.   When were you married?

A.   Sorry?

Q.   When did you get married to Miss Crystal Gad?

A.   I got married to Crystal -- we didn't get married long.  We got married in 2010, I think, and we divorced in 2011, something like that.

Q.   How long did you live in Florida?

A.   I lived in Florida from 2009 to 2012.  I think 2012, yeah.  That's when I moved to Pennsylvania.  2012 or '11?  2012.  I'm not sure.

Q.   Do you know where you lived in Florida?

A.   Yeah, I was living in Atlantic -- it's called A1A, A1A Street, or Atlantic.  It's the same name, A1A Street in Florida, in some resort over there, I don't remember the number.  And it's like a condominium.  And I was living over there, and --

Page 28

1   Q.   Do you know the city?

2   A.   Yeah, Daytona Beach.

3   Q.   Have you lived anywhere else in the United

4 States?

5   A.   Yeah. I lived in Egypt.

6   Q.   In the United States?

7   A.   Sorry? In the United States?

8   Q.   Yes, besides Florida and Pennsylvania.

9   A.   Have I lived anywhere -- I used to study

10 in California when I was studying at the Universal

11 Air Academy. I used to study over there. And I

12 study in California. This is when I lived -- this

13 was long time ago. That was year '99 or 2000, I

14 don't remember, but anyway, I used to live in

15 California, Los Angeles.

16   Q.   Los Angeles from --

17   A.   You talking about the dates?

18   Q.   Yes.

19   A.   I would say '99 to 2000. One year,

20 approximately.

21   Q.   Were you born in the United States?

22   A.   No.

23   Q.   Where were you born?

24   A.   In Egypt.

25   Q.   And is that where you lived prior to

Page 29

1 coming to the United States?

2   A.   Yes.

3   Q.   Okay. So besides California, Florida and

4 Pennsylvania, have you lived anywhere else in the

5 United States?

6   A.   I'm not sure. I don't think so. I'm not

7 sure.

8   Q.   So you married Ms. Crystal Gad in 2010 and

9 you were divorced in 2011?

10   A.   Yeah.

11   Q.   Have you been married any other time?

12   A.   No.

13   Q.   Neither -- besides Ms. Eva Fisher, which

14 came after, you were not married before 2010?

15   A.   No.

16   Q.   Do you have any children?

17   A.   No.

18   Q.   Do you practice any particular faith?

19   A.   I'm Muslim.

20   Q.   Or religion?

21   A.   You're talking about the United States;

22 right? Everything is about in the United States;

23 right?

24   Q.   Well, we can -- did you change your

25 religion at some point?

Page 30

1   A.   No. I'm talking about the marriage.

2 You're talking about the United States; right?

3   Q.   Yes.

4      MR. GECKLE: He didn't ask you about

5 the marriage. He asked if you practice any

6 faith.

7      THE WITNESS: Yes.

8      MR. GECKLE: What faith do you

9 practice?

10      THE WITNESS: Muslim.

11 BY MR. GILLIAM-BROWNLEE:

12   Q.   Have you ever practiced any other faith

13 besides --

14   A.   No. I born Muslim.

15   Q.   Prior to being arrested were you attending

16 mosque regularly?

17   A.   I don't understand this question. Prior

18 to being arrested what?

19   Q.   Prior to being arrested, did you attend a

20 mosque?

21   A.   Did I go to the masjid? Yeah. Yeah. I

22 used to go to the masjid, or mosque; it's the same

23 meaning.

24   Q.   Where did you attend the masjid?

25   A.   In Whitehall. In Whitehall. Whitehall,

Page 31

1 Pennsylvania, there is a masjid over there. And on

2 Linden Street, there is a masjid over there. In

3 Daytona Beach when I used live over there, there was

4 a masjid there. I used to go to all of them.

5   Q.   Let's focus on Pennsylvania. You went to

6 a masjid in Whitehall, Pennsylvania?

7   A.   Yes, sir.

8   Q.   Do you know the name of the masjid?

9   A.   It's called the Muslim Center. That's

10 what they called. There is a big board that is

11 written the Muslim Center over there.

12   Q.   How long were you going there?

13   A.   Every week. Every week at least once or

14 twice, at least.

15   Q.   I mean how many years --

16   A.   All the time.

17   Q.   -- did you attend?

18   A.   All the time I'm here, when I'm living in

19 Pennsylvania, all the time.

20   Q.   Since you moved to Pennsylvania, that was

21 the masjid that you went to?

22   A.   Since I'm moving to Pennsylvania, that was

23 the whole time. And I go to Linden, but the one in

24 Linden Street got burned. There was a fire happened

25 over there. They closed it for a while. So I was

Page 32

1 going to both. But when the fire happened in Linden
2 Street, I've been going only to the one in
3 Whitehall, because there is no other one.
4     Q. What was the name of the one that was
5 on -- on Linden Street?
6     A. Yes, it's just a -- a Muslim masjid. I
7 don't know. There is no name for it. It was on
8 Linden Street.
9     Q. Linden Street in what city?
10     A. In Allentown. Linden Street, Allentown.
11     Q. And you don't -- there was no name for it;
12 it was just --
13     A. Muslim center. It can be the same, but I
14 didn't see any name or any board saying anything.
15 It's like a Muslim center or masjid.
16     Q. And how often would you attend, meaning
17 how many times a week?
18     A. At least twice, at least. Sometimes
19 three, sometimes four. At least twice. The Jumah
20 is necessarily, that is, I have to go every week.
21     Q. Have you ever missed any weeks?
22     A. No. No. It was very -- even my wife
23 know, it was very important for me. I used to leave
24 my job just to go to pray. I used to leave my job.
25 I used to -- especially the Jumah, the Friday. Even

Page 33

1 you can ask David. I used to tell him, give me off
2 Friday. When he need me, I said if you need me, I
3 cannot do it until after I pray. I have to pray the
4 Jumah, and this is very important to me.
5     Q. Excuse me. Would you usually -- would you
6 attend it with anyone?
7     A. Sorry?
8     Q. Would you attend with anyone? Would you
9 go with anyone to the masjid?
10     A. Eva used sometime to come with me. She's
11 Christian, but I used to go with her, and she used
12 to come with me, like even if she don't want to
13 attend, she can stay in the car, or she can go
14 anywhere, if she want to attend, if she want to
15 listen. My wife sometimes used to come with me.
16     Q. Anyone else?
17     A. No. I'm living with my wife. Who I going
18 to take? No, I just go by myself. If she don't
19 want to come, I go by myself, yeah.
20     Abd Ell Hady, he is the manager over
21 there, he knows me. He knows me in the masjid. His
22 name Abd Ell Hady.
23     Q. Could you spell that?
24     A. A-B-D, Abd, E-L-L, Hady, H-A-D-Y. E-L-L,
25 Hady, H-A-D-Y. Abd Ell Hady. He knows me.

Page 34

1     Q. Do you pray every day?
2     A. I pray every day, yeah.
3     Q. Did you pray every day before you were
4 arrested?
5     A. Yes. My wife saw me praying.
6     Q. How often would you pray?
7     A. Every day.
8     Q. I mean how many times a day?
9     A. Five times. This is -- this is not --
10 this is obligatory. You can pray more if you want,
11 but this is what you have to do, five times a day.
12 Even when you sit -- even if you can't do it, you
13 have to do it, either way. Even if I'm working,
14 like say, for example, I left the house in the
15 morning. I pray the Fajr. I go to work. I'm
16 working.
17     Sometimes I sneak from my work to go
18 outside or take a pray just to pray, in the street,
19 in my car. I have to pray. I go to bathroom, I
20 wash, and then I do my pray. I come at night.
21 Before I sleep I pray. I have to pray. This is
22 very very obligatory in my religion. If you are not
23 praying, you are not Muslim. It's part of your
24 religion to pray.
25     Five things in the Muslim they have to do

Page 35

1 it, to pray, to fast Ramadan, to do the Hajj if you
2 can, and to -- and to say (speaking in Arabic).
3     MR. GECKLE: You're going way too
4     fast, and plus he didn't ask you this. He
5     asked you how many times you pray.
6     THE WITNESS: There is five things to
7     be a Muslim. Okay, slow, pray, fast Ramadan.
8     MR. GECKLE: That's Ramadan, right?
9     THE WITNESS: Right, to fast Ramadan,
10 to pray the five prayers at least, this is
11 obligatory, and to do the Hajj, to do the Hajj
12 if you can. If you have money, you have to do
13 it. If you don't have money -- and to do the
14 Zakah, which is a donation.
15     MR. GECKLE: What's the last thing
16 there, the donation, what's it called?
17     THE WITNESS: The Zakah.
18     MR. GECKLE: How do you spell that?
19     THE WITNESS: Z-A-K-A-H.
20     MR. GECKLE: And H is H-A-J?
21     THE WITNESS: H-A-J, Hajj. And to
22 say -- and to believe in only one God, and
23 Mohammed is one of the prophets of God.
24 BY MR. GILLIAM-BROWNLEE:
25     Q. Okay. So you will pray every single

Page 36

1 day --
2    A. Yeah, if I miss it I'm not Muslim. I have
3 to pray.
4      MR. GECKLE: Let him ask a question,
5   and answer the question. You don't have to
6   explain everything.
7    Q. Would you pray alone?
8    A. If I had the chance to pray with people, I
9 will. If I don't have the chance to pray with
10 people, I pray alone. But either way. Like say I'm
11 working --
12    Q. Okay. Did you ever skip any prayers?
13    A. No.
14    Q. Okay. All right. Now I'm going to get
15 into your educational background, and you can tell
16 me about this -- you say that you are -- did you
17 attend any college or trade schools?
18    A. Yes. Yes.
19    Q. Which ones?
20      MR. GECKLE: Maybe we can do this in
21   sequence. How far did you go to school in
22   Egypt?
23      THE WITNESS: Okay.
24      MR. GECKLE: All right. And then
25   tell us what you did in Egypt, and tell us what

Page 37

1 you did when you moved to the United States.
2      THE WITNESS: Okay.
3      MR. GECKLE: Keep it in order. It
4   might be easier for you.
5    A. Okay. I finished my high school. And
6 then I went to, in Egypt to -- it's called civil --
7 Aviation Civil Institution, Aviation Civil
8 Institution. The Aviation Civilian Institution I
9 studied. In this Aviation Civilian Institution I
10 studied to be an aircraft engineer.
11    So I finished my aircraft engineering as
12 aircraft engineer for power plant and airframe for
13 air crafts. Okay?
14    Then after that, after I finished my --
15    Q. How long did you -- how long did you do
16 that? How long did you attend the Aviation Civil
17 Institution?
18    A. From '94 to '98. This is when I finished.
19    Q. Okay.
20    A. 1994 to 1998.
21    Q. Okay. And then after that you --
22    A. Then I traveled to United States. I came
23 in 1998 to United States, so I can -- because I want
24 to be a pilot. My mom, she told me that she wanted
25 me to be an engineer, but I like to be a pilot more

Page 38

1 than engineer. I love to fly airplanes.
2      So I came to the United States and I
3 studied -- first when I came to the United States, I
4 studied in Embry Riddle. I was there to do my
5 pilot, Embry Riddle, phonetically, University.
6      Then after that it was too expensive for
7 me. I studied for there for a little bit. Then it
8 was too expensive, so I moved from Embry Riddle. I
9 went to California.
10    Q. Okay. Before we leave, where was Embry
11 Riddle?
12    A. This was in Daytona Beach, Florida. This
13 is the first place I came. Then I moved to
14 California in Universal Air Academy.
15    Q. How long were you at Embry Riddle
16 University?
17    A. I can't recall. Months, but I can't
18 remember exactly. Months.
19    Q. So probably one semester? Would that
20 be --
21    A. Maybe something like that. I can't
22 recall. I'm not saying. Approximately.
23    Q. Okay. Thank you.
24    A. Then I went to Universal Air Academy in
25 California. And I finished my commercial pilot in

Page 39

1 Universal Air Academy in California.
2    Q. Where was that?
3    A. In El Monte, California. It's called El
4 Monte.
5    Q. And how long were you there?
6    A. I would say from '99 to 2000, like a year.
7    Q. Did you graduate with a --
8    A. I took my commercial pilot from there,
9 yeah. I finished from there.
10    Q. Okay. Have you had any other -- other
11 formal school or training?
12    A. No. That's my career, only pilot and
13 engineer. That's my -- aviation.
14    Q. So you haven't attended any other schools
15 since, or trade school, since 2000, or universities?
16    A. Are you talking about like courses or
17 something like that?
18    Q. Yes, any education, either a school or
19 trade school or --
20    A. Yeah. Yeah. I went back to Egypt after
21 2000. After I finished my education, I went back to
22 Egypt. I was working as both, as an engineer and a
23 pilot, both. And I was in Egypt Air. I took the
24 Airbus 320. You know, the Airbus 320? You talking
25 about education, right? You told me have you

Page 40

1  attended any classes. I told you, yes. I've been
2  doing a lot of studying in aviations, yeah.
3      Q. Okay. But that was just kind of a course
4  to learn how to fly a particular plane?
5      A. Yeah, like ratings. Like some -- I work
6  in the balloon, you know, hot air balloon. I was a
7  general manager over there, engineering, general
8  manager for the whole company. I was -- I did a lot
9  of study. Yeah, I did a lot of study.
10     Q. Earlier you mentioned that you were
11  attending school -- you were attending some type of
12  school right before you were arrested?
13     A. Yeah. I was in Gateway Aviation in
14  Allentown to do my CFI. CFI is Certified Flight
15  instructor, to work as a flight instructor in
16  Gateway Aviation. I took the deal with Bradley
17  Snyder, he's the owner of the school. And I told
18  him I do my CFI in your school, and you hire me as a
19  flight instructor, and he said yes. We got a deal.
20     So I began studying. I finished my two
21  written exams, which I said the CFI and the FOI, and
22  I was going for my practical, which is the last one,
23  but I got arrested.
24     Q. And how long were you at Gateway Aviation?
25     A. Right before I got arrested, like I say a

Page 41

1  month, like a month.
2      Q. Did you graduate with --
3      A. Two month.
4      Q. Did you graduate with your CFI?
5      A. I was having one more exam, but I got
6  arrested. I have only the practical test, and I got
7  arrested before that. That's the CFI. I didn't
8  finish it because of that.
9      If I want to do it, I have to repeat all
10  the exams again. It's like two month I say. Two
11  month. But the study tooks longer, like when I go
12  to him, like six months, like he tell me, finish
13  your exam, like six months. I went to him, I took
14  the deal.
15     So finish your study, take your -- so I
16  have to go home and study, first book, and then I go
17  finish it. Then I go home, I study the second book.
18  And then I do the FAA exam and finish it. And then
19  I go and begin flying.
20     I was flying for one month, beginning to
21  take my -- with my instructor to go to my test.
22  That's when I -- but I took the deal like before
23  that, months before that.
24     But I did my two tests, not in two months,
25  not in one month. I did my two tests for longer

Page 42

1  than that. You got what I mean?
2      Q. Yeah.
3      A. The last period I was attending in the
4  school is like a month, just to prepare to go to
5  my -- to my test, my practical test. This is when I
6  have to fly and view all the maneuvers with my
7  instructor, like go do the steep turns, sit with me
8  and tell me -- explain for me what the stall is,
9  explain for me what the spin is, explain to me what
10  is the weather like that, you can't fly in this,
11  what kind of clouds is dangerous, what kind of --
12  this is revision, just to prepare yourself.
13     Q. Okay. So did you say that there was a
14  course before that that you took or was --
15     A. Yeah, it's every book is different test.
16     Q. And how -- so is it a set schedule for how
17  long each book --
18     A. Yeah. The book depend on you. But the
19  book can take -- the book is over a thousand
20  questions. You have to study them and go and take
21  the test. And then another book, over a thousand
22  question. And then you go take the test. Then the
23  practical test, which they can ask you about
24  everything.
25     Q. So just -- so you studied the book kind of

Page 43

1  on your own; there wasn't an actual formal class?
2      A. Because I'm a pilot already, I don't need
3  nobody. You can take classes, you can take, but it
4  cost money. So I was trying to depend on myself
5  more, just to -- to --
6      Q. Okay.
7      A. I ask my instructor if I stuck with
8  everything, but I was doing self study.
9      Q. All right. So do you have any medical
10  conditions?
11     A. Not before I got arrested. I wasn't going
12  to any doctor or anything.
13     Q. You didn't have any -- you didn't have a
14  primary care physician; is that what you are saying?
15     A. No.
16     Q. Okay. So you didn't have any prior
17  medical conditions prior to being arrested?
18     A. No. I -- maybe I went to -- I don't
19  understand, what do you mean?
20     Q. Medical conditions, any ailments, any --
21     A. Like take your medicine and going to
22  doctor all the time and this stuff, right? No. If
23  you are talking about something happen, like say,
24  for example -- for example, I went to the hospital
25  because my hand got burned, or an accident happened

1 on my job, like I told you when I got accident in
2 Job Connection, yeah. But not like -- not
3 continuously. Like it's for one time, two time, and
4 that's it. No.
5     Q.  Okay.
6     A.  Like I'm not on medicine like now. Now
7 I'm taking mental medication every day. Every day I
8 have to take it. And when I don't take it, I got
9 stressed. Before I wasn't on medication. That's
10 what I want to explain to you.
11     Q.  So prior to you being arrested, you never
12 had any mental health diagnoses or anything like
13 that?
14     A.  No. I didn't take any medication.
15     Q.  Did you have any mental health diagnoses?
16     A.  I don't know this means.
17     Q.  Were you ever diagnosed with a mental
18 health issue?
19     A.  No. I don't -- I don't recall that.
20     Q.  Okay. Where did you -- so you say that
21 you didn't want to go to the hospital before for
22 your hand. Where did you go for that?
23     A.  I can't hear you. I can't understand.
24     Q.  You went to the hospital before when you
25 burnt your hand?

1     A.  No. No. I didn't burn my hand. One time
2 I was cooking, and I dropped something on my leg,
3 and I went to the hospital for that, like a dot of
4 oil splash on me, and I went for -- this is nothing,
5 they just give me a cream.
6     Q.  Do you know what hospital you went to?
7     A.  Huh?
8     Q.  Do you know --
9     A.  Yeah, it was in Allentown. It was on
10 Fourth Street, I think. I'm not sure. Fourth
11 Street, I think the one on Fourth Street. One on
12 Fourth Street, the hospital on Fourth Street,
13 Allentown. And they give me a cream. They say put
14 this cream on.
15        It was like oil splash, you know when the
16 oil splash on your skin and it burn you, like that,
17 something like that.
18     Q.  I understand. Have you ever been to any
19 other hospitals or any type of --
20     A.  I'm not sure. I can't recall. I'm not
21 sure. This is like -- I'm talking about four or
22 five years ago, like if I talk about. Before that,
23 you're talking about long time, so I can't recall
24 it. I'm not sure.
25     Q.  How many times have you been arrested?

1     A.  If you talking about arrests, I would say
2 like all together five times. But the convictions,
3 none except one simple assault long time ago. But
4 five-six times, I'm not sure. That's when I got
5 arrested a lot, because I used to have an ex
6 girlfriend, she used to accuse me a lot.
7        MR. GECKLE:  You don't have to
8     explain. He'll ask you. If he wants to know
9     why you were arrested, he'll ask you.
10        He asked you how many times you were
11     arrested. You said five?
12        THE WITNESS:  I'm not sure, five or
13     six times.
14     Q.  Five or six times, okay.
15     A.  Maybe four times.
16     Q.  When was the first time you were arrested?
17     A.  In Daytona Beach with my ex girlfriend.
18     Q.  Not your wife, but your ex girlfriend?
19     A.  She was an ex girlfriend. She was a
20 girlfriend at this time, yeah, but she's my ex.
21     Q.  So it was --
22     A.  At Daytona Beach she was my girlfriend.
23     Q.  Okay. When was that? When were you
24 arrested?
25     A.  When?

1     Q.  Yes.
2     A.  2011, 2010 or '11, I'm not sure.
3     Q.  Why were you arrested?
4     A.  She accused me.
5     Q.  What did she accuse you of?
6     A.  She accused me of a lot of things, a lot.
7 I went to trial and I win and everything get
8 dismissed. Do you want to know the charges?
9     Q.  Yes.
10     A.  The charges, she accused me -- one charge,
11 this was one charge, she accused me with aggravated
12 assault, sexual assault, burglary of her dwelling,
13 this was all one charge, kidnapping, kidnapping or
14 false imprisonment, something like that, and
15 violation of injunction.
16        That was all one charge. And I went to
17 trial. And they dismiss all my charges.
18     Q.  And that was in 2011?
19     A.  That was in 2011. And she said she don't
20 know me, and she lie, and -- I don't want to
21 explain, but everything was a lie. And after that
22 we been back together, and we're not together now.
23     Q.  Okay. The second time you were arrested?
24     A.  Me and her, we moved to Pennsylvania.
25 She's the same girl. And she arrested me in

Page 48

1 Pennsylvania again.
2    Q.   Miss Crystal Gad you are talking about?
3    A.   No, no, no, no, not Crystal Gad.  This is
4 my wife.  Crystal Gad you are talking about
5 marriage.  Crystal Gad was my wife; never get
6 arrested with her.
7         MR. GECKLE:  What was the name of the
8 girl that got you arrested?
9         THE WITNESS:  Maryam, M-A-R-Y-A-M,
10 E-Z-Z-A-T.
11 BY MR. GECKLE:
12   Q.   So Maryam Ezzat was the one who had you
13 arrested in 2011?
14   A.   Yeah, this was after my wife.  My wife,
15 Crystal, we never got arrested together.  Maryam
16 Ezzat is the one who got me arrested.
17   Q.   So now the next time you got arrested was
18 in Pennsylvania?
19   A.   Because of Maryam Ezzat.
20   Q.   When did that happen?
21   A.   That was in 20 -- not sure, 2013 maybe,
22 2014.  I'm not sure, 2013 -- something like that.
23 I'm not sure.
24   Q.   Okay.  So about 2012, 2013?
25   A.   Something like that.  I'm not sure.

Page 49

1    Q.   Why were you arrested?
2    A.   She accuse me with simple assault and
3 intimidation of the witness.  She's the one who come
4 to me and give me intimidation.  Anyway.
5    Q.   There were -- what was the result of --
6    A.   I took a plea, no contest.  I took a plea
7 just to get out of the jail.  I want to get out of
8 the jail, so they tell me, the lawyer came to me and
9 he said, you want to get out of the jail today, you
10 plead guilty.  I said I'm not going to plead guilty.
11 He said, okay, what about you plead no contest?  I
12 will leave today?  He said yes.  So I took it.  They
13 make me leaving the same day.
14        I was about to go to trial.  And the trial
15 was -- they did the -- the Judge I went to the Court
16 and I said to the Judge, I want to go to trial.  And
17 the lawyer get mad at me, and he said, what are you
18 doing, what are you doing.  And he took me.  I said
19 I'm going to trial.  Then he come to me in the jail
20 again, and he told me, why you don't want to --
21 you're going to stay another month.  I say I don't
22 want to stay another month, I've been in jail a long
23 time.  I was almost four months.
24        MR. GECKLE:  What county is it?
25        THE WITNESS:  Lehigh County.

Page 50

1    A.   So he told me, okay, you want to take the
2 plea, you are going to go on probation.  So I said,
3 I going to leave today?  He said yes.  I said okay,
4 and I left.
5    Q.   And the next time you were arrested, when
6 was that?
7    A.   This time.  This time.
8    Q.   This time was the --
9    A.   After this time, this time.  This time
10 when I got arrested.
11   Q.   So -- and so when were you arrested for
12 what you are in prison for now?
13   A.   Sorry, I --
14   Q.   When were you arrested for this?
15   A.   What date?  2017, when I got arrested.
16        MR. GECKLE:  I think it was 2016.
17        THE WITNESS:  2016 is the charge, but
18 I got arrested after trial in 2017.
19        MR. GECKLE:  You got arrested, but
20 you were out on bail.
21        THE WITNESS:  Ah, yeah.  2016, yes,
22 sir, you are right.
23 BY MR. GILLIAM-BROWNLEE:
24   Q.   2016?
25   A.   Yeah, they release me on ROR.

Page 51

1    Q.   Was that also in Lehigh County?
2    A.   No, that's this time.
3        MR. GECKLE:  Northampton County.
4        THE WITNESS:  Northampton County.
5    Q.   Okay.  And what were the charges?
6    A.   Simple assault and harassment.
7    Q.   Who filed the charges?
8    A.   My wife, Eva Fisher.
9    Q.   So you say that you were out on bail --
10 you were arrested in 2016, and then you were allowed
11 out on bail?
12   A.   I got arrested, the Judge released me on
13 ROR.  I left.  I went back.  He said no contact.  I
14 said can I go and pick my stuff.  I said that to the
15 Judge, can I go and pick my stuff, because my car is
16 at the house, everything is in Bangor.  He said yes.
17        I went back to the house.  I talked to my
18 wife.  I said -- my wife, actually when they
19 arrested me, she was kissing me when they putting
20 the handcuffs on me.
21        Anyway, I went back to the house, I talked
22 to my wife, and I told her, the Judge said no
23 contact, so either me or you have to leave.  She
24 said I'm from Allentown, and I don't drive.  So if
25 you leave, I'm not going to be able to do nothing.

Page 52

1 Take me to my mom in Allentown.
2 So I said, okay, pick your stuff. She
3 picked her stuff. I took her to Allentown, and I
4 came back to Bangor. When I came back to Bangor, I
5 find the police knocking on my door. What are you
6 doing here?
7 I said I know there is no contact. My
8 wife is not at house. They said, the Judge evacuate
9 you from the residence. You can't be in here.
10 So I said, okay. So I packed my stuff,
11 and I left the house too.
12 So both of us left Bangor. I went to live
13 in Hamilton Street, and she went to live with her
14 mother.
15 Q. Okay. And then you were rearrested in
16 2017?
17 A. No. I was in jail since then. Oh, are
18 you talking when I went to trial? The Judge revoked
19 my bond, my bail, and she arrested me in the same
20 day in the trial.
21 Q. And that was in June of 2017?
22 A. That was June 2017.
23 MR. GECKLE: That was for the perjury
24 and the victim intimidation and all of that
25 stuff.

Page 53

1 THE WITNESS: That was in two
2 thousand -- sorry, sir?
3 MR. GECKLE: That was in 2017, right?
4 Isn't that what the Judge had you arrested for,
5 the victim intimidation, and the perjury and
6 all that?
7 THE WITNESS: No. No, sir. What
8 happened in 2017, no. They give me the perjury
9 and that after I lost the trial for the simple
10 assault. They revoked my bond. The Judge
11 revoked my bond, and she arrested me in the
12 same day.
13 Then when I went to jail, I called my
14 wife. I told her to tell my friend David to
15 take my car from the courthouse. So that was
16 from the jail. When I -- after I got arrested.
17 And my wife put money on my -- on her phone so
18 she can accept my calls.
19 And my wife told me, look like I have
20 to do something. I will go to DA and tell them
21 what the fuck is my husband doing in jail? And
22 she told me the DA is racist, I looked over his
23 Facebook.
24 And she told me -- I told her I'm not
25 going to call you, not waste your money. She

Page 54

1 said no, no, no, I want you to call me, I want
2 you to call me, you don't know how much money I
3 put on my phone so you can be able to call me.
4 And I told her I will -- I don't --
5 if you don't want to meet with me, that's fine
6 with me. She said no, no, I love you, I want
7 to be with you. I told her that I'm trying to
8 send her some money, because when I got
9 arrested, I had $300 with me, or
10 200-and-something.
11 So I told her I would send you some
12 money, but the lieutenant said that you put a
13 PFA on me, so I cannot send you nothing.
14 She said I didn't put a fucking PFA
15 on you, that's a lie.
16 So what happened is that she was -- I
17 would go, I would hug you, I would do that, I
18 would do this.
19 Anyway, I find them -- because when I
20 was outside in the street, my wife send me a
21 letter saying that she wanted to drop the
22 charges, and that I never put my hand on her.
23 And she sent me this letter from Allentown to
24 the address in Bangor, so she can help me in
25 dropping the charges.

Page 55

1 I took this letter, I gave it to my
2 lawyer at this time. The lawyer gave it to the
3 DA. The DA took the Judge -- the DA took this
4 letter, and he give me intimidation of the
5 witness because of this letter. How I
6 intimidate my wife, if she sent it to me by
7 mail? I don't know.
8 They give me these charges while I'm
9 in jail, the intimidation and the perjury. The
10 perjury is because he asked me, where is your
11 wife. I said I don't know. He give me perjury
12 for that. He give me two years because I said
13 I don't know.
14 BY MR. GILLIAM-BROWNLEE:
15 Q. First I want to go back to the simple
16 assault. Where were you arrested, the physical --
17 A. In Bangor.
18 Q. You were arrested in Bangor?
19 A. I was in Bangor.
20 Q. At?
21 A. 42 Broadway, Bangor.
22 Q. So your wife had called the police on you
23 at that location?
24 A. I think so. I'm not sure what should she
25 do. I was at work, but she went to the police

Joint Appendix 0180

Page 56

1  station, she called them.  She contact the police at
2  this address, yeah.
3      Q.  Is this the probable cause?
4          (Mr. Geckle hands a document to
5      Mr. Gilliam-Brownlee.)
6          MR. GECKLE:  You are certainly
7      entitled to ask him, but if you are just trying
8      to get to the bottom, that explains everything.
9          THE WITNESS:  They give me two years
10     for saying I don't know.
11     Q.  All right.  Sorry, I'm trying to make sure
12 I'm back on track.  All right.  So have you ever
13 threatened or -- a correctional officer or a police
14 officer?
15     A.  Threaten a police officer?
16     Q.  Or a correctional officer?
17     A.  No.  No.  I never threatened anybody.
18     Q.  Okay.  Do you understand what the criminal
19 charge of perjury is; correct?
20     A.  Yes.  Perjury is to lie under oath; right?
21     Q.  Yes.
22     A.  No.  Yes, I understand that.
23     Q.  Okay.  And have you ever been convicted of
24 perjury?
25     A.  Right now they convicted me of perjury,

Page 57

1  but I didn't -- I didn't commit perjury.  I know I
2  didn't commit perjury, but they convicted me.  They
3  convicted me of a lot of things I didn't do it.
4  They can convict me -- they can say that my name is
5  Michael, while my name is Ahmed.  They can do
6  anything they want.
7          MR. GECKLE:  Listen to the question
8      and try to answer the question.  All right.
9      Q.  Okay.  So you were convicted of perjury,
10 but you say that you did not commit perjury?
11     A.  No.
12     Q.  And that was the -- that's why you are in
13 prison now is because you were convicted of perjury?
14     A.  Of all those charges.
15         MR. GECKLE:  Amongst other things.
16         THE WITNESS:  Sorry?
17         MR. GECKLE:  He asked why you are in
18     prison now.  And I said the perjury is part of
19     it, but that you were also convicted of a
20     simple assault, and you were convicted of, I
21     think, witness intimidation.
22         THE WITNESS:  Intimidation and, yeah.
23     Q.  Okay.  So you were arrested in June of
24 2017, and you were taken to --
25         MR. GECKLE:  2016, I think.  I beg

Page 58

1  your pardon; I'm sorry.
2      Q.  Yeah, 2017, and you were taken to
3  Northampton County Prison?
4      A.  They revoked my bond on the trial, June of
5  2017, yes.
6      Q.  And how long were you at Northampton
7  County Prison before you were transferred to, I
8  believe, Waymart?
9      A.  They transfer me to Graterford in the
10 beginning.
11     Q.  Graterford, okay.
12     A.  Then to Camp Hill, and then to Waymart.
13 I've been here from June -- I've been -- I'm not
14 sure, but approximately I think April 2018.  Yeah.
15 April 2018, this is when they took me to upstate.
16     Q.  Okay.  And so from -- so you were at
17 Graterford from April 2018 until when?
18     A.  No.  Graterford just -- just a
19 classification.  You go to Graterford, you stay for
20 a few month, and then you go to Camp Hill, you stay
21 a few months, and then they take you to the home
22 jail or Waymart is.
23         But I can't recall how many month.  It's
24 like I would say two months in Graterford and
25 another three months in Camp Hill, and the rest in

Page 59

1  Waymart.  Like two and two, and the rest in Waymart.
2      Q.  You came again in April of 2018?
3      A.  Yes, approximately.  This is not -- yeah,
4  it's not exactly, because I can't remember how many
5  months, but months.
6      Q.  So about two months, two or three months
7  in Graterford, then two or three months in Camp
8  Hill, and then you are at Waymart?
9      A.  Yes, sir.
10     Q.  How long were you at Waymart before you
11 were transferred back to Northampton County Prison?
12     A.  I came in at this -- are you talking about
13 this time, when I came this time?
14     Q.  Yes.
15     A.  Because I came in right before.
16         MR. GECKLE:  You first came here in
17     June of 2017, after you got convicted of the
18     assault.
19         THE WITNESS:  Yes, sir.
20         MR. GECKLE:  They sent -- the Judge
21     said you're going to jail, that was in June of
22     2017; right?  And you stayed here until April
23     of 2018.
24         THE WITNESS:  Yes, sir.
25         MR. GECKLE:  Then you got sent

Page 60

1  upstate.
2        THE WITNESS:  Yes, sir.
3        MR. GECKLE:  In April of 2018.
4        THE WITNESS:  I came this time --
5        MR. GECKLE:  Is that right?
6        THE WITNESS:  Yes, sir.
7        MR. GECKLE:  Then you came back --
8  you've been back here since November of 2018.
9  So you've been back here --
10        THE WITNESS:  No.
11        MR. GECKLE:  Well, I'm looking at the
12  booking form.
13        THE WITNESS:  No.  I came here right
14  before.  I came here in November, and I left in
15  January.
16        MR. GECKLE:  Isn't that what I said,
17  you came back here in November?
18        THE WITNESS:  I came back in
19  November, and I left in January, I think, yes.
20  And then I came back here in May, this time.  I
21  stayed there from January until May.  I came
22  here back on May -- May maybe 2nd or 1st or
23  3rd, something like that, and I'm still here,
24  again for my charges.
25

Page 61

1  BY MR. GILLIAM-BROWNLEE:
2      Q.  Okay.  So now we are going to get into
3  kind of the incidents in your complaint and get more
4  details about that.  So when you were arrested
5  originally and taken to Northampton County Prison,
6  where were you housed?
7      A.  I'm sorry?
8      Q.  Where were you housed?  When you were
9  arrested in June of 2017 --
10        MR. GECKLE:  That's when he was
11        convicted.  He went to trial, he got convicted,
12        and the Judge said you're going to jail.
13        THE WITNESS:  Oh, they took me to the
14        intake.  And from the intake they stayed like
15        two-three days, and then they put me in B2, B2.
16        I was in B2 Block.
17      Q.  How long were you on B2 Block?
18      A.  I'm not sure.  I'm not sure.  A month or
19  two.  Two month, something, I'm not sure.  I'm not
20  sure.  I don't -- I can't say, even approximately.
21  Like two months probably.  I'm not sure.
22      Q.  Can you describe the cell for me that you
23  were being housed in?
24      A.  Yes.  It's a cell, eight person in one
25  cell, that's eight -- four beds, each bed -- you ask

Page 62

1  about the size?  You want the size?  I don't
2  remember.  But it's like four beds, each bed two
3  bunks, and it's eight people in one cell and one
4  toilet.  One cell for the eight people, one toilet
5  and one sink.  That's the cell.
6        MR. GECKLE:  That's on B Block;
7        right?
8        THE WITNESS:  Yeah, that's in B2,
9        sir.
10  BY MR. GILLIAM-BROWNLEE:
11      Q.  Okay.  So did you have any cell mates?
12      A.  I had all seven.
13      Q.  Do you have their names?
14      A.  No, I don't know the names.
15      Q.  You don't remember any of the names?
16      A.  No, I don't remember any of the names.
17      Q.  Okay.
18      A.  I don't remember the names.  It's eight
19  people.  And these eight people is like I would say
20  some of them change it every two days.  Some people
21  go on bails, then other people come.  I can't
22  remember the names.
23      Q.  Okay.  And so eventually you were
24  transferred off of B Block; correct?
25      A.  Yeah.  I was in B Block, you mean?  Right?

Page 63

1      Q.  As an individual, you were transferred off
2  of B Block?
3      A.  Off, what's off it mean?
4        MR. GECKLE:  They took you somewhere
5        else.
6      A.  They take me from B Block to somewhere
7  else?  That's what -- Yeah.  Yeah.
8      Q.  Where did they take you?
9      A.  They took me to the Gallery.  Yeah, they
10  took me to the Gallery.  Yes.
11      Q.  Okay.
12      A.  And then from the Gallery, they took me to
13  K Block.  And then from K Block, they took me to the
14  E Block.
15      Q.  Okay.  Let's stay with the Gallery first.
16  So where -- does the Gallery have a block
17  designation?
18      A.  What's designation mean?
19      Q.  Like B Block, C Block, D Block, does it
20  have a --
21      A.  As they say G, or Gallery, G Block or
22  Gallery.  It's the same.  It's called the Gallery.
23  They call it the Gallery or G Block.
24      Q.  And can you describe the cell that you
25  were being housed in when you were there?

Page 64

1   A.   Four people, no air condition, very hot
2   weather in the summer, and one sink, and one toilet
3   for the four people.  And that's it.  Locked all
4   day, out for 20 minutes to shower at the time I was
5   there, or a phone call.
6   Q.   So did you have -- you didn't have any --
7   how much time did you have out of the cell?
8   A.   Twenty minutes, either shower or phone
9   call, that's it.  There was no tablet.  At this time
10  I was there, the time I'm complaining about, I never
11  seen the tablet.  There is no tablet at this time.
12      MR. GECKLE:  You never seen the what?
13      THE WITNESS:  Tablet, you know,
14  something they make it like a tablet, like the
15  iPad, they make it.  You can have it in your
16  cell.  But at this time there was no tablet.
17  Q.   How much time did you have out of your
18  cell when you were being housed on B Block?
19  A.   In B Block when I got arrested this month
20  or something like that?  You go out in the morning.
21  You only be in your cell for like -- they only lock
22  you for like four hours or three hours a day.  The
23  rest of the day you are out, like -- I would say
24  four hours a day maximum, approximately.
25      But the rest of the time, you are out.

Page 65

1   You can go take a shower.  You can -- like two --
2   you locked from I would say exactly you locked from
3   one time in the morning, I say 12:00 o'clock maybe
4   to 2:30, and then you locked again from 5:00 o'clock
5   to maybe 6:30 or 7:00 o'clock, something like that.
6   Q.   Okay.
7   A.   And then from 9:30 or 9 o'clock, you are
8   locked in the morning to 6 o'clock.
9   Q.   Do you remember any of your cellmates
10  names when you were being housed on G Block?
11  A.   In Gallery?  It was a short time in the
12  Gallery.  It wasn't that long.  It was like a week
13  or two weeks.  I don't remember how many; I can't
14  recall.  But it was a short time.  And I don't
15  recall names too.  I don't recall names.
16  Q.   Okay.  So you would say less than a month?
17  A.   It was a long time.  I can't recall names.
18  Q.   Are you saying you were there for less
19  that a month?
20  A.   I think so, yeah, less than a month.  I'm
21  not sure.  It was a short time.  All together, I
22  been arrested in April, and I went to the E Block
23  in -- I think in October, or in September, I'm not
24  sure.  So all together, from B Block to the Gallery
25  to K Block, if you count it --

Page 66

1   Q.   Well, let's take them one at a time.  So
2   that's pretty much G Block or the Gallery.  So after
3   the Gallery, you were transferred to K Block?
4   A.   Yeah, but I don't recall how much time I
5   was in the Gallery.  I can't recall it.
6   Q.   I think you --
7   A.   A short time, but I don't recall how long.
8   Q.   Less than a month is a fine answer.  We
9   can --
10  A.   I'm not sure from that too.  Maybe maximum
11  a month.  I'm not sure.  Okay.
12  Q.   Got it.  So now K Block?
13  A.   Yes, sir.
14  Q.   After -- after the Gallery, you were
15  transferred to K Block.  Can you describe the cell
16  that you were being housed in?
17  A.   It was two people in a cell.  Actually
18  they move me -- yeah, from Gallery to K Block, yeah
19  I -- I moved to there, and it was two people in a
20  cell, me, an old man.  And I remember this guy name.
21  His name was Brian Dewitt.  He was an old man.  He
22  was an old man and I don't never have any problem
23  with him.  I didn't have no problems with him.
24      He was on heroin all the time outside, so
25  he was sleeping most of the time.  And he was old.

Page 67

1   And I never -- I never get in an argument with him.
2   I be with him in the cell in K Block, and that's it.
3   Q.   Okay.  So --
4   A.   And other people, because he was the
5   longest one with me, I mean.  But there was people
6   before him, but I never had problems with anybody.
7   There was a young guy who was there too.  He said
8   they call him Sonny, but I don't know what's his
9   name, his real name.  He left too.  He stayed a week
10  with me.
11      There is another guy too, stay with me.  I
12  never have any problem with anybody.  They say they
13  call him Sonny, but that's not his real name,
14  because he was blond, his hair is blond, and his is
15  white, and his eyes very blue, so they call him
16  Sonny.  But what is his name, I don't know.
17  Q.   Okay.  And that was all on K Block;
18  correct?
19  A.   That was all on K Block, yeah.
20  Q.   And did you have -- so the cell had a
21  sink -- correct -- and a toilet; is that correct?
22  A.   Yeah, sink and toilet.
23  Q.   Okay.  So after K Block, were you
24  transferred anywhere to any other block at the
25  prison?

Page 68

1    A.   E Block.
2    Q.   And when were you transferred to E Block?
3    A.   When?
4    Q.   Yes, about how long after K Block?
5    A.   September or October, I'm not sure.  About
6  September or October.  Around this time, September
7  or October, 2017.
8    Q.   And can you describe B Block?
9    A.   I'm saying approximately, because, you
10 know, I'm not like -- I don't have it on computer
11 like --
12   Q.   We understand that.  It's -- and, again,
13 it's totally fine to approximate.
14   A.   You can charge me for perjury for that
15 because they charged me for saying I don't know.
16 They give me two years, you know.  I'm scared now,
17 you know.
18   Q.   So E Block, how long were you there?  How
19 long --
20   A.   Since this date, until I left in April,
21 2018.
22   Q.   So you spent the rest of your time on E
23 Block?
24   A.   Yeah, the whole time, from this time to --
25   Q.   Can you describe E Block for me.

Page 69

1    A.   E Block, that's where I am right now.
2  It's -- it's sealed block.  Like the doors are very
3  thick.  The doors are very thick.  It's not like
4  even the Gallery or the K Block or anything.  The
5  doors are very thick and glass, small window, glass
6  window on the door.  Very thick glass.
7        So when they close the door, even you
8  loud, your voice, and you scream, somebody will hear
9  you like that (indicating a whisper).  It's like
10 that in your cell.
11       I was by myself most of the time.  Some
12 people, even the disciplinaries, they put them two
13 guys in the cell so they can talk.  I was by myself
14 most of the time.  Like if I stayed there for seven
15 months, I would say five months of them are -- I'm
16 not sure, or four, I'm not sure, but most of the
17 time I was by myself.
18       No -- in my cell, I don't know about the
19 other cells, but I'm sure it was different.  I even
20 complain about the maintenance.  I said there is no
21 hot water.  And it was very cold.  I wake up in the
22 morning, I want to pray the Fajr at four o'clock or
23 five o'clock in the morning, the water is freezing
24 in the snow time.
25       And at this time when I was -- now they

Page 70

1  change it a lot.  But when I was there at this time
2  in E Block, the air condition was even more colder
3  than here, and in the snow time.
4        And I wake up in the morning, I try to
5  make the wudu, it's freezing.  I called the CO, man,
6  I need hot water.  All the other cells, I talked to
7  them, like, like, please, CO, I need hot water.  I
8  can't put my hand even under the sink.
9        Okay.  He leave me.  He didn't even
10 answer.  He neglect me and go.
11       I see the maintenance guy, I told him,
12 please, I need -- he look at me like I'm crazy or
13 something.  I keep trying to talk to them, nobody
14 want to talk to me, neglecting me, sending requests
15 to Mr. Harman, why I'm in E Block, I didn't do
16 anything wrong.  I never have a fight with anybody.
17 I never have a disciplinary.
18       We're going to look.  He send me back the
19 first request.  He said reclassified in 45 days.
20       After the 45 days, I keep sending him,
21 okay, the 45 days.  I'm sorry, you want to say
22 something?
23   Q.   Yeah.  And we'll get further down the line
24 with all of that stuff, but let's focus on the cell
25 conditions.  So you had -- so you were in that cell,

Page 71

1  you were mostly alone?
2    A.   The cell is sealed, like I told you.  It's
3  very freezing.
4        MR. GECKLE:  Listen to his question,
5    and answer his question, please.
6        THE WITNESS:  Okay.  I'm sorry.
7    Q.   So you were mostly alone during your time
8  in E Block?
9    A.   Yes.  Mostly, yeah.
10   Q.   Did you have any cellmates?
11   A.   Yeah, I have some cellmates.  They came
12 and they left.  Like one of them name is -- I don't
13 remember the -- the whole names, but I can give you
14 some of the names.  But one -- like -- a guy who got
15 a murder charge.  He killed his stepson.  His name
16 is Long.
17   Q.   Just Long, as like his last name?
18   A.   That's all that I can -- that's what I'm
19 saying.  I can't give you the full name, but I can
20 give you part of it.  Part of his name is Long.  But
21 what is the other part, I don't remember.
22   Q.   Okay.  Any other cellmates?
23   A.   Frank Hanuszak, Frank Hanuszak, he was for
24 rape charge, something like that.  And I have a
25 simple assault, and they segregate me with these

Page 72

1  people.  I don't know why.  So he has a rape charge.
2  And the other one have a murder charge.
3       And one guy called Collin Rice, Collin
4  Rice, maybe like a day or two, that's it, he stay
5  with me.  Because his dad called, and they move him
6  right away because his dad know Mr. Harman, and he
7  know people.
8       They moved him, they moved him like within
9  a day or two maximum, because his dad knows
10  Mr. Harman, in the jail.  He called him, and
11  Mr. Harman came to him like personally.  And he told
12  him, your dad called me, where do you want to be.
13       He said I want to be in the Gallery,
14  because I have friends over there.  He moved him to
15  the Gallery in the same day.
16       I been there months trying to move.
17    Q.  Okay.
18    A.  Collin Rice.  Frank Hanuszak, and what's
19  else, Long.  And another guy, old man, he was also
20  doing fentanyl in the street.  He was like -- he was
21  messed up, messed up completely.  His name is Luis
22  Cuevas, Luis Cuevas.  He's Puerto Rican.
23    Q.  Okay.  So when you --
24    A.  This is the people I recall them, yeah.
25    Q.  Okay.  So when you were on B Block, and

Page 73

1  you were moved, do you know why you were moved from
2  B Block to the Gallery?  I'm sorry.
3    A.  I don't know.
4    Q.  You don't know?
5    A.  They never give me any explanation for
6  anything, even when I was in E Block.
7       MR. GECKLE:  Listen to his question.
8  Answer his question.
9    Q.  Okay.  So you don't know why you were
10  moved from B Block to the Gallery?  And you don't
11  know why you --
12    A.  Like they give me an answer for that?  You
13  want to tell me like they give you why you move?
14  No, nobody give me an answer.
15    Q.  Okay.  Even if you don't -- even if they
16  didn't give you an answer, if you know if you had
17  any issues with anyone, did you have any issues with
18  anyone on B2, when you were in B2?
19    A.  Are you talking about fighting or
20  problems?  No.  No, no fighting.  Maybe you talking
21  about like if some -- everybody there, you are eight
22  people in the cell, there's a lot of inmates in the
23  block, we talking all the day when some things
24  happen.
25       But if you are talking about like -- I

Page 74

1  don't know what you are talking about.  Issues, like
2  what kind of issues?
3       Like some people say stuff, and you can
4  say, for example, to the CO, this guy is telling me
5  that.  But it's not like issue that can make you
6  move.  It's just like, please, take him away from me
7  or something like that.  This is happen all the
8  time.
9       But not fighting.  I never fight with
10  anybody.  I never have any problems, anybody to
11  fight.  Like say, for example, somebody tell me I
12  don't like you, or you understand what I mean?
13       Or I will -- I will -- man -- no, it's
14  criminal people.  You are living with criminal
15  people.  They can say a lot of things.  And you can
16  say to the CO, please, I want him to be away from
17  me, he is telling me that.  That doesn't mean that
18  you have a issue with somebody.  You understand what
19  I mean?
20       I don't have no issues, but maybe, yeah,
21  maybe it's all the time.  We are staying there and
22  people talking.
23    Q.  Okay.
24    A.  But I never fight.  I never have any
25  problems with anybody.  Maybe if I -- if I don't

Page 75

1  like something, I say to the CO, that's all.  I
2  don't know, maybe they waiting for me to say
3  anything, just to -- to hurt me or to give me hard
4  time.  I don't know.
5    Q.  Okay.  I'm going to -- I'm going to mark
6  this as -- like as Gad 1.
7    A.  What is this?
8       MR. GECKLE:  He's going to show it to
9  you.
10       MR. GILLIAM-BROWNLEE:  That's the
11  right one.  I'm sorry for not being completely
12  organized.
13       (Exhibit Gad 1, Incident Report dated
14  June 29, 2017, was marked for identification.)
15  BY MR. GILLIAM-BROWNLEE:
16    Q.  What I'm putting in front of you has been
17  marked as Gad 1.
18       MR. GECKLE:  Incident Report dated
19  June 29th, 2017.  All right?
20       THE WITNESS:  Yeah.  This is --
21       MR. GECKLE:  Hold on.  He didn't ask
22  you a question yet.
23       THE WITNESS:  Okay.
24  BY MR. GILLIAM-BROWNLEE:
25    Q.  So this is an Incident Report dated

Page 76

1 June 29th, 2017, regarding a fight between you and a
2 fellow inmate?
3    A.   Uh-huh.  Okay.
4    Q.   Do you have any knowledge of this
5 incident?
6    A.   Yes.
7    Q.   Okay.
8    A.   A --
9         MR. GECKLE:  He hasn't asked you a
10 question yet.
11        THE WITNESS:  Yes.
12    Q.   Can you describe to me what happened in
13 this incident?
14    A.   Yeah, I can describe for you.  This
15 inmate -- I remember that now.  He has -- he told
16 me -- and I said that to the lieutenant,
17 lieutenant -- let me tell you the lieutenant name.
18 And that's why he got in the hole.  I didn't go to
19 the hole, because I didn't fight him.  He fight me.
20        What happened is that this inmate, he told
21 me, Muslims are like black people in the past, they
22 are like slaves here.  That's what he said.  He told
23 me Muslims are like black people in the past; they
24 are like slaves here in the United States now.
25 That's what he said.

Page 77

1        So I told him, man, stop it.  So I find
2 him telling me, fuck you, pushing me and fighting
3 me.  CO Holmes came and he saw that.  They took us
4 out of the cell in handcuffs.  They asked me what
5 happened.  I told the lieutenant.  His name is
6 Lieutenant Lamont.  I think Lamont.
7        He said -- I told him he told me that.
8 And I told him to stop it.  So he put his hand on
9 me, and he hit me.  So the guy said, yes, I hit him,
10 like that.  I punch him in the face.
11        So Lieutenant Lamont said so he didn't do
12 nothing, Gad didn't do nothing, he didn't do
13 anything.  Take Gad back to his cell and take this
14 guy to the hole.  That's what happened.  I didn't
15 have nothing.  I didn't do nothing.
16        MR. GECKLE:  Who got taken to the
17 hole?
18        THE WITNESS:  The guy who fight me,
19 and he told me that.  He took him to the hole.
20        MR. GECKLE:  I just asked you, it
21 wasn't you that went to the hole; it was the
22 other guy?
23        THE WITNESS:  Exactly, sir.  Yes,
24 sir.
25    Q.   Did you have any other issues with anyone

Page 78

1 else?
2    A.   I told you, I have no issues.
3    Q.   Did you have any other issues with anyone
4 else while you were on B Block?
5    A.   No.
6    Q.   Okay.  So how long after this incident
7 were you moved to --
8    A.   I stayed in B Block after this incident I
9 would say like maybe a month -- I can't remember
10 time.  And it's talking about two years.  I can't --
11 I'm not sure.  But I stayed for a time over there.
12 How long I can't remember.  And they keep
13 complaining, he's doing --
14        MR. GECKLE:  He asked you how long
15 you were there.
16        THE WITNESS:  So I'm not sure.
17        MR. GECKLE:  If you don't remember,
18 then that's the answer.
19        THE WITNESS:  I don't remember.
20 BY MR. GILLIAM-BROWNLEE:
21    Q.   Okay.  So after you were moved to B Block,
22 then you were moved to the Gallery.  Did you have
23 any issues with anyone at the Gallery, on the
24 Gallery?
25    A.   No, except complaining about me praying

Page 79

1 too, and complaining about me doing wudu, and that
2 my cellies don't like that.  And he's waking up us
3 in the morning, he's praying in the morning, he's
4 doing that.  That's the only things.
5        But I never have no problems with nobody.
6 We were good together, but they don't like the way
7 that I'm praying.  They didn't like that I'm
8 praying.  They didn't like that I'm doing wudu in
9 the sink, washing my hands, my feets, my face.  I
10 can't -- the Gallery is officially -- the doors are
11 closed the whole day.  What can I do?
12    Q.   When you say they, you mean --
13    A.   My cellies.
14    Q.   Your cellmates?
15    A.   My cellmates.  And they complain to the
16 COs.  The COs, they don't say no.  They don't say,
17 he has to do his wudu.  They don't advise them that
18 this guy is supposed to pray.
19        They talk to me that I'm not supposed to
20 do that.  The CO is telling me you can't do -- you
21 wait until you go to the shower.
22        How I going to do my wudu in the shower if
23 the door is locked?  How I going to go to the shower
24 and pray?  I have to pray.
25        So you can't do it.  And the cellies, when

Page 80

1 they say that in front of them, they think that they
2 are right, that I don't have the right to pray.
3          They talk to the CO.  CO, he wash his feet
4 in the sink.  He wash his face in the sink.  He
5 is -- man, I can't move in the cell is too small, he
6 is standing and praying, I can't move, man.
7          He can move, but they are just trying to
8 find anything.  Because I take a small corner just
9 to pray.  I was sometimes praying on my bed.
10         But, anyway, the CO come to me.  Gad, you
11 can't do that.  Can't do what, sir?  You do wudu in
12 the shower.  Man, but the cell is locked, how I
13 doing wudu in the shower?
14    Q.   So it sounds to me that you were saying
15 that you had issues on the Gallery because people
16 didn't like the fact that you were praying there?
17    A.   Exactly.
18    Q.   Other inmates didn't like the fact that
19 you were praying?
20    A.   Exactly.  Some people, they told me, you
21 have to stop this shit, man.  You should stop this
22 shit now.
23    Q.   And then you were -- due to that you were
24 moved off of the Gallery to --
25    A.   The Gallery to -- I talked to the CO.  I

Page 81

1 told him that, yeah.  To K Block.
2    Q.   -- K Block?
3    A.   Yes, sir.
4    Q.   And did you have any issues with anyone on
5 K Block?
6    A.   I don't have no -- like I told you, as me,
7 maybe people don't like what I'm doing when I do the
8 wudu.  Even I used to do sometimes the wudu and --
9 in the bathroom, in the -- there's a big bathroom in
10 K Block, a big bathroom.  It's like a shower and a
11 sink.  When I used to do my wudu, they didn't like
12 the fact that I'm doing the wudu when they see me
13 over there doing the wudu in the sink, even in the
14 shower.
15         They say you have to do it under the
16 shower, like you are taking a shower.  So they kept
17 complaining about that.  They didn't like the fact
18 that -- I don't know why, but people didn't like
19 that I'm praying, or this make them problems.
20         And also the COs was -- was on their side,
21 like you have to do it in the shower.
22    Q.   Okay.  Did you have any issues with -- so
23 you had issues with your other --
24    A.   Just because of my praying.
25    Q.   -- inmates on K Block; correct?

Page 82

1    A.   Sorry?
2    Q.   You had issues with other inmates on K
3 Block?
4    A.   I don't understand what you mean by
5 issues.  Like fighting with me or something like
6 that?
7          MR. GECKLE:  Arguing, fighting.
8    Q.   Arguing, fighting, any --
9    A.   No, they go and talk to the COs.  They
10 don't talk to me.  They talk to themselves.  Like
11 sometimes when I'm walking, they talk like they --
12 they is throwing words on me, like you have to stop
13 this shit, man, like some kind like that.
14         But they don't talk to me, like you can't
15 pray.  You go and talk to the CO.  And they find the
16 CO coming and complain to me, you have to do it in
17 the shower.  So I know that somebody talk.  But who
18 is this?  I don't know.
19         Like I want to find the CO coming and talk
20 to me, I can't say specific person.  I know that
21 some people complaining.  When I find when I'm
22 walking somebody is throwing word, you got stop this
23 shit, man.  When I'm praying, I'm praying.
24         (A brief recess was taken at 2:11 p.m.)
25         (The deposition resumed at 2:13 p.m.)

Page 83

1          MR. GILLIAM-BROWNLEE:  We will mark
2 this as Gad 2.
3          MR. GECKLE:  This is an in Incident
4 Report from October of 2017.
5          (Discussion held off the record.)
6          (Exhibit Gad 2, Incident Report dated
7 October 17, 2017, was marked for
8 identification.)
9          MR. GECKLE:  Mr. Gad, we are looking
10 at the Exhibit that was marked Gad 2.  It
11 involves an incident that occurred on
12 October 17, 2017, on K-Tier.  It was reported
13 by CO VanArsdale.
14         And it's a description of the
15 incident is as follows:  I was asked by the
16 runner for 27 request slips.  I inquired as to
17 why and was informed everyone on the tier
18 wanted inmate Gad removed from K-Tier.  Gad is
19 being accused of causing multiple disturbances
20 with the other residents.  It was also said
21 having Gad on the tier could potentially cause
22 a physical altercation in the near future for
23 the tier's patience with Gad was getting thin.
24 I informed the shift supervisors, and
25 Lieutenants Ackerman and Werley told me to move

Page 84

1  him to E-Tier as an administrative segregation
2  inmate.
3          THE WITNESS: Okay. So what does
4  this have to do with me?
5          MR. GECKLE: He's going to ask you a
6  question now.
7  BY MR. GILLIAM-BROWNLEE:
8      Q. Okay. So based on that account, you were
9  having issues with the other inmates on K-Tier.
10         MR. GECKLE: That's not a question
11  yet.
12         THE WITNESS: Okay. What are you
13  saying?
14         MR. GECKLE: Shh, let him ask a
15  question.
16     Q. Do you have any recollection of that?
17     A. No.
18     Q. You have no recollection of having any
19  issues with people on K-Tier?
20     A. They -- like I told you. Can I answer?
21  No.
22         MR. GECKLE: You did answer. You
23  said no. I mean this does not refresh your
24  recollection of there being incidents with
25  other inmates on K-Tier?

Page 85

1          THE WITNESS: No. No.
2          MR. GECKLE: Okay.
3      Q. So that also in the case that you were
4  moved from K-Tier to E-Tier. Do you recall being
5  moved from K-Tier to E-Tier?
6      A. Yes, sir.
7      Q. That is dated -- I'm sorry.
8          MR. GECKLE: October 17th.
9      Q. October 17th. Do you recall that that was
10  around the time that you were moved from K-Tier to
11  E-Tier?
12     A. Yeah.
13     Q. Okay. Now, on E-Tier, did you have any
14  issues with any other inmates?
15     A. I think Long -- Inmate Long, the one
16  who -- the murder one, the one who have the murder
17  charge, he used to fart in my face while I'm
18  praying. And this is happened. And he said that to
19  the CO, and the CO told him you can't do that. And
20  they move him from my cell.
21         While I'm praying, he used to stand up and
22  fart in my face while I'm praying, Inmate Long. And
23  he complained. I think it's been written, and you
24  have a paper saying that. And he told -- the CO
25  said why I moved him, because he said he told the

Page 86

1  CO, it's not my problem if my fart is stink, like
2  that.
3          So the CO told him, you can't do that
4  while he's praying. He don't like the fact I'm
5  praying.
6      Q. So you did have issues with people?
7      A. I didn't have any issues. I just -- like
8  I told you, I talked to the COs, I tell them what is
9  going on. I talk to the CO, I tell them I'm praying
10  and this guy is farting in my face while I'm
11  praying.
12     Q. Okay. What did the CO do?
13     A. He asked him, why do you do that. Like I
14  told you, I just answered you. He said, it's not my
15  problem that my fart is stink. Like, I farted,
16  yeah, what's my problem.
17         The CO told him, you can't do that. And
18  then he moved him from my cell to another cell.
19     Q. So the CO moved him out of your cell,
20  so -- to allow you to be able to practice your
21  religion freely?
22     A. I would say yes, he move him. He moved
23  him.
24     Q. Okay.
25     A. He -- in the beginning he didn't want to

Page 87

1  move him. But I told him I can't be praying, and he
2  knew that.
3      Q. Okay.
4      A. So he -- he keep saying, I do whatever I
5  want, so the CO moved him. But in the beginning he
6  was not trying to move him.
7      Q. All right. Okay. So based on all of
8  this, it seems that you were having issues with --
9  on pretty much every tier because of the way you
10  wanted to practice your religion, and you were moved
11  so you would be allowed to practice your religion?
12         MR. GECKLE: I object to the form.
13  You can answer, though.
14     A. I -- I have a problem, people -- I don't
15  have no problems with anybody, but people having
16  problems with me, even the COs or the inmates for me
17  practicing my religion, yes.
18     Q. Okay. And you were moved and housed
19  alone --
20     A. I didn't ask to move.
21         MR. GECKLE: Let him finish the
22  question.
23     Q. Regardless of whether you asked to move or
24  not, you were moved and housed alone where you were
25  able to practice your religion however you like?

Page 88

1   A. I moved and housed alone so I can be able
2 to practice my religion wherever I like? So I have
3 to be segregated in order to practice my religion?
4 That's what you mean?
5   Q. My question is --
6   A. They keep moving me.
7   Q. Were you moved and --
8   A. Because --
9     MR. GECKLE: Let him finish the
10 question so I can hear it too.
11   Q. Were you moved and housed alone where you
12 would be able to practice your religion how you
13 would like to?
14     MR. GECKLE: I object to the form.
15   A. No. That's my answer, no. Because even
16 when they move me and they segregate me, I didn't
17 have hot water. Even when they moved me and
18 segregate me, I didn't have a clock to look on to
19 see what time is it so I can pray. Even when they
20 moved me and they -- there's a lot of things, man.
21 There's lot of things more than that.
22   I can't see the clock, I can't see the
23 light, I can't see it's day or night, what time I
24 can pray. I can't see -- I can't use hot water to
25 pray. That's not the reason?

Page 89

1   Q. But you were able to pray, though?
2   A. How I going to be able to pray if I don't
3 know the time? I need to know the time to be able
4 to pray.
5   There are certain time. It's called
6 prayer time. It's on the tablets right now. They
7 made it's the tablet. At this time there was no
8 tablet. There was no even prayer time. They made
9 it right now. It's on the tablet. You have to know
10 because the time changes every day.
11   Q. Did you have access to --
12   A. No.
13     MR. GECKLE: Let him finish his
14 question.
15   Q. Did you have access to a CO who you
16 were --
17   A. They neglected me. They was neglecting me
18 all the time. They were neglecting me. All of
19 them, they were neglecting me.
20     MR. GECKLE: You said that.
21   Q. How were they neglecting you?
22   A. CO, (knocking sound), CO, (knocking
23 sound). Knocking on the door, banging on the door,
24 CO. Even if they would answer me, my light, can you
25 please turn on my light.

Page 90

1   The switch is broken.
2   And my switch is not broken. All the
3 switches are not broken. Why is mine the only one
4 is broken in the whole block? I swear to God. I
5 swear to God.
6   Putting papers on my door, calling me gay.
7 I fight, I hit my wife because I don't like girls, I
8 like men, I'm a gay, putting me papers calling me
9 terrorist, laughing. Man, you don't know what
10 happened to me, man.
11   Q. Calm down. We are trying to stay focused
12 here.
13   A. Okay.
14   Q. Okay? All right. So what exactly was
15 preventing you from practicing your religion?
16   A. Where?
17   Q. At any of these -- in Northampton County
18 Prison at all?
19   A. Everything.
20   Q. Specifically?
21     MR. GECKLE: Let's go down one by
22 one. You've already mentioned some things,
23 where they -- you weren't permitted to use the
24 sink. Right? To wash.
25   A. For example, one of them. The time. I

Page 91

1 can't know the time. When they put me in E Block,
2 for example -- you are talking about E Block right
3 now, right? Or are you talking in general?
4   Q. Specifically. So you say that you weren't
5 able to use the sink when you were on K-Tier;
6 correct?
7   A. Yes, the inmate --
8   Q. And then you were transferred off of
9 K-Tier to be housed in a different cell?
10   A. You are confused. I'm sorry. When they
11 put the paper on the sink saying you only use the
12 sink for your hand or something like that, you wash
13 your hand only in the sink, somebody put paper on
14 the sink saying that, that was on B Block, B2.
15   Q. That was on B.
16   A. That was on B2.
17   Q. And then you were transferred off of B?
18   A. Then to Gallery, then to K, then to E.
19   Q. Were you able to use the sink as you --
20   A. They was complaining like --
21     MR. GECKLE: Let him finish his
22 question.
23   Q. Were you able to use the sink on -- in the
24 Gallery for whatever washing you needed to do for
25 your religion?

Page 92

1    A. I was using it, but they were complaining
2 about me. And the COs used to come to me and
3 prevent me, tell me no, you can't do that, you have
4 to use the shower. That's what they used to tell
5 me.
6    Q. Okay. But then you were transferred to
7 another block. You were transferred to K Block.
8 Were you able to use the sink for your washing needs
9 then?
10    A. They were saying the same thing, Gad, you
11 have to use the shower. They was preventing me.
12    Q. Then you were transferred to E Block.
13 Were you able to use the sink for the shower
14 there -- were you able to use the sink to wash
15 there?
16    A. I was by myself. I was by myself in the
17 cell. So I was using the sink, but it was cold
18 water. They was not having hot water in the
19 beginning. I was by myself for months.
20    Q. You were able to use the sink?
21    A. I was freeing, but I have to pray. I was
22 doing it. I was doing it, yes.
23    Q. So you were able to use the sink?
24    A. I was freezing. I was freezing, I swear
25 to God. My fingers was freeze.

Page 93

1       MR. GECKLE: You've told us that.
2       THE WITNESS: I don't know if you
3   call that able or not. You can call -- if
4   somebody put his hand on the sink and got
5   freeze, is this is in your opinion is able to?
6   Okay.
7    Q. Were there -- do you know if there were
8 any other followers of the Islamic faith on any of
9 these cell blocks?
10    A. Do I know if there is right now or when?
11 You have to tell me specific question.
12    Q. During the time that you were at
13 Northampton County Prison from June 2017 to
14 April 2018, were there any other Muslims on your
15 cell block?
16    A. In my cell, no.
17       MR. GECKLE: Your cell block.
18    A. In my block? I think there was one guy
19 called Yaiya (phonetic), but he wasn't in the
20 whole -- he stayed for a short time, and then they
21 move him to another -- he went to the Workers' Tier.
22 I think went to the Workers' Tier.
23      I think I know Yaiya. Yeah, he was a
24 Muslim. I think he was a Muslim, yeah.
25    Q. Did you see -- did anyone discriminate

Page 94

1 against him? Did you see any discrimination against
2 him?
3    A. He was white. He was white guy. That's
4 why I don't think they have no problems with him,
5 because he was white. I don't know.
6    Q. So you didn't see any discrimination
7 against him?
8    A. He wasn't in my cell. I never --
9       MR. GECKLE: The question was: Did
10   you ever see anybody discriminate against that
11   other Muslim fellow, regardless of --
12       THE WITNESS: He was not living with
13   me, so I don't know. My answer is I don't
14   know. He was not living with me in the same
15   cell. I don't know what's going on with him.
16       MR. GECKLE: Then the answer is I
17   don't know.
18       THE WITNESS: Yeah.
19 BY MR. GILLIAM-BROWNLEE:
20    Q. Okay. So you named specific correctional
21 officers in your complaint that you claim were
22 involved in the denial of your right to practice
23 your religion freely. So I'm going to go through
24 each and every one, and I want you to inform me
25 exactly how they denied you your right to practice

Page 95

1 your religion freely.
2      So let's start with Correctional Officer
3 Harman. How was he involved in the denial of your
4 right to practice your religion freely?
5    A. First of all, he never listened to me. He
6 neglected me. He segregate me in a cell which I
7 cannot see the time or I cannot know what time of
8 the day is it. And even when I ask to move me to
9 another cell, which I can see the clock, they
10 didn't.
11      I don't know why, why is my cell
12 positioned so I can't see any clock, or I can't see
13 the time, or the date, or I can't see any window.
14 And he didn't listen to me.
15      And I tried to call him. I tried to talk
16 to him. I send him a lot of request slips. He
17 never even answer me. He never even come to my cell
18 and talk to me, even when he came to Collin Rice,
19 because his father call him. I try to talk to him.
20 He make like that (indicating) and he left.
21    Q. So essentially he was involved in the
22 denial of your right to practice religion freely
23 because he didn't move you to a new cell?
24       MR. GECKLE: Object to form. You can
25   answer.

A.  No, because he segregated me in a position, I can't use the water, it's very cold, and, no, I can't see the time of the day, and I can't see a clock.

Q.  Okay.

A.  And everybody is neglecting me, and even him neglecting me even if I try to talk to him or talk to anybody, neglection.  So I'm like, okay, you practice your religion, now, be here, nobody will look --

Q.  So -- I'm sorry to cut you off, but we are kind of pressed for time, so I want to make sure we get through this in a speedy way.

So Correctional Officer Harman, he's the Classifications Coordinator at Northampton County Prison; correct?

A.  Yes, sir.

Q.  And he makes the decisions on where inmates are to be housed; correct?

A.  Yes, sir.

Q.  Okay.  And you believe that he denied you the right to practice your religion freely because of the cell that you were placed in?

A.  He torture me, sir.

MR. GECKLE:  That's not what he asked

you.

A.  Yes, I believe so.

Q.  Okay.  Is there any other reason why you believe that he denied you the right to practice your religion, besides the cell that you were placed in?

A.  I believe that he has a lot of discrimination and racist issues with me.  That's why he did that to me.

MR. GECKLE:  We don't want you to read his mind.  We want to know what he did or said.

A.  What he did or said is don't even answer me why -- I think you have a lot of -- if you have a discovery, you would have a lot of request slip.  I'm asking him why I'm in segregation, what did I do?  Is this -- is anything wrong I do?

He didn't even answer me.  While he came to the other guy and telling him where you want to go, because your dad call me.  I think he didn't even give me an explanation.

Q.  Okay.  And we are not talking about anyone else other than you, unless I ask you about them.  So you keep bringing up --

A.  Isn't this discrimination?

MR. GECKLE:  He asks you the questions.  You answer the questions.

THE WITNESS:  Okay.

Q.  Yes.  Okay.  So Officer Colarusso, how did Officer Colarusso prevent you from practicing your religion freely?

A.  He -- he has -- he can't prevent me like physically.  Like he can't tie me.  But the way he act, like with the other inmates, calling me terrorist, because I'm Muslim, with the other inmates putting papers on the door and laughing with them and read the paper and put it back on my door, and I give a time and I give the date on my complaint, calling me gay, terrorist, laughing with them about that, calling me a camel, coming to my cell giving me the food, oh, I see a lot of camels today.  That's kind of like hate against me.

But he cannot like -- if I ask somebody to pray, like I'm in my cell right now, I'm segregated like if they put a dog in a box, for example.

What's he going to do for him more than that?

MR. GECKLE:  What did Colarusso do?

THE WITNESS:  I just said.

Q.  So it was just pretty much him saying mean

things to you?

A.  Gay, and terrorist, and camel, and all this, laughing with the other inmates about me.

Q.  And that prevented --

A.  Kicking the food with his feet in my cell when I drop something from my tray like a piece of cheese or something, that's my cheese here, with his feet.  It's hate.

Q.  And that prevented you from being able to practice your religion freely?

A.  Is this preventing me from practicing my religion?  No, it didn't prevent me from practicing my religion, this stuff, but it show me a lot of discrimination and hate because I'm practicing my religion.

Q.  Okay.  Correction Officer Glovas?

A.  He opened the door to the inmates to get inside my cell and attacking me, me and my celly.  And I think my celly, I have a request slip, and he write that this has happened to us, right?  And he sign it.  No, I have it in my complaint.  It's in my discovery.  He sign it, and he said that he allowed the inmates to come in my cell and attack us.

Why they call us PC?  He said I am putting you in PC to protect you, which I never asked for

1 protection, because I know how to protect myself,
2 but he put me in a PC for to segregate me.
3      But, anyway, so why they call me PC, he
4 open the door to some people to attack me in my
5 cell. Plus telling the other inmates, this is his
6 tray, you can put your dick on it. I think that's a
7 lot of hate.
8           MR. GILLIAM-BROWNLEE: Okay. Okay.
9      I don't think I managed to bring a copy of
10      this, but I'll get you a copy whenever we can.
11      If we could just -- you can mark this one. And
12      this is --
13           MR. GECKLE: 3.
14           MR. GILLIAM-BROWNLEE: Gad 3.
15      (Exhibit Gad 3, Incident Report dated
16      November 17, 2017, was marked for
17      identification.)
18 BY MR. GILLIAM-BROWNLEE:
19      Q. I'm going to have you read this into the
20 record. Or your attorney can read it into the
21 record as well.
22           MR. GECKLE: All right. What -- I'm
23      looking at what has been marked Gad 3, an
24      Incident Report dated November the 17th of
25      2017, for an incident that took place on E-Tier

1 upper.
2      The reporting CO is Jacob Allen. He
3 refers to you, Mr. Gad, and also to an inmate
4 named Dennis long. It actually says I think
5 you were in PC at the time.
6      And the description of the incident
7 is as follows: At approximately 14:35, Inmate
8 Gad, Ahmed, Number 24937, told this officer his
9 cellmate Long, Dennis, Number 5436, was
10 disrespecting him during prayer and requested
11 to be placed on protective custody. Inmate
12 Long was moved from E16 to E15.
13           THE WITNESS: Not true at all.
14           MR. GECKLE: Let him ask you a
15      question.
16 BY MR. GILLIAM-BROWNLEE:
17      Q. Have you ever asked for protective
18 custody?
19      A. Never. Never.
20      Q. So, are you saying that what is written in
21 this report is not accurate?
22      A. It's not accurate a hundred percent. If
23 you read in the inmate book, if you want the
24 protective custody, you have to sign for it. You
25 have to sign a paper. Where is my signature that I

1 asked for protective custody?
2           That's a lie. That's a lie.
3      Q. Okay.
4      A. But I asked that he -- he farted when I
5 was praying. He farted. He disrespect me. This is
6 what I said, but I didn't ask to be in protective
7 custody.
8      Q. So now you mentioned that Correctional
9 Officer Glovas was involved in allowing someone to
10 beat you up in your cell?
11      A. He opened the door for the inmate to come
12 and attack me in my cell. And I have a request
13 slip, even my celly said that. He's an old man.
14      Q. Where did this happen?
15      A. In the same cell, I think? Yeah, the same
16 cell, Cell 16.
17      Q. Cell 16, E16?
18      A. E16, yeah.
19      Q. Who was your roommate at the time, or your
20 cellmate?
21      A. Luis Cuevas. Luis Cuevas, and he wrote a
22 request slip. He sign it. I wrote what happened,
23 and he sign it, like this is my signature as a
24 witness on the request slip, that he opened the door
25 for another inmates to come and attack us. And this

1 is in my discovery, in my complaint.
2      Q. Was this incident investigated?
3      A. I don't see anything investigated. I was
4 just neglected. I was just neglected all the time.
5 No investigation.
6      Q. Did you suffer any injuries from this
7 incident?
8      A. Mentally and physically, both.
9      Q. Okay.
10      A. From --
11      Q. Can you describe to me exactly what
12 happened. So he opens the cell. How does he open
13 the cell door?
14      A. I find the cell door open. The CO is
15 standing outside the cell, open the door, let the
16 inmate inside. That's what happened, exactly. I
17 was laying on my bed, Cuevas laying on his bed, both
18 of us, and all of a sudden we found our door open.
19      I saw the CO will come or something. I
20 find another inmate inside my cell coming, pushing
21 me, yelling at me and my cellly, snatching -- I
22 don't know how to say in English, but grabbing the
23 jumper suit, and give me, this is mine.
24      So I said, man. He said fuck off, and he
25 pushed me, and pushed -- Cuevas was scared too. And

Page 104

then he left the cell.

I was like, oh, my goodness, like if I step one more step he might kill me. And Cuevas was standing outside. He --

Q. Weren't your cells supposed to be locked 24/7?

A. Sorry?

Q. Was your cell supposed to be locked at all times?

A. Where is the cells -- I don't understand the question.

MR. GECKLE: Was your cell -- where did this happen, first of all?

THE WITNESS: Yeah, it was supposed to -- this was happen in E16, in my cell. And where my cell, like you said -- if the cell supposed to be locked all the time, at this time, yes.

If you are in E Block, you have to be locked all the time, except in your time out to shower, or your time out to make a phone call, and then you go back and you lock.

This is a segregation when I was there. It's not supposed the door to be open to some inmates. And even if the door is open,

Page 105

which is not true, nobody supposed to go in each other's cell. Like he get in my cell while I'm sleeping, attacking me and my celly. And the door was closed. They just opened the door for him to get inside. And then when he left, he closed the door.

MR. GECKLE: You say he. Who is he?

THE WITNESS: Glovas, the CO.

BY MR. GILLIAM-BROWNLEE:

Q. Glovas closed the door?

A. Yeah, the CO, Glovas. I think his name is Glovas. Yeah, when the guy -- when the guy finished what he's doing, and he left the cell, Glovas closed the door.

Q. And what did the guy do? Did he just grab you?

A. He cursed me and my celly, and he pushed me. And he grab -- and he snatched the jumper suit from me and my celly. Like we were scared. We were threatened if we move or if we do anything and say this is my jumper, for example, he might -- if like -- like if you are in the street, and somebody come and he attack you taking your wallet, and you give him your wallet, he is not going to attack you no more; right?

Page 106

That's what happened. We gave him what he want so he can leave the cell. He want the jumper, take the jumper. But if we said no, we might get attacked more. We might get killed. We might get stabbed.

Q. So you didn't suffer any physical injury because of this?

A. No, it was not injuries, but just threaten me. Like I felt like threat and stress, but is not injuries. No, I didn't get injured.

Q. So you -- did this guy strike you at all?

A. No, he didn't strike me.

Q. Okay. Let's move on to Correctional Officer -- I'm sorry.

MR. GECKLE: Kyle Wene?

MR. GILLIAM-BROWNLEE: First let's do McNair, Correctional Officer McNair.

THE WITNESS: Yes, sir.

Q. How were they involved in denying you your right to practice your religion freely?

MR. GECKLE: Just McNair he's talking about now.

THE WITNESS: Yeah.

A. Neglecting asking to turn my light on, and he said -- this is what I talked to you about, I

Page 107

just told you about. He said your light switch is broken, which is why -- that's for every time I ask him, your light switch is broken. And he leave.

What time is it, to pray, he don't answer me. Even when he answer me, like say for example, it's 10 o'clock or 10:20, he don't answer me. What time is it? He answer like that, right, and he leave. Excuse me, what? CO, can I know what time is it, please, I need to pray, I don't know, I have to pray at twelve o'clock, for example. He don't even comply.

What does this mean? I don't -- if he answer. He didn't even answer me. Giving me missed trays, missed trays all the time. My tray is different than any other tray, missing stuff from it. And when I talk to him, you want it or no? If I don't -- if I just be late, he's not going to give me my tray.

Q. Did that stop you from being able to practice your religion freely?

A. Not giving me the time. If you are talking about the religion, he refused to give me the time to pray. When I ask him for the time to pray, he don't even answer me. Don't turn on --

Q. So, Correctional Officer McNair's actions

Page 108

1 that stopped you from being able to practice your
2 religion freely was not providing you with the time?
3     A.  Exactly.
4     Q.  And nothing else, that was the only thing
5 that --
6     A.  About the pray or about the hate?  About
7 the pray, the time.  But about the hate, there's a
8 lot of things.
9     Q.  We are talking about --
10     A.  The pray.
11     Q.  -- what prevented you from being able to
12 practice your religion.
13     A.  To pray is the time.  He don't provide me
14 with the time to pray.
15     Q.  Okay.  Now, let's talk about Correctional
16 Officer Wene.  So I believe you alleged that
17 Correctional Officer Wene assaulted you while at --
18     A.  Wene was not serving on the E-Tier.  He
19 was not working on the E-Tier.  He was just taking
20 us to -- like if you want to go to yard, if you want
21 to go to medical, if you want to go to a visit, if
22 you want to go to see your lawyer, he take you over
23 there.  But he is not on the E-Tier.
24         In my time I didn't see him on E-Tier.  He
25 was just taking me.  On my way he punched me.

Page 109

1     Q.  So, can you tell me exactly what -- how
2 many incidents were you involved with --
3     A.  Two.
4     Q.  You were involved in two incidents with
5 Correctional Officer Wene?
6     A.  Yes, three.  Three.  Sorry; three.
7     Q.  Three.  Tell me about the first incident?
8     A.  The first incident, I was going, and he
9 was taking me like you see me like that, for
10 example, and they take me to here right now.  And I
11 told you, I was talking to somebody, like saying
12 what's up, or somebody telling me what's up.  I
13 turn, hey, what's up, man, and, boom, move, and he
14 punch me.
15     Q.  He punched you?
16     A.  Yeah.
17     Q.  When did this happen?
18     A.  When or where?
19     Q.  When.
20     A.  When exactly I can't give you a straight
21 time, because I'm -- it's all over, you know.  Like
22 I can tell like --
23     Q.  An estimate, give me an estimate.
24     A.  An estimate, I'm not sure an estimate.
25 Like a few month, I would say a few month before I

Page 110

1 go to upstate.
2     Q.  Okay.
3     A.  But estimate time, like what month
4 exactly, what day exactly --
5     Q.  So sometime in December or January?
6     A.  I can't say what exactly, because I'm not
7 a computer.  I can't put the date in my mind.  I
8 wrote a letter --
9     Q.  Sometime -- what --
10     A.  You see my complaint?  I'll tell you very
11 easy.  You see my complaint when I complain to
12 Lieutenant Werley and Lieutenant Werley took me to
13 his office, around this time, maybe a week or two
14 before.
15     Q.  So that's the incident you are referring
16 to --
17     A.  I complained to Lieutenant Werley, and he
18 look at it on the computer, and he apologize to me.
19 And he ask the CO to took the handcuffs off my hand.
20 And he said nobody is allowed to put his hand on you
21 and I will talk to him.  He told me that.
22     Q.  So tell me exactly, so you were being
23 moved -- where were you being moved to?
24     A.  No, I wasn't moving.  He was taking me to
25 somewhere like -- he was taking me, I don't

Page 111

1 remember, maybe the medical or something like that,
2 or the yard, I don't remember.
3         MR. GECKLE:  He was being escorted
4     somewhere, like he was escorted here today.
5     Right?
6         THE WITNESS:  Right.  Exactly.
7     Q.  Where were you being escorted to?
8     A.  I'm not sure, medical or yard.  I'm not
9 sure.  Either this or this, I'm not sure.  I'm not
10 sure.
11     Q.  And you say that you stopped to talk to
12 someone?
13     A.  I'm not stopped.  I was like slowing down,
14 so I can talk to somebody.  Like he tell me what's
15 up.  I say, hey, what's up, how are you doing, like
16 something like that, and just looking like that.
17 And all of a sudden I find, like even before he say
18 move.  The punch was first and then he said move,
19 like that.
20         So I was about to fall down, the first
21 time.  And I got pain.  But I -- I was like -- I was
22 scared, and even the guy was scared.  And he said,
23 go, go.
24     Q.  Is this the time where you suffered a
25 broken rib?

Page 112

1   A.  In both time I got pain, and in both time
2  I -- I think this is the time, yeah.
3   Q.  This is the time you suffered a broken
4  rib?
5   A.  Yeah.
6   Q.  And in the other incidents you didn't
7  suffer any --
8   A.  What injuries?
9   Q.  You said three incidents.  We are going to
10 get to the other two, but we are still on the first
11 one.  For incidents two and three did you suffer any
12 injuries?
13  A.  Okay.  Let me explain it to you, because
14 you don't understand me.  In both time he punched
15 me, I was in pain, and I went to the medical.  But I
16 don't know what time is exactly cause me the injury.
17 I know that he punched me twice.  In both time I got
18 pain.
19  Q.  On which side of your body did you have
20 the broken rib?
21  A.  On which time --
22  Q.  On which side of your body did --
23  A.  He punched me the first time on the left
24 side and the second time on the right side.  Yeah.
25  Q.  On which side of your body did you have a

Page 113

1  broken rib?
2   A.  The left side.
3   Q.  The left side?
4   A.  The left side, yeah.
5   Q.  In which incident did he punch you on the
6  left side?
7   A.  In the first one.
8   Q.  The first incident?
9   A.  Yes.
10  Q.  So based on that, you believe that the
11 injury to where -- that caused the broken rib, it
12 happened in the first incident?
13  A.  Yes.
14  Q.  Okay.  So now in this incident you say
15 that you were being -- you were being escorted
16 somewhere by Officer Wene and he punched you.  How
17 did he punch you?
18  A.  Like I just said, he punched me with a
19 closed fist in my rib, telling me, move, like that.
20  Q.  With a closed fist in your rib he punched
21 you?
22  A.  Yeah.  Yes, sir.  It's on the camera.
23  Q.  Okay.  Did you fall, did you --
24  A.  I was about to fall.  I been thrown like
25 from here I would say to the wall, like long

Page 114

1  distance, like about to fall, but I hold myself, but
2  I didn't fall.
3   Q.  So you didn't fall?
4   A.  No.  But I been thrown like --
5   Q.  Did you suffer any other injuries besides
6  a broken rib?
7   A.  I feel pain.  I don't know what's going
8  on.  I don't know what happened.  What happened is
9  that I went to the medical several times.  And I
10 been asking to go the medical a long time until they
11 take me one time.  And then another time after.
12       And then after like months, I didn't know
13 what happened to me.  I find the doctor coming to my
14 cell telling me, Mr. Gad, we know that you have a
15 broken rib, but there is nothing to do about it
16 except time to heal.  And she left.  And that was
17 like months after I went to the medical.
18       Like it took me like two-three months to
19 tell me that?  I would say two month.  I'm not
20 accurate.  I'm not -- but long time.  And then I
21 feel the pain, and even after I went to upstate I
22 was still in pain.
23  Q.  Now tell me about the second incident
24 where you allege that Officer Wene punched you?
25  A.  I was going from -- I was coming back from

Page 115

1  somewhere with him, and I stopped in front of K
2  Block to talk to Mr. Robert Curren, and while I'm
3  talking to him, I was asking him -- I think I was
4  asking him about something, my case, like what's the
5  meaning of the word remittal in the law.  Because he
6  was a paralegal, and he knows about law.  So I tell
7  what's -- so I find --
8   Q.  I don't even know what you're talking
9  about --
10  A.  Yeah.  Anyway, so I find that Officer
11 Wene, the same thing he did, boom, move like that.
12 So I been thrown away again.  And I was about to
13 fall again.  And I got scared.  And even Mr. Robert
14 say the same thing, go, go, go, go, go, just go.  So
15 I just go.
16  Q.  How did he punch you?
17  A.  With a closed fist in my rib.
18  Q.  With which hand?
19  A.  I don't know.  I was just talking and I
20 find a closed fist in my rib throwing me.  I didn't
21 even see him while he doing it.  I just hear go and
22 punching.  But when he came behind me, when he did
23 it, how he did it, I didn't see nothing except the
24 punch, and me thrown.  That's it.
25  Q.  Okay.  What happened after that?  Did you

Page 116

1  go back to your cell?
2     A.  I just go.
3     Q.  Did you go back to your cell?
4     A.  They took me -- he took me back to my
5  cell.
6     Q.  Okay.  And did you request may medical
7  assistance?
8     A.  I request from the nurse, from the COs, to
9  go to medical.  And I wrote a request slip until
10  they take me.  After a while they took me up to
11  medical, and they schedule me with a -- with a -- I
12  think a specialist for x-ray.
13     Q.  Okay.
14     A.  And she made an x-ray for me.
15     Q.  Now, tell me about the third incident
16  involving Officer Wene.
17     A.  I went -- I was going -- they call yard.
18  They was trying like kind of, I don't know, hate or
19  discrimination or what.  Every time people go to
20  yard, I want to go with them.  They tell me no,
21  that's not you.  That's the yard for Ad Seg.
22     MR. GECKLE:  Yard for what?
23     THE WITNESS:  Yard, like --
24     MR. GECKLE:  For who, though?
25     THE WITNESS:  Rec.  Rec.  Recreation.

Page 117

1     MR. GECKLE:  I know.  I know.  But
2  you said that's not for you, that's the yard
3  for someone else?
4     THE WITNESS:  They call the inmates
5  to go to recreation.  The inmates in E Block,
6  we going to rec.  So they called rec.  So I
7  want them to open my door, can I go to rec with
8  all the other inmates.  No, that's not you.
9  Why?  Your classification is different.  They
10  are Ad Seg.
11     MR. GILLIAM-BROWNLEE:  They were
12  what?
13     THE WITNESS:  Ad Seg.
14  BY MR. GILLIAM-BROWNLEE:
15     Q.  Administrative segregation?
16     A.  Yeah.
17     Q.  All right.
18     A.  So they call another time for another
19  people, rec.  So I said okay, you call me PC, this
20  is PC.  He said, no, you are not PC; you are Ad Seg
21  PC.  What's Ad Seg PC?  That's your classification.
22  They are only PC.  You can't go with PC, you go with
23  Ad Seg PC.
24     So when they call for Ad Seg --
25     MR. GECKLE:  Ad Seg.

Page 118

1     THE WITNESS:  They call it Ad Seg,
2  Administration Segregation, to go to rec, I
3  asked to go with them.  They say no, you are
4  PC.
5     MR. GECKLE:  You are PC?
6     THE WITNESS:  PC.
7     MR. GECKLE:  Protective custody.
8     THE WITNESS:  Custody.  When they
9  call for PC to go to rec, I asked to go with
10  them.  They say no.
11  BY MR. GILLIAM-BROWNLEE:
12     Q.  Okay.  But what does this have to do with
13  Officer Wene?
14     A.  I'm telling you.  I'm coming in my way.
15  I'm explaining.  So I wrote requests until they took
16  me to the rec.  So when I get out of my cell to go
17  rec, Officer Wene, he saw, he let the inmates coming
18  out of that block.  And while I was on my way out of
19  the block, he slammed the door in my face.  And he
20  left with the inmates, took me to rec, but he
21  didn't take me.
22     I was -- I was in my way, like all the
23  inmates here, and I'm with them.  He took the
24  inmates out.  I'm trying to get out.  He slammed the
25  door in my face, like he refusing me.  He don't want

Page 119

1  me to --
2     Q.  Did the door hit you?
3     A.  And let me -- but, anyway, go ahead.  The
4  door didn't hit me.  What happened is that he was
5  telling them before, I heard him saying, he is not a
6  PC, he is an Ad Seg PC.
7     Q.  Okay.  But --
8     MR. GECKLE:  You were not a PC,
9  right?  I'm trying to help here.
10     THE WITNESS:  Yes.
11     MR. GECKLE:  You are an -- what are
12  you again?
13     THE WITNESS:  Ad Seg PC or PC.  I
14  don't know what was my classification, but
15  every time they tell me you are a different
16  classification.  And when I was trying to get
17  out, he tell them, he is not this
18  classification.
19     So I complained.  So when I was
20  going, after I complained to rec, he let the
21  other inmates going out, and he slammed the
22  door in my face not to let me out.
23     And CO Bird, his name is Bird.  He
24  told him, you cannot do that.  He called, and
25  he opened the door for me, and he told him, you

1  cannot do that.
2  BY MR. GILLIAM-BROWNLEE:
3  Q. Did you file a grievance for all of these
4  incidents?
5  A. I wrote. Yes, I complained. They don't
6  give you a grievance here, sir. When you ask for a
7  grievance, they don't give it to you. I swear to
8  God. I swear to God. It's even -- get a tablet
9  right now, and click on the grievance icon on the
10 tablet. It will give you this answer. No such
11 form. Does not exist.
12       (Exhibit Gad 4, Inmate Request dated
13 December 3, 2017, was marked for identification.)
14 BY MR. GILLIAM-BROWNLEE:
15 Q. So now I want to introduce another
16 Exhibit, Gad 4. And this is a grievance or inmate
17 request that you had filed?
18 A. Request, huh?
19 Q. Yes.
20       MR. GECKLE: Do you want me to read
21 this as well?
22       MR. GILLIAM-BROWNLEE: Yes, if you
23 can read it into the record, please.
24       MR. GECKLE: I'm reading what has
25 been marked Gad 4. It's an inmate request form

1  dated December 3rd, 2017, applying to Cell
2  Number E16. It reads as follows: I
3  specifically request, I never had any
4  disciplinary since I have -- since I been to
5  the prison, and I'm here because of domestic
6  violence. Please, I need your help. If you
7  please tell Officer Wene not to put his hand on
8  me, because he pushed me twice for no reason.
9  He can just talk. Also he didn't take me to
10 rec. That word is unintelligible. I think it
11 says with the other inmates. And the other
12 officer --
13       THE WITNESS: Officer Bird.
14       MR. GECKLE: He told him that he
15 can't do that.
16       And by the other officer you mean
17 Officer Bird?
18       THE WITNESS: Um-hmm. Yeah.
19 BY MR. GILLIAM-BROWNLEE:
20 Q. Does that accurately reflect what happened
21 with this -- this appears to refer to only one
22 single incident.
23 A. This was talking about the rec, actually.
24 And I was trying to complain about the recreation.
25 I think this is two of them. I didn't read the

1  other one.
2       MR. GECKLE: I didn't read this.
3  There is a second part to this.
4       MR. GILLIAM-BROWNLEE: Yes.
5       MR. GECKLE: Do you want me to read
6  that as well?
7       MR. GILLIAM-BROWNLEE: Yes, please.
8       MR. GECKLE: It says, Note: Officer
9  Wene pushed me hard. I was about to fall down
10 on the floor in my way to the rec more than
11 once. And another time I was standing with the
12 other inmates waiting to go to the rec. He
13 took all of them and locked me in the block.
14 But the officer of the block opened the door
15 for me and he told him that he can't do that.
16 Please, he is really against me for no reason.
17 Even the other officer noticed it, otherwise he
18 will not tell him that he can't do that.
19 Please, I never did any discipline -- I'm
20 sorry. Please, I never did any disciplinary.
21 I want to finish my time safe and leave safe.
22 Thank you.
23       THE WITNESS: Um-hmm. Okay. What
24 about that?
25

1  BY MR. GILLIAM-BROWNLEE:
2  Q. Does that accurately reflect what
3  happened?
4  A. Yeah. When I say pushed hard, I mean
5  punched, because you have to understand that my
6  first language is not English. And by the time in
7  jail, I've been talking to a lot of inmates and
8  that's improved my language.
9       But when I said pushed hard, I mean closed
10 fist. I mean punched me, but maybe this means like
11 I was trying to -- to explain or to complain about
12 his hate to me. So I didn't give it exactly. But I
13 was talking about that he punched me twice and he
14 has hate against me that he slammed the door. Even
15 when I said slammed the door, I didn't even say
16 slammed the door, I just said he closed the door in
17 my face.
18       Look at my language. My first language is
19 not English. That's why I'm telling you that I
20 couldn't explain it good. But I mean what I said.
21 Q. Okay. So did he punch you, or did he push
22 you?
23 A. It's a closed fist, punching me hard.
24 What do you call closed fist, push me hard or
25 punched me. He punched me.

Q. So you are now saying that he punched you?

A. Yes, sir.

Q. When before you say that he pushed you?

A. This because of my language. It's not because of my -- I'm describing, like when I said he closed the door in my face, I didn't say slammed the door. I told you, my language has improved while I'm in jail. But I would say he -- he punched me, and it really caused me a lot of pain.

But if you are talking about my language in the request, because my language, my first language is not English, that's all.

Q. So how long have you been in America, in the United States of America?

A. To now?

Q. Yes.

A. Almost -- almost ten years.

Q. Okay. And until recently you didn't understand the difference between a push and a punch?

A. No, I understand, but that's not my first language. So the way you explain is not the -- when your first language is English, is different than somebody's else language -- first language is not English. So when you try to explain something, you

might explain it wrongly.

But I don't say that I don't understand English. I don't say that I'm ignorant. I don't say -- I'm telling you, I told you, I'm engineer and I'm a pilot. Before even I come to the United States, I was an engineer.

So I understand English. But when I try to explain, like look at my language when I said he closed the door in my face. Look at this. When you try to explain something, it's different than it's your original language. You might say you don't mean what -- you don't mean what you say, but you say it the wrong way. You understand what I mean?

If I said push me hard in my ribs, I mean he punched me. But I don't give it the same way you can do it like American people or people from the first language. You understand what I mean? Like I understand, but sometimes when you try to explain, it don't be in the right way.

(Exhibit Gad 5, Incident Report dated December 3, 2017, was marked for identification.)

MR. GILLIAM-BROWNLEE: Okay. And now I'm going to introduce Exhibit Gad 5, which is another -- which are -- Gad 5 and Gad 6, two

incident reports, completed in regards to your claims. We'll start with Gad 5, which is an incident report completed by Officer Wene regarding this incident.

MR. GECKLE: Is this 5?

MR. GILLIAM-BROWNLEE: Yes. Could you please read that into the record.

THE WITNESS: That's not my handwriting.

MR. GECKLE: No, it's not. It's Officer Wene's handwriting, I believe.

MR. GILLIAM-BROWNLEE: Yes.

MR. GECKLE: This is an incident report dated December 3rd, 2017. The place of incident is E-Tier. The officer name is Wene, Kyle Wene. And the inmate is Ahmed Gad, housing E16.

And the description of the incident is as follows: On December 3rd, 2017, I was questioned by Lieutenant Werley about accusations made by Inmate Gad. Inmate -- I'm sorry, Inmate Gad, Ahmed, that I pushed him. The incident may have occurred on 24th, '17, when a Code Red was called on -- I think it's B4. I was escorting protective custody

recreation back to E-Tier.

When the Code Red was called, I was attempting to rush these protective custody inmates back to E-Tier in order to respond to the code. I was also questioned about shutting the Door 60 in inmate Gad's face. Inmate Gad had walked out of line for recreation to talk to another inmate on E-Tier. I did close Door 60 and escorted the remaining protective custody inmates to the recreation yard.

THE WITNESS: Okay.

BY MR. GILLIAM-BROWNLEE:

Q. So minutes ago you testified that at -- during one of these incidents you stepped out and was talking with another inmate.

A. Okay.

Q. Is that what is being reflected in this report?

A. First of all, there is no line. Look at the camera, sir, there was no line. He said stepped out of the line. There was no line.

Q. Is that what is being reflected in this report, that you had stopped and talked to another inmate --

A. Stepped out of the line, no. That's

Page 128

1 wrong.
2         MR. GECKLE: Let him finish his
3 question.
4    Q.  Regardless of the line, is what is being
5 reported -- what is being written in this incident
6 report accurately reflect what happened when you
7 allege that Officer Wene slammed the door in your
8 face?
9    A.  That's not true. That's not true. You
10 want me to explain?
11   Q.  What part is inaccurate?
12   A.  Okay. First of all, there was no line.
13 Everybody was talking to each other. We were going
14 to recreation. We were a standing group, okay?
15 Some other guy in his cell, he told me, he was
16 asking me about to give him something. And I said
17 when I come back. That's all what I did. That's
18 all what I said. I said when I come back. That's
19 it.
20        We going out. He let the other inmates,
21 and while I'm behind them, he slammed the door in my
22 face. I didn't get out of the line like he said. I
23 didn't go back to my cell. I wasn't far away. We
24 were all grouped. There was no line, sir.
25        Like I would tell you, like, say, for

Page 129

1 example, we are sitting, like now, and some CO told
2 me something over the door right now, and I tell
3 him, okay, when I finish here, I will tell you. And
4 then I come back, and you slam the door. That's the
5 same exactly.
6        I didn't get out of the line. I didn't go
7 away. All this is not true. What happened, I was
8 standing with a group to go to the rec. Some other
9 guy asked me about the Koran, I think, he was asking
10 me about to give him the Koran, or my Bible, Muslim
11 Bible. So I told him, I will give it to you when I
12 come back. That's all what happened.
13        So all of them, we were going, and when it
14 come to my turn to get out, he slammed the door.
15 And that's why Officer Bird told him, you cannot do
16 that. If Officer Bird see that I was doing wrong,
17 he's not going to tell him, you cannot do that. You
18 heard me?
19        MR. GILLIAM-BROWNLEE: All right.
20 Now we're going to introduce Gad 6, which is an
21 Incident Report completed by Officer Tosado,
22 who was in the area of the alleged incident
23 where you had the door slammed in your face.
24        THE WITNESS: Tosado -- Tosado wasn't
25 even with downstairs. Tosado was upstairs, I

Page 130

1 think, or he wasn't there, I don't know, but
2 anyway.
3        (Exhibit Gad 6, Incident Report dated
4 December 1, 2017, was marked for
5 identification.)
6        MR. GILLIAM-BROWNLEE: Could you read
7 that into the record.
8        MR. GECKLE: All right. This is an
9 Incident Report dated December 1st, 2017. This
10 is Number 6; right?
11        THE WITNESS: Um-hmm.
12        MR. GECKLE: It's by Officer Tolsado,
13 badge looks like 441. Inmate name is Ahmed
14 Gad. Description of incident: On
15 December 1st, 2017, at or around 2000 hours, I,
16 Office Tolsado, was in the process of rounding
17 up PCs for yard. In the process, I opened up
18 Cell 16, which housed Inmate Gad, Ahmed. I
19 informed Gad to go downstairs with the rest of
20 the PCs for yard. He complied. Gad -- oh,
21 Gad, once downstairs, began engaging in a
22 conversation with Inmate Jason Moore. Officer
23 Wene then arrived to transport the PCs to yard.
24 Wene stood at the door waiting for him to exit.
25 Gad continued to talk, and I instructed him to

Page 131

1 go. When he was making his way to the door,
2 Wene had closed it. I then called to have the
3 door opened, and Gad made his way out with the
4 rest of the PCs. I did not see any pushing or
5 shoving by Officer Wene during the process.
6        THE WITNESS: That's funny. That's
7 all I can say. That's funny, because that's
8 going to show the hate more, because it's on
9 camera. Look on the camera. That's all I can
10 say. Look on the camera. If I was going
11 outside of the door and Wene is outside -- I'm
12 here, and Wene is here, and he closed the door,
13 his face is looking, his eyes is looking in my
14 eyes, that's what he is talking, he closed the
15 door. And when I went the door was closed.
16        If I was in front of him and he
17 closed the door in my face, what are you
18 talking about? Look on the camera, sir. Look
19 on the camera. That's a lie.
20        MR. GECKLE: Also, it looks like
21 Lieutenant Werley interviewed you about this.
22 And Lieutenant Werley says that he spoke with
23 the inmate. He was unable to give days or
24 times when the issues occurred with this
25 officer. Inmate admitted to not being in line

1 when rec left -- am I reading that right?
2     MR. GILLIAM-BROWNLEE: Yes.
3     MR. GECKLE: When rec left the block
4 due to talking to Inmate Moore on E-Tier.
5 Inmate also admitted to talking to an inmate on
6 K-Tier when he was returning from recreation.
7 Officer Wene admits to putting his hand on him
8 to continue to move him from K-Tier.
9     THE WITNESS: Okay.
10 BY MR. GILLIAM-BROWNLEE:
11   Q. Okay. So that --
12   A. I told you that --
13   Q. Does that accurately reflect the
14 conversation that you had with Lieutenant Werley?
15   A. Conversation? What conversation?
16   Q. This refers --
17   A. You're talking about incident, not
18 conversation.
19   Q. Well, this -- in the Immediate Action
20 Taken is a paragraph that refers to a conversation
21 that you had with Lieutenant Werley regarding --
22   A. No. No, this is not true. I remember
23 when I went to Lieutenant Werley, the only
24 conversation I talked to him about, I remember that,
25 is that when I told him that he has hate against me,

1 he hit me two times, or he punched me, or he pushed
2 me, whatever you call it.
3     So I -- can I continue?
4   Q. Yes.
5   A. That's the talk about -- that's the
6 conversation with Lieutenant Werley. And he was
7 looking, he was sitting on his desk, and I was
8 standing in front of him, and I told him that he
9 slammed the door in my face. That's what I said.
10     And most of the talking, I was explaining
11 to him how he punched me and where. And he was
12 looking on the computer, on -- when he was talking
13 to me, he was looking at the screen of the computer,
14 and he apologized to me and I stand up.
15     Because in the beginning he wasn't
16 believing me. He was thinking that I'm lying. And
17 he keep talking like --
18   Q. Okay. So --
19   A. And then he asked the CO to take the
20 handcuffs off my hand. And he said, I apologize to
21 you, nobody has a right to put his hands on you,
22 after he saw it on the computer.
23   Q. So you had a conversation with Lieutenant
24 Werley as indicated in this report, but you are
25 saying that the conversation is not accurately

1 reflected in what Lieutenant Werley wrote?
2   A. Yeah. Exactly. It is not actually
3 reflected -- it is not reflected right. Exactly.
4 This is the thing you said. You get it right. It
5 is not reflected right.
6   Q. So you did not admit that --
7   A. Lieutenant Werley didn't say --okay.
8   Q. So you didn't admit that you had stopped
9 to talk with someone --
10   A. No, I did. I just told you that. I told
11 you somebody asked me about the Koran, and I told
12 him I'll give it to you when I come back. That's
13 all.
14   Q. So that's true?
15   A. I admit that, yeah. Somebody asked me a
16 question.
17   Q. Did you admit that -- that you were out of
18 line?
19   A. There was no line, sir. There was no line
20 to be out of.
21     MR. GECKLE: Is the answer no?
22     THE WITNESS: No. Everybody was
23   standing around. Everybody standing
24   everywhere. There was no line.
25

1 BY MR. GILLIAM-BROWNLEE:
2   Q. Okay. I guess we'll just move on.
3   A. I'm being clear to you.
4   Q. Were there any witnesses to the alleged
5 punch by --
6   A. Mr. Robert, he didn't told me that he's a
7 witness, but I know he saw it, because he told me
8 go, go. He saw what happened. He was scared when
9 he saw that, and he said go, go, go like that.
10     MR. GECKLE: Who was this?
11     THE WITNESS: Robert Curren, I put
12   his number and his wife's number and his name
13   on my report.
14   Q. Okay. Did you file any other reports
15 regarding this incident or any other incidents at
16 Northampton County Prison?
17   A. I don't understand the question.
18   Q. Did you file any other complaints or
19 reports about the incidents that you allege against
20 Officer Wene?
21   A. I filed to the Court, to my Judge. And I
22 filed what they doing to me, and I filed that I'm
23 being not taken food, I'm being prevented from yard
24 and food and shower. And all the other inmates,
25 they open the door for them.

Page 136

1      The Judge took me to the Court, and she
2 told me, that's not -- I have no control of -- over
3 DOC, that's the DOC job. I can't do nothing to you.
4      MR. GECKLE: Let's -- what he asked
5 you about are these inmates request forms.
6 Have you filed any other inmate request forms
7 other than the ones we've already talked about?
8 He didn't ask you about the Judge.
9      THE WITNESS: Yeah. I filed a lot of
10 request slips, but I can't remember them. I
11 filed a lot of request slips and complaints and
12 letters to the Judges and everywhere, and to
13 the DA, the district attorneys. I filed to
14 everywhere.
15 BY MR. GILLIAM-BROWNLEE:
16  Q.  And what were these complaints about?
17  A.  About the discrimination, and because I
18 pray they segregate me, and I can't -- they didn't
19 give me my trays, they hitting me, they putting
20 papers on my doors, they tell the other inmates to
21 put their genital, their dick, in my tray, they
22 allowing inmates to attack me in my cell, everything
23 I just talk.
24  Q.  Okay. Did you -- did you complain about
25 not being able to choose your -- choose a cell that

Page 137

1 you would like?
2      MR. GECKLE: I'm sorry?
3      MR. GILLIAM-BROWNLEE: Sorry.
4 Scratch that.
5  Q.  Did you complain about the cell that you
6 were being housed in?
7  A.  Did I complain about the cell I being
8 housed in?
9  Q.  Yes.
10  A.  Like cell 16? Sure, I been complained. I
11 been asking them can you move me at least to any
12 other cell? Can you please move me to any other
13 cell? No, that's your cell. You're not going to go
14 anywhere except this cell. That's it, because I
15 can't see the time.
16  Q.  So you had a complaint mainly with just
17 the cell that you were being housed in?
18  A.  I complain about the time. I been
19 complain about the time. I been complain about the
20 water. I been complain about everything, the trays.
21 I been complain about the yard. It's in my request
22 slip.
23      They take people, they tell me, this is
24 different, this isn't the correct classification. I
25 don't see my classification. I been complain about

Page 138

1 everything, everything. I been complaining like in
2 my request slip, yard, they don't take me, that's
3 why I been complain. I been complain about the
4 food. They don't give me my trays like the other
5 people. I been complain about telling the tiers to
6 put their dick in my food. I been complain about
7 everything.
8  Q.  Were these complaints investigated?
9  A.  I don't know. I've been neglected. I
10 don't know. The only thing he talked to me about,
11 when I got hit by Officer Wene. That's the only
12 thing. And he apologized to me. That's the only
13 thing. Lieutenant Werley took me to his office and
14 talked to me about it.
15      That's the only thing. I never been
16 talking about anything else, so I don't know if they
17 investigated it or not. They say we investigate.
18 But is it true or not? I don't know.
19  Q.  So you never had any communications
20 with --
21  A.  No. No, I'm sorry. Officer Horvath,
22 yeah, yeah, I remember that. Detective Horvath, or
23 Investigator Horvath, I don't know what's his
24 position. I think he's an investigator. He took me
25 and he talked to me. And he said that he will move

Page 139

1 me to B2, and I will turn you back to the block. He
2 told me that, I will return you back to B2, you will
3 go to B2.
4      And he told me, and I can -- I can even
5 take you out of all this jail, because I feel like
6 you feel unsafe. I can move you from this jail to
7 another jail. He told me that. I swear to God.
8      And then I find Mr. Harman open the door,
9 and he get inside, and he said, I'm not going to
10 take him nowhere. And he will stay in the -- in the
11 E Block and the -- I will keep you over there, and
12 do whatever you want to do. He tell me that.
13      Oh, he said also, I -- I control the --
14 this is my jail. I control this jail.
15      MR. GECKLE: Who said that?
16      THE WITNESS: Mr. Harman, John
17 Harman.
18  Q.  Okay. So you had communications with the
19 Investigator Horvath?
20  A.  Horvath, yeah. Horvath, yeah.
21  Q.  And did he investigate the claims that you
22 made?
23  A.  I don't know.
24  Q.  You don't know?
25  A.  I don't know.

Q.  Have you ever received any communications from Officer Horvath?

A.  Yeah, he sent me a letter saying -- saying you lied.  Something like that.  Something he say, you lied, and if you send me another complaint I will put you in DS.  He said something, I was like -- even my friend tell me, man, like -- like shut your mouth and just take anything they give it to you.

MR. GILLIAM-BROWNLEE:  I'm going to mark this as Gad 7.

THE WITNESS:  This is the letter from him, right?

MR. GILLIAM-BROWNLEE:  Yes, it is.

THE WITNESS:  Yeah, I remember that.

(Exhibit Gad 7, Letter dated February 14, 2018, from Charles Horvath to Ahmed Gad, was marked for identification.)

MR. GILLIAM-BROWNLEE:  Could you please read that into the record.

MR. GECKLE:  This is a letter dated February 14, 2018, to Mr. Gad, from Charles Horvath, Professional Responsibility Investigator.

Dear Mr. Gad, each of the complaints

you have filed have been investigated and all have been unfounded.  Moreover, the last time I spoke with you, I found that you lied to me about the occurrence that allegedly took place -- the occurrences -- I'm sorry, let me repeat that.  Moreover, the last time I spoke to you, I found that you lied to me about the occurrences that allegedly took place.  Therefore those alleged incidents were unsubstantiated.

You have repeatedly complained about various illnesses and injuries, yet none have been substantiated.  If you are experiencing medical issues, contact the officer on your housing unit, and a nurse will be summoned.  You will then be treated appropriately.

Writing a letter days after falling ill or being injured does you no good and makes your allegations even more suspect.  If you feel you are not receiving appropriate treatment, contact your attorney and he will proceed accordingly.

Until then, each of your complaints will continue to be investigated.  However, if your allegations prove to be false or

misrepresented, you will be disciplined.

Thank you.  Signed Charles Horvath.

THE WITNESS:  He say that I lie.

MR. GECKLE:  He didn't ask you a question yet.

BY MR. GILLIAM-BROWNLEE:

Q.  Do you -- did you receive this letter from Officer Horvath?

A.  Yeah, that's what I just told you.

Q.  So you do have knowledge that your complaints were actually investigated by Officer Horvath?

A.  I received this letter.  But if he do his job or not, I don't know.  He's probably do nothing.

MR. GECKLE:  That's a perfectly good answer.

MR. GILLIAM-BROWNLEE:  Okay.  And I'll mark this as Exhibit Gad 8.  And this is an investigation -- Investigative Report completed by Officer Horvath into the allegations that you have made.

(Exhibit Gad 8, Investigative Report, Case No. 17-136, was marked for identification.)

MR. GECKLE:  Do we have to read all

that?  Can't it just speak for itself?

MR. GILLIAM-BROWNLEE:  It's only one page.  It's the second page.

MR. GECKLE:  This is an investigative narrative, which I -- I'm not sure who authored this.  Are you representing to us that it was Mr. Horvath?

MR. GILLIAM-BROWNLEE:  Yes.

MR. GECKLE:  Okay.  On December 19th, 2017, Director Daniel Keen provided me with copies of two handwritten letters sent to the Court Administration Office by Inmate Ahmed Gad.  The letters were very similar and were dated December 7th, 2017, and December 9th, 2017.

Gad alleged there was physical abuse and drug use occurring in the jail, among other things, and the misconduct was being allowed by the officers.

On December 20th, 2017, at about 11:43 hours, I interviewed Inmate Gad in a treatment interview room.  I introduced myself to Gad and told him why I was speaking with him.  Gad claimed he had witnessed the following misconduct:  1, officers passing

Page 144

1  kites to inmates; 2, officers giving inmates
2  commissary; 3, officers allowing inmates to
3  fight, which result in injuries to the inmates;
4  4, use of drugs and smoking of tobacco, quote,
5  even in the hole, end quote.
6      I asked Inmate Gad for the names of
7  the officers and inmates engaged in the
8  aforementioned behavior, but he declined,
9  claiming his treatment in the jail would be
10 even worse. I asked Gad if he could provide
11 specifics of the activity that he claimed, but
12 he did not.
13     Inmate Gad questioned why he was in
14 protective custody when he did not ask to be
15 placed there. Classification Coordinator John
16 Harman happened to be walking by the interview
17 room, and I caught his attention. He entered
18 the room, and I advised him of Gad's PC
19 concern.
20     Harman related that Gad's former
21 cellmates in B2 and other housing units did not
22 tolerate Gad's way of practicing his Muslim
23 religion, which caused friction. For Gad's
24 safety, Harman moved him.
25     Gad asked that he be moved back to B2

Page 145

1  because he does not have access to commissary
2  or television where he is currently housed,
3  E14. And he complained of the small dimensions
4  of his current cell. However, Harman was
5  reluctant to do so.
6      According to Inmate Gad, Officer Kyle
7  Wene recently punched him on the right side.
8  Gad spoke with Lieutenant Jason Werley about
9  the incident. Officer Lou Donatelli was
10 present. It was determined that Wene had
11 pushed Gad, who was refusing to move. No punch
12 was thrown. The incident was documented.
13     This case will be considered closed
14 at this time due to Inmate Gad's complaints
15 being unsubstantiated.
16     Did you understand all that? He
17 might ask you a question about it.
18     THE WITNESS: Sure, I'm here for any
19 question.
20 BY MR. GILLIAM-BROWNLEE:
21 Q.  So based on this investigative narrative,
22 do you believe that your complaints were
23 investigated?
24 A.  I believe that it's been corrupted, not
25 investigated. Very corrupted. Yeah.

Page 146

1  Q.  How is it corrupted?
2  A.  Because, first of all, he say something --
3      MR. GECKLE:  Who is he?
4      THE WITNESS:  Mr. Horvath.
5  A.  He say something and he do something else.
6  What he told me that he is going to move me. And he
7  said I can move you to another jail. And when
8  Mr. Harman came and he talk like that and he was
9  looking to Harman and they looking to each other, he
10 say I'm not going to do anything to him, I'm not
11 going to take him nowhere, he will stay over there,
12 and it's my jail, I control the jail. And he didn't
13 move me.
14     I been waiting for him, and he didn't do
15 nothing. He say something, which he didn't do it.
16 Also -- also -- also, when he asked me, he said that
17 I lied. I didn't lie on anything. I did not -- I
18 don't want to -- please, when I talk, I'm sorry to
19 tell you that, I like to feel comfortable so I can
20 be slow so she don't have hard time. So let me
21 continue. Don't interrupt me, I'm sorry.
22     What he say is a lie because, first of
23 all, he ask me about everything. I told him. If I
24 said this is officers giving stuff, that's true. If
25 I said that there is officers taking commissary from

Page 147

1  some inmates to let them fight in the cell, that's
2  true.
3      The inmates come, give the officer some
4  eats, commissary to chill and eat, chips or whatever
5  they sitting with, and they go. And they know them
6  from outside. And they fight in the cells. And
7  they come out with a blue -- black and blue eyes.
8  They come with red, they come with swollen, and they
9  see them and they don't do nothing. Why? Because
10 they pay them, or they know them, or something is
11 going on. I swear to God, I saw that. Okay?
12     Q.  Do you --
13 A.  I didn't lie in anything. Please, don't
14 interrupt me. Please. Please. I didn't lie in
15 anything.
16     They fight. They pass tobacco, they bad
17 stuff. I saw officers giving inmates papers in
18 their hands. I don't know what it does. I know the
19 officer is supposed to give tray, supposed to give
20 legal papers, they are not supposed to do give
21 bended papers or bended stuff in hands to the
22 inmates.
23     I saw a lot of stuff in the jail, but is
24 not my business. That is not my business. I'm
25 complaining about my segregation, my position that

1 I've been discriminated, being hitted, or what they
2 call it pushed hard, or punched, or whatever you
3 call it, or being broken ribs, or being -- putting
4 papers calling me gay, or telling the inmates to
5 attack me, or to put the genital in my tray.
6   I been complaining -- these are the things
7 that concern me.  The other things, it don't concern
8 me.  If some inmate is fighting, they fight with
9 each other, they don't do nothing about it, this is
10 not my business.
11   If some inmate is taking drugs and they
12 been caught, and I saw Harman talking to some
13 inmates selling cocaine in the jail, that's not my
14 business.
15   It's my business, it's my business, it's
16 mine.  I don't care about when he ask me, who is the
17 inmate who is fight, who is the inmate who took the
18 stuff.  I don't want to get killed.
19   MR. GECKLE:  That's enough.
20 Q.  Okay.  All right.  But included in this
21 investigation was an investigation into the claims
22 that are the reasons why you are here today, that
23 you are claiming that you were assaulted by Officer
24 Kyle Wene?
25 A.  Wene.

1 Q.  Yes.  And that you were complaining that
2 you weren't -- you weren't allowed to practice your
3 religion because you weren't housed in the cell that
4 you would like.  Is that correct?
5   MR. GECKLE:  Object to the form.
6   THE WITNESS:  I don't understand the
7 last part of the question.
8 Q.  So this investigation --
9 A.  I understand this part.  The other part of
10 housing unit, I don't understand.
11 Q.  But what Officer Horvath was investigating
12 were your complaints, not just about what you allege
13 was going on in the prison, but about your alleged
14 assault by an officer, Officer Wene; correct?
15 A.  Yes.  Yeah.
16   MR. GECKLE:  He says he investigated
17 it.
18   THE WITNESS:  He was investigating
19 everything I put in my complaint to the Court,
20 which is more than that, I think more than
21 that.
22 Q.  So you spoke with Officer Horvath about
23 these things as part of his investigation?
24 A.  Yeah, I spoke about that.  Yes.  Yes.
25 Q.  So at the very least, he at least

1 interviewed you as part of his investigation;
2 correct?
3 A.  He interviewed me in the treatment.
4 Q.  Okay.  So at least -- he at least
5 performed at least some of an investigation into
6 your claims; is that correct?
7 A.  I don't know that.  I don't know he
8 perform investigation.  I don't know he talked to
9 them.  I don't know they talk to him.  All I
10 received is a letter telling me if you talk and you
11 are a liar, if you say any lie, I will discipline
12 you.  That's the meaning of the letter.
13 Q.  Is that the letter that was marked as --
14 A.  Exactly.  That's the meaning of the
15 letter, you are a liar, if you lie --
16   MR. GECKLE:  Shh.  I apologize for
17 shushing you.  Let him finish his question.
18   THE WITNESS:  Okay.
19   MR. GILLIAM-BROWNLEE:  And that was
20 Exhibit 6?
21   MR. GECKLE:  I believe so.
22   MR. GILLIAM-BROWNLEE:  Okay.
23   MR. GECKLE:  The letter from Horvath.
24 BY MR. GILLIAM-BROWNLEE:
25 Q.  The letter that you are alleging was him

1 calling you a liar and everything was --
2 A.  And if you --
3 Q.  -- this letter provided by Officer Horvath
4 to you?
5 A.  Yes, sir.
6 Q.  Okay.  Were you able to provide any
7 evidence regarding any of the allegations made in
8 your -- into your complaints that were investigated
9 by Officer Horvath?
10 A.  I did already.  I did already provide
11 evidence, which is dates, times, another inmate's
12 signature, and my request slip approving.  I did
13 already.
14 Q.  Previously documents indicated that you
15 were not able to provide dates about -- or times
16 about when these incidents occurred?
17 A.  Lie.
18 Q.  So you are saying that those documents
19 were a lie?
20 A.  You said any -- no.  I provide times when
21 I talk to him, because it was around the time, I
22 provide.
23   I said, like, say, for example, you asked
24 me about something happened this week.  I will tell
25 you in the beginning of the week, in the end of the

1 last week, something like that.

2      But, but, in my complaint to the Court, to

3 the United States District Court, I put dates, I put

4 times. You said for any complaints, for some

5 complaints of them, because there was some

6 complaints, when I find that it is -- that the hate

7 is all over, I began to take some notes to myself.

8      In the beginning, I wasn't taking notes.

9 But when I find that it's too much, I begin to take

10 notes to myself. And that's why I begin to put some

11 dates and times. And this is what I provide to

12 the -- to the Court right now in my -- in my request

13 slips or my complaint.

14    Q. So at the time it was being investigated,

15 you weren't able to provide any evidence?

16    A. I did provide some. I did provide some,

17 because it's in the letters too. If you see --

18    Q. Because -- wait. Hold on.

19    A. How I didn't --

20    Q. Wait. Correct me if I'm wrong, but what I

21 thought you just said was that at the time that you

22 spoke with Officer Horvath and Officer Werley, you

23 were not able to provide dates regarding this

24 information, or regarding the complaints, but you

25 were able to provide that information later when you

1 filed your lawsuit?

2    A. No. That's why I said my first language

3 is not -- maybe you misunderstand me. That's why I

4 said my first language is not English.

5      If you -- first of all, Detective Horvath,

6 he come to me because he said, which is -- please,

7 please. Please, I beg you to let me continue.

8    Q. But you already said -- you've already

9 covered this.

10    A. I didn't even answer nothing. You don't

11 want me to continue. I don't know why. I didn't

12 even say nothing yet.

13    Q. Proceed.

14    A. Mr. Horvath, he came to me regarding my

15 complaint to the Court. He got complaint papers.

16 If you read, he said you sent complaint to the

17 Court. I sent to my Judge and the DAs, on 7 and 9,

18 whatever dates he write, this complaints -- it's

19 including -- some of them including times and dates

20 on them, on the complaints.

21      Second of all, Detective Horvath is a

22 liar, because even when he introduce himself to me,

23 he introduce himself wrongly. He said I'm a

24 detective from the Court Administration, or the

25 Court -- I'm a detective from Court Administrator

1 coming to investigate your complaints to the Court.

2 He didn't -- he didn't introduce himself

3 like working in the jail. I swear to God. He told

4 me he is an investigator from the Court

5 Administrator. He introduce himself to me wrong.

6 This is number 2.

7      And in the complaints, there is dates and

8 times. So how come I didn't give him dates and

9 times if it's in the complaints?

10      MR. GECKLE: Hold on a second. Hold

11 on a second. Let me try to clear this up.

12      I believe we are referring to

13 Exhibit 8, which is the Investigative Report.

14 We've already read into the record the second

15 page of that, the investigative narrative.

16 Correct?

17      THE WITNESS: Um-hmm.

18      MR. GECKLE: Then beyond that, there

19 are some handwritten notes. And then beyond

20 that, there is a letter from you to the Court

21 Administrator of Northampton County.

22      THE WITNESS: Um-hmm.

23      MR. GECKLE: Right? That's dated

24 December 9th.

25      THE WITNESS: Yes, sir.

1      MR. GECKLE: Would you agree with me

2 if there is not any dates in here, then there's

3 no dates in there, in that letter to the Court?

4      THE WITNESS: May I look at the whole

5 letter, please?

6      MR. GECKLE: If there are dates, then

7 there are dates. All right?

8      And is it also fair to say that when

9 Horvath came to you, he asked you if you could

10 be more specific about days and times for these

11 incidents that you talked about, officers

12 passing kites and officers giving -- or inmates

13 giving officers commissary --

14      THE WITNESS: Okay. If about the

15 officers --

16      MR. GECKLE: No. No. No. Answer my

17 question.

18      THE WITNESS: Yes, sir.

19      MR. GECKLE: Is it fair that there is

20 nothing about dates in this letter that you

21 sent to the Court?

22      THE WITNESS: I don't see this

23 letter, no, that's including no dates, no.

24      MR. GECKLE: And is it fair that

25 Horvath came to you and asked you about dates

Page 156

1  when officers passed kites or inmates gave
2  officers commissaries or officers allowed
3  inmates to fight, or you saw use of drugs and
4  smoking of tobacco.
5          Did Horvath ask you about that?
6          THE WITNESS:  Yeah, he asked me about
7  that and --
8          MR. GECKLE:  And at that time you
9  were not able to give him the dates?
10         THE WITNESS:  I didn't -- not able; I
11  was able, but I told him it's not my business,
12  I don't want to get hurt in the jail.  That's
13  what I answered him.
14         I didn't say I don't know the dates,
15  or what I said to him, and he knows that.  I
16  said, I don't want to get hurt in the jail, I'm
17  not going to talk about, that's not my
18  business.  All what I care about --
19  BY MR. GILLIAM-BROWNLEE:
20    Q.  But you sent these letters to the Court
21  Administrator complaining of these issues?
22    A.  I complained that they do that to inmates.
23         MR. GECKLE:  Right.  Right.  You sent
24  the letter.  The letter speaks for itself.
25         THE WITNESS:  Yes.  Yes, sir.

Page 157

1    Q.  But you thought it wasn't your business,
2  and that's why you weren't able to provide any dates
3  to --
4    A.  Not able.  I don't want to.
5    Q.  Or you refuse --
6    A.  I refuse, exactly.
7    Q.  You refuse to provide --
8          MR. GECKLE:  He was worried about his
9  safety, he said.
10         THE WITNESS:  Exactly.  I was worried
11  about my safety.
12  BY MR. GILLIAM-BROWNLEE:
13    Q.  Okay.  Were there any other incidents
14  involving correctional officers that denied you your
15  right to practice your religion freely?
16    A.  Can you repeat the question?
17    Q.  Were there any other incidents that we
18  haven't talked about involving correctional officers
19  at Northampton County Prison that did not allow you
20  to practice your religion freely?
21    A.  Yes.  Yes.  When I -- all the officers of
22  Northampton County, they told me that it's an order
23  from the lieutenant that I cannot do wudu in my
24  cell.  I cannot -- I cannot wash.  I cannot wash my
25  hands, my feets, my face, in my cell.

Page 158

1  I have to use the sink while the cell is
2  locked most of the times.  In any block, you're
3  going to be locked in from 5:00 to 7:00 or from
4  12:00 to 2:30.  You are going to be locked the whole
5  night.  Because say, for example, it's different --
6  I have to pray all the day.
7    Q.  When did these occur?
8    A.  This is from Officer Barofski.  He told me
9  when they put the paper on my -- on my cell saying
10  that I can't -- I can't wash anything except my face
11  in the sink, Officer Barofski told me that the
12  lieutenant --
13         MR. GECKLE:  What lieutenant?
14         THE WITNESS:  He didn't tell me the
15  name.  He say it's order from the lieutenant,
16  that -- you can bring him now.  I don't care.
17  Bring him and ask him this question.  He said
18  it's an order from the lieutenant that you
19  can't do wudu except in the shower.
20    Q.  When did this happen?
21    A.  That was in B2.  What date?
22    Q.  So back when you were first housed?
23    A.  Yeah.  That's from the beginning of my
24  arrest, yeah.  And again Officer Rivera in K Block,
25  before I go the E Block, he told me the same.  He

Page 159

1  told me, Gad, you know you cannot do wudu.  You have
2  to do it only in the shower.
3          Because I was trying to do it in the
4  shower.  Because they saw me.  I was try to do it in
5  the shower, but sometimes the door is locked, and I
6  have to pray.
7    Q.  But after that, after -- after whatever
8  happened where you were told that you weren't able
9  to wash in the sink, you were transferred to another
10  cell and you were able to wash in the sink?
11    A.  No.  He came to me, I told you, Officer
12  Rivera, in K Block, he told me, you know you only
13  allowed to do it in the shower --
14         But when you got to --
15         MR. GECKLE:  Now let him finish.
16         MR. GILLIAM-BROWNLEE:  I'm sorry.
17    A.  Officer Rivera, they moved me from B --
18         MR. GECKLE:  To G.
19    A.  To G, from G to K.  Officer Rivera came in
20  K Block because I think, I think, the inmates keep
21  complaining.  And he told me, you know, Gad, that
22  you are not supposed to do your wudu except in the
23  shower.  Do it like B Block.
24         Because I was doing sometimes -- I was
25  trying my best to make everybody happy.  I was doing

Page 160

1  in it in the shower. But sometimes the cell is
2  locked, what can I do? I have to pray.
3      Q. But eventually you were housed in a cell
4  where you were able to wash in a sink for your
5  prayer?
6      A. That was when I was by myself, in E Block.
7  And they segregate me, when they segregate me. And
8  even when they segregate me with some people, they
9  fart on my face and they doing that like I told you
10  before.
11      Q. So now you've made some claims that people
12  posted things on your door, on the door of your
13  cell?
14      A. I put the dates.
15          MR. GECKLE: He didn't ask you about
16      dates yet. Will you let him ask you a
17      question?
18          THE WITNESS: Oh, sorry about that.
19      Q. What was posted on your door?
20      A. I hate -- I beat my wife because I hate
21  woman. I like men. I'm a gay. That's one.
22  Another time, I'm a terrorist. And I think this is
23  two of them. And most of the time was verbal, like
24  talking, like camel, terrorist, whatever, laughing
25  with the COs about that.

Page 161

1          Even right now, even right now while I'm
2  in jail.
3      Q. They were posted on the outside of your
4  door?
5      A. On the window. I told you there is a
6  small window on the door. There is a small window,
7  a square. They put the paper. They -- I don't
8  know, they get the tape or whatever, and they stick
9  it on the window and they leave it over there.
10      Q. Do you have any evidence of --
11      A. Yeah. I put the date and the time on my
12  complaint. On my complaint to the Court, it's by
13  the date and the time, because I took the date and
14  the time they put it when I saw it happening, I took
15  the date.
16          When I see that it's happening, they
17  putting papers on my door, I took the paper and I
18  took the date and I put it, because you can't get
19  the paper, you are inside the cell. They put it
20  outside of my door like everybody look at it and
21  laugh.
22          And the CO came, the CO Colarusso -- he
23  took -- I told him, like why is he doing that? Can
24  you please remove this paper? He took the paper, he
25  said what is this? I hate woman. He read it

Page 162

1  loudly. I hate woman, I beat my wife, and I like
2  men, I'm a gay. He put it again on my door, and he
3  left. He took it off, and he put it by his hand and
4  he left. Like this is -- this is you.
5      Q. And this happened on E-Tier?
6      A. On E-Tier, sir.
7      Q. So while you were housed on E14?
8      A. While I'm housed in E16.
9      Q. E16?
10      A. That was on E16. He just moved me to E14
11  like a week or something before they take me to
12  upstate.
13      Q. Where were -- you just mentioned that you
14  were able to see the date and the time to write it
15  down. Where were you --
16      A. Approximately, not mention that I been
17  able. Approximately. I put it approximately
18  like --
19          MR. GECKLE: I didn't understand a
20      word -- could you slow down, please.
21      Q. You just testified that when they would
22  put these papers on your cell window, you would look
23  at the -- you would look at the date and time and
24  write it down?
25          MR. GECKLE: I object to the form.

Page 163

1      A. Okay. Can I answer?
2      Q. Yes.
3      A. It's approximately. If you look on my
4  request, I didn't put exact date and exact time.
5  Like I put the time, I know it's lunch time, so it
6  happened between, for example, 10:00 and 10:30, so I
7  put from 10:00 to 10:30.
8          There is no exact time in front of me.
9  There is no clock like that I can look on it. The
10  date, because I count it in my mind, that's all.
11  But if you look on my request slip, there's no time.
12  If I have a clock in front of me I would say at
13  3:30. I put between 3:00 and between 4:00, between
14  5:00 and 6:00.
15          Why? I know that when they do, for
16  example, when they do this count, it's at six
17  o'clock. When it's lunchtime --
18          MR. GECKLE: All right. All right.
19      All right.
20      A. That's why I put it approximately. But I
21  don't have access to clock. I have no access to
22  time, sir. I put it -- look at my request.
23          MR. GECKLE: All right. All right.
24      Q. Okay. But you had -- you were able to
25  write down the date and the time --

Page 164

1 MR. GECKLE: He's just answered that,
2 Charles. He said he approximated based upon
3 whether it's lunchtime or --
4 THE WITNESS: I couldn't --
5 MR. GECKLE: Shh. When it's time for
6 counting, things like that.
7 MR. GILLIAM-BROWNLEE: Okay.
8 THE WITNESS: May I say something?
9 MR. GECKLE: No. No.
10 THE WITNESS: My first language is
11 not English. That's all.
12 MR. GECKLE: You've already
13 established that. We know that already. You
14 are doing fine.
15 THE WITNESS: I'm not lying in
16 anything.
17 MR. GECKLE: I apologize for shushing
18 you.
19 BY MR. GILLIAM-BROWNLEE:
20 Q. Do you still suffer any injuries from
21 any -- from the alleged assault by Officer Wene?
22 A. Yes.
23 Q. What injuries are you currently still
24 suffering?
25 A. First of all, I went to the doctor, and he

Page 165

1 told me that there is some -- I told him in certain
2 movement, I feel pain. He tells me this is
3 something called cartilage between the ribs. It's
4 very hard to heal.
5 MR. GECKLE: Is that cartilage? Is
6 that what you said?
7 A. Cartilage, something like that. I don't
8 know, I'm not a doctor. He said something like
9 cartilage. And he said it's between the ribs and it
10 is very hard to heal. That's why when you -- it can
11 be with you your whole life. This is number one.
12 Number two, I feel very very hard to trust
13 anybody, or to -- I have very very depression and
14 very stress and mental -- I don't know how to
15 explain it in English. But the way they treat me,
16 it makes me really, really, really change my
17 personality, change my mentality. It make me sick
18 mentally.
19 MR. GECKLE: He asked you about
20 Officer Wene I think punching you in the ribs
21 or pushing you in the ribs.
22 THE WITNESS: That's my answer.
23 MR. GECKLE: All right.
24 THE WITNESS: That's my answer about
25 if somebody punch me or push me or --

Page 166

1 MR. GECKLE: All right. That's your
2 answer.
3 THE WITNESS: -- or kick me or hurt
4 me. What do you think, I'm not going to be
5 suffering?
6 MR. GECKLE: That's enough.
7 BY MR. GILLIAM-BROWNLEE:
8 Q. So you still have pain in your --
9 A. To now, yes, sir.
10 Q. On which side of your body?
11 A. On my left side.
12 Q. On your left side?
13 A. Yes, sir.
14 Q. You still have pain on your left side?
15 A. Um-hmm.
16 Q. And can you describe that pain?
17 A. It's only in certain movements, like say
18 for example, if I'm laying down, and for certain
19 time, like I'm stretching my -- and then I come to
20 sit down, I feel like stabbing, like pain, very hard
21 stabbing in certain movements, only in certain
22 movements. That's it.
23 And if I'm laying down, that's it. If I'm
24 like watching TV and laying on my shoulder like
25 that, or I'm moving in certain movements, not all

Page 167

1 the movements, not all the movements. Only certain
2 specific movements. It hurt me.
3 And I talk to doctor about it. And she
4 told me that this is something between your ribs
5 called cartilage, and this is hard to heal. Even if
6 your rib heal --
7 MR. GECKLE: You've already told us
8 that.
9 Q. When did you seek treatment for this?
10 A. I talk to treatment here, and in Waymart.
11 And I talk to the psychiatric about it. I talked to
12 the --
13 MR. GECKLE: Stick with here. Who --
14 when did you talk to anyone here?
15 THE WITNESS: Before I leave. Before
16 I leave, and after I came to the doctor.
17 BY MR. GILLIAM-BROWNLEE:
18 Q. Did you speak with a nurse?
19 A. Nurse, doctor, everybody.
20 Q. Which nurse did you speak with?
21 A. All of them. All of them. Like I don't
22 know the names, sir.
23 Q. Did you file sick requests regarding this?
24 A. Yes, I did file sick requests that I have
25 pain. And I talk to the nurse. I filed sick

---

Page 168

1 requests when I first -- when I first get punched.
2 But talking to the nurse about the cartilage, I
3 think that was when I came, because I thought it was
4 going to heal, but it's never healed.
5    Q. Do you have copies of the sick requests
6 that you filed?
7    A. They don't given you copies. They don't
8 send back copies. They keep it for themselves.
9 Never going to send a sick request and they send it
10 to you back. Never happened. I never seen it. you
11 just send a --
12       MR. GECKLE: You've already said
13   that. You've already said that.
14       THE WITNESS: Okay.
15    Q. So what activities were you able to
16 perform before that you can't perform now as a
17 result your injury?
18    A. What activities?
19    Q. Yes.
20    A. What do you mean the activities?
21    Q. Are you limited in your movement, that you
22 can't do something that you used to be able to do?
23    A. No, I do all the activities. I do all the
24 activities. Even when I told you I have pain when I
25 lay down on my -- or stretching or laying down

---

Page 169

1 watching TV, even when I stand up, I can stand up, I
2 can do, but I have pain. I feel pain. That's all.
3      I can do all the activities, but still
4 pain.
5    Q. Okay, got it. And you suffer -- you claim
6 that you suffered mental injuries by just being --
7    A. I'm on mental medication right now. Yeah.
8 Because when I don't take the medication, I -- I
9 keep walking around, I keep like feeling like I'm
10 very, very -- I don't know how to say it, like my
11 brain is going to explode.
12      I feel like my brain -- what happened to
13 me is abnormal. I feel like I want to get out of
14 the hole of the cell, like I want to break the wall
15 and get out from the other side. I feel like I'm
16 crazy. When I don't take the medication, I'm not
17 normal.
18    Q. What do you believe that that was a result
19 of? What do you believe that now your mental health
20 issues was a result of?
21    A. All of what they did to me. All of what
22 they did to me. All since Mr. Harman -- Mr. Harman
23 used to -- I will tell you something if you don't
24 mind, if my lawyer don't mind. Mr. Harman -- I told
25 to one guy, he want to move out of the PC. He want

---

Page 170

1 to go to the block.
2      I told him, if you want to move out, and I
3 can tell you that, I told him if you want to move
4 out, write a request that you have a problem with
5 me, he will move you next day. He said why. I said
6 because he hate me.
7      He wrote a request saying that, they move
8 him next day. And the guy didn't even tell me what
9 he wrote in his request. I know what his request
10 is. How I know his request?
11       MR. GECKLE: You didn't answer his
12   question.
13    A. They used to hate me. That caused a lot
14 of problems. The hate and the discrimination and
15 abusing they did to me is a lot.
16    Q. So your mental health issues that you now
17 currently have is a result of the fact that you
18 suffered hate?
19       MR. GECKLE: And discrimination, and
20   the other abuse that he's described earlier.
21    A. Exactly.
22       MR. GILLIAM-BROWNLEE: Okay. Just
23   give me a couple of minutes to make sure I'm
24   not missing anything.
25    Q. Where are you currently housed at

---

Page 171

1 Northampton County Prison?
2    A. Segregation.
3    Q. On E-Tier?
4    A. On the E-Tier. They put me at DS. They
5 disciplinary me.
6    Q. You're on the disciplinary --
7    A. Disciplinary on E-Tier.
8      Do you want me to read --
9       MR. GECKLE: Let him ask a question.
10       THE WITNESS: Okay.
11    Q. Are you housed alone, or are you housed
12 with a cellmate?
13    A. Alone.
14    Q. And are you able to practice your
15 religion?
16    A. In my cell by myself, yes.
17       MR. GILLIAM-BROWNLEE: Okay. That's
18   all I have.
19           * * *
20        EXAMINATION
21 BY MR. GECKLE:
22    Q. I just have a couple of questions. First
23 of all, wudu, how do you spell that?
24    A. W-U-D-U, wudu.
25    Q. And what -- can you tell us in layman's

---

1 terms, somebody that's not a Muslim, what is wudu?
2     A.   It's -- it's cleaning yourself before you
3 pray.  Like say, for example, if you are eating and
4 you have food in your mouth, you have to wash your
5 mouth.
6     Q.   You don't have to give me all the details.
7 It's cleaning before you pray?
8     A.   Yes, exactly.
9     Q.   Is that required by the Muslim faith that
10 you be allowed to clean before you pray?
11     A.   It's required.  If there is water
12 available, you have to use the water to clean
13 yourself before you pray.
14     Q.   And when you were on B Block, you were
15 told you could not do wudu in the sink?
16     A.   Except in the shower, yes, sir.
17     Q.   And the showers were not always -- you
18 said the showers sometimes were locked?
19     A.   The cells all most of the time are locked.
20 Like, say for example --
21     Q.   All right.  When were the showers
22 available to you to use if you wanted to do wudu in
23 the shower?
24     A.   Only in the early morning until 12:00.
25 They lock us.  That's in B2.  And B2 in the early

1 morning until 12:00.  Then we locked from 12:00 --
2     Q.   Wait.  Wait.  When were they available?
3 They were available from --
4     A.   Some blocks they are available at certain
5 times.
6     Q.   I want to know about B Block, where you
7 were.
8     A.   B Block, from the morning, from -- I think
9 they opened the door at 7:00, I think, I'm not sure,
10 until 12:00.  Then from --
11     Q.   12:00 noon?
12     A.   12:00 noon, which I don't have to do any
13 pray at this time, because there is no prayer at
14 this time.  The prayer --
15     Q.   Are they opened up again after 12:00 noon?
16     A.   They open -- at 12:30 they open it again
17 until, I think, 5:00.  And then they lock it at 5:00
18 until I think 6:30 or 7:00, I'm not sure.  And then
19 they -- they open it from 6:30 to 9:00.  And then
20 they lock it again at 9:00 or 9:30 until 6 o'clock
21 in the morning.
22     Q.   So the showers are open from 7:00 a.m. to
23 12:00 noon?
24     A.   Um-hmm.
25     Q.   Right?  Is that right?

1     A.   Yes.  Yes.
2     Q.   And then they lock them for a half an
3 hour, from --
4     A.   From 12:00 to 2:30.
5     Q.   12:00 to 2:30?
6     A.   Yes, sir.
7     Q.   All right.
8     A.   2:30 or 3 o'clock sometime.
9     Q.   Hold on.  And then they --
10     A.   Some days they lock us to two days
11 straight, no out time at all.
12     Q.   Well, what I'm trying to find out is when
13 were you not -- you're supposed to pray five times a
14 day?
15     A.   Yes, sir.
16     Q.   How many times a day were you prevented
17 from praying because of the showers being locked?
18     A.   Most of the time, because first of all --
19     Q.   When do you first pray?  What time do you
20 first pray?
21     A.   First pray, sometimes -- it varies,
22 sometimes at 4:00, sometimes at 5:00.  Like right
23 now it's like 4:30 in the morning.
24     Q.   Well, the showers are always closed at
25 four o'clock --

1     A.   At 4:30 in the morning, for sure.
2     Q.   When is the next time you pray?
3     A.   And if the light come on, you can't pray
4 this prayer, you missed it, because it's only --
5     Q.   I didn't ask you that.  I asked you when
6 is the next time.  You said the first is 4:00 to
7 5:00?
8     A.   Right now it's 4:30 exactly.
9     Q.   When is the next?
10     A.   The next time is at one o'clock,
11 1:00-1:05, that's the next pray.
12     Q.   All right.  And are the showers
13 available -- were the showers available in B Block
14 then at 1:00 p.m.?
15     A.   No, we closed.  The door is closed.
16     Q.   All right.  When is the next time after
17 approximately 1:00 p.m.?
18     A.   Five o'clock, which is we are supposed to
19 be locked in, five o'clock, dusk.
20     Q.   Were the showers available to you?
21     A.   No.  No.
22     Q.   All right.  And when is the next time
23 after 5:00 p.m.?
24     A.   Right now -- right now it's supposed to --
25     Q.   I'm not talking now.  I'm talking about

Page 176

1 June of 2017 when you were on B Block?

2    A. June and July is the same, yeah. Same

3 time approximately. So the next one is at 8:30,

4 which is right now, the Maghrib, which is -- the

5 Maghrib is 8:30 right now, and -- 8 o'clock.

6 This is the door is open. I can do it in the

7 shower. But some days --

8    Q. I'm not asking you that yet. When is the

9 next time? You got --

10    A. 10:30.

11    Q. 10:30 at night?

12    A. 10:15, 10:10 something like that.

13    Q. 10:15, 10:30?

14    A. Approximately, yeah.

15    Q. All right. So when you went to pray at

16 the four or five o'clock in the morning time, there

17 is no shower available to you?

18    A. No.

19    Q. And you told the COs that the inmates

20 would not let you use the sink. Is that what the

21 problem was?

22    A. Yes. Yes.

23    Q. And the inmates said too bad, we told you

24 you can't use the sink, you have to use the shower?

25    A. They put paper on the sink saying you

Page 177

1 can't use the shower.

2    Q. Who is they?

3    A. The inmates put paper on the sink saying

4 you cannot use the sink except for washing your

5 hands.

6       Then I told the CO and they said that the

7 order from the lieutenant that you can only use the

8 shower.

9    Q. And at 1:00 p.m. is your second time when

10 you pray; right?

11    A. One o'clock. I can't pray because the

12 door is locked until 2:30.

13    Q. When you say the door, what door is

14 locked?

15    A. The cell door, the door of the cell, we

16 are locked inside. And sometimes the cell is locked

17 for two days straight. We can't get out. In the B

18 Block, sometimes they lock us in the cell.

19    Q. And at 5:00 p.m., why can't you use the

20 showers at 5:00 p.m.?

21    A. Because we are locked from 5:00 to 6:30.

22    Q. You are locked in?

23    A. In the cell, yeah. It's the count time.

24 It's lock time at this time.

25    Q. Why can't you pray at like 4:30, 4:35,

Page 178

1 4:50?

2    A. Because in the Koran, in the (the witness

3 speaks in Arabic) means -- I know you don't

4 understand it -- means that the pray is on time. It

5 can be different. It has to be on time. It's on

6 time. It's in the Koran, in our Bible, it say that.

7    Q. All right. 8:30, why can't you use the

8 shower at 8:30 when you were on B Block? Why

9 couldn't you use the shower?

10    A. 8:30 at night?

11    Q. Yes.

12    A. Sometimes I said I -- sometimes I use the

13 shower.

14    Q. All right. That's the one you could?

15    A. Yeah.

16    Q. And how about 10:15?

17    A. I'm locked in. I can't use the shower.

18    Q. You're locked in?

19    A. Yeah. They lock the door at 9:00, 9:30.

20 How am I going to open the door and go?

21    Q. Hold on. All right. And when you were on

22 the Gallery, were you able to do wudu when you were

23 in --

24    A. Impossible. In the Gallery, impossible,

25 because we locked down the whole day. We only get

Page 179

1 out for 20 minutes, to shower or phone call. And

2 this 20 minutes --

3    Q. All right. You answered the question. On

4 K Block, were you able to do wudu when you were on K

5 Block?

6    A. I was doing it, but they were complaining

7 about me. They been complaining about me.

8    Q. We saw that. It was like --

9    A. Yeah.

10    Q. We saw that. Then you get sent to E

11 Block; right?

12    A. Yeah.

13    Q. You were in your cell for 23 hours a day;

14 right?

15    A. Me, 24 sometimes. But most of the time

16 24. But, yeah, 23 hours, supposedly.

17    Q. You were supposed to get out 20 minutes a

18 day for a shower and a phone call?

19    A. Yeah. Yeah. Yes, sir.

20    Q. And it's your understanding that the only

21 reason you were on E Block is because the other

22 inmates complained about your practicing your Muslim

23 faith?

24    A. I didn't even get any complaint. I

25 didn't -- I was asking. I didn't understand why

Page 180

they moved me. I was getting crazy in my cell. And I don't know why they put me in a graveyard like that. They just take me from my cell to put me in E Block. I didn't -- didn't give me any answer.

Q. Did anyone ever tell you -- you were on E Block for seven months. You were in solitary confinement for seven months; right?

A. Yes, sir.

Q. Between approximately October 2017 --

MR. GILLIAM-BROWNLEE: Objection to form.

Q. -- until April of 2018; right?

A. Yes, sir.

Q. Were you ever given any reason why you were in solitary for that -- you know, that seven-eight month period?

MR. GILLIAM-BROWNLEE: Objection to form.

A. No. They didn't -- they didn't give me a specific reason. Nobody answered me, except after I complained to the Court, and I see Mr. Harman, he came and he said I will put you over there.

Q. You are not answering my question.

A. No, nobody give me a reason. No, sir.

MR. GECKLE: All right. Those are

Page 181

all the questions I have for you.

MR. GILLIAM-BROWNLEE: Okay. I don't have any further questions.

THE WITNESS: Do you mind I read -- I testify from my celly?

MR. GECKLE: No, because that has nothing to do with this.

THE WITNESS: A statement. Okay.

* * *

RE-EXAMINATION

BY MR. GILLIAM-BROWNLEE:

Q. Okay. Just one more question. So what is your understanding of solitary confinement?

A. I don't understand what's this mean.

Q. What do you consider to be solitary confinement?

A. What's the meaning of solitary confinement? I don't know what's this mean.

Q. What is your understanding of what that means?

A. Segregation? Maybe? That's the meaning of it. Solitary confinement is mean segregation? Or to --

Q. What does it mean to you?

MR. GECKLE: Solitary means by

Page 182

yourself.

THE WITNESS: I didn't understand it. That's why I'm asking. What does this mean? So what is my understanding to what?

BY MR. GILLIAM-BROWNLEE:

Q. What if I'd say -- you tell me that you were in solitary confinement. What does that mean; that you were housed alone?

A. Now I understand mean to be by yourself, yeah.

Q. But you did have roommates while you were on E-Tier; correct?

A. Yeah.

Q. So technically you weren't really housed alone the entire time?

A. I been ten months in Northampton County, seven of them by myself and three was with other inmates. But seven of them they -- the last seven after the inmates complain about me praying, they said segregate me, or solitary confinement, whatever you call it, there for seven months, yes.

Q. But you did have roommates when you were able to get along with --

A. When first they came, before they know that I'm praying.

Page 183

Q. You did have cellmates where you were able to get along with your cellmates?

A. Yes. I never have no problem with nobody. I never have no problem with nobody, except they -- even they complain, this complaints, they give to the COs. They never talk to me. They go and talk to the COs, and the COs just moved me.

MR. GILLIAM-BROWNLEE: No further questions.

* * *

RE-EXAMINATION

BY MR. GECKLE:

Q. When you were on E-Tier, I know we heard about Inmate Long; right?

A. Inmate who?

Q. Inmate Long.

A. Long, yeah. Yes.

Q. Have you had other cellmates on E-Tier? And we're talking now about back in --

A. I know what you're talking about. I know when it was, yes.

Q. In October of 2017 through April of 2018?

A. I know.

Q. Did you -- how many other cellmates did you have besides Long?

1    A.  As I remember, Mr. Long and Mr. Luis
2  Cuevas.  I have no problem with Luis Cuevas at all.
3    Q.  I didn't ask you if you had problems.
4    A.  No.
5    Q.  How many other cellmates did you have?
6    A.  Mr. Luis Cuevas, Mr. Long, Mr. Frank
7  Hanuszak and Mr. Collin Rice.
8    Q.  Okay.  Those are the ones you can
9  remember; right?
10    A.  This is the ones I can remember, the four,
11  all of them.
12    Q.  Regardless of whether you have a cellmate
13  or not, you are -- are you kept in your cell 23
14  hours a day, except for the -- you are kept in your
15  cell, except for the time where you are allowed out
16  to take a shower or make a phone call?
17    A.  Yes.  And sometimes I am not able even to
18  take a shower or a phone call.
19    Q.  Do they allow you any recreation when you
20  are on the E-Tier?
21    A.  In the beginning, no.  But when I complain
22  too many times, then they began to give it to me.
23          MR. GECKLE:  Okay.  Those are all the
24    questions I have.
25          MR. GILLIAM-BROWNLEE:  No further

1  questions.
2          (Witness excused.)
3          (Deposition concluded at 3:56 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T E
I, Florita C. Hobaugh, Court Reporter
and Notary Public in Berks County,
Pennsylvania, do hereby certify that Ahmed F.
Gad was by me first duly sworn to testify to
the whole truth and that the above deposition
was recorded by me and was transcribed by means
of computer-aided transcription under my
personal direction and that the said deposition
constitutes a true record of the testimony
given by said witness.
I further certify that I am not a
relative or employee of any of the parties, a
relative or employee of any attorney involved
in this action or financially interested
directly or indirectly in this action.


Florita C. Hobaugh, RPR
Notary Public, Berks County,
Pennsylvania
My commission expires
December 18, 2019