# EXHIBIT I

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

AHMED GAD,                      )
                               ) Case No. 18-cv-03900-MSG
                               )
        Plaintiff(s),          )
                               )
                               )
      v.                       ) Philadelphia, Pennsylvania
                               ) April 8, 2021.
NORTHAMPTON COUNTY,            ) 10:05 a.m.
et. al.,                       )
                               )
        Defendant(s).          )
_____)

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE MITCHELL S. GOLDBERG
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:        PATRICK G. GECKLE, ESQ.
                          Law Offices of Patrick Geckle
                          1515 Market Street, Suite 1200
                          Philadelphia, PA 19102

For Defendants:           SAMANTHA RYAN, ESQ.
                          The MacMain Law Group
                          433 W. Market Street, Suite 200
                          West Chester, PA 19382

```
 1   Court Recorder:                    Stephen Sonnie

 2                                      Clerk's Office

 3                                      U.S. District

 4

 5

 6

 7   Transcription Service:

 8

 9           Foothill Transcription Company, Inc.

10           9328 Elk Grove Blvd., Suite 105-309

11           Elk Grove, CA  95624

12

13

14   Proceeding recorded by electronic sound recording;

15   Transcript produced by transcription service.

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES FOR THE
PLAINTIFF:

Ahmed Gad           11    22
    (By Mr. Geckle)


WITNESSES FOR THE
DEFENDANTS:

Mark Bartholomew    33    45    57    59
    (By Ms. Ryan)

1                          E X H I B I T S

2      PLAINTIFF:                              Marked    Admitted

3      Exhibits 1 to 13                          8           8

4

5

6

7

8

9

10

11     DEFENDANTS:                             Marked    Admitted

12     Exhibits 1 to 11                          8           8

13

14

15

16

17

18

19

20

21

22

23

24

25

26

```
1              PHILADELPHIA, PENNSYLVANIA

2             THURSDAY, APRIL 8, 2021

3        (PROCEEDINGS HELD IN OPEN COURT:)

4            THE BAILIFF:  All rise.  The Court is now in

5  session.  The Honorable Mitchell Goldberg presiding.

6            HONORABLE JUDGE MITCHELL S. GOLDBERG:  Have a

7  seat.

8            MR. PATRICK G. GECKLE:  Good morning, Your Honor.

9            THE COURT:  All right.  This is Ahmed Gad versus

10  Northampton County, Civil Matter 18-3900.  And who is here

11  on behalf of the Plaintiff?

12            MR. GECKLE:  Patrick Geckle on behalf of the

13  Plaintiff, Your Honor.

14            THE COURT:  Good morning.

15            MR. GECKLE:  Good morning, Your Honor.

16            THE COURT:  And there's a number of Defendants

17  from Northampton County.  And one counsel represents all,

18  and who is that?

19            MS. SAMANTHA RYAN:  That's correct, Your Honor.

20  Samantha Ryan on behalf of all Defendants.

21            THE COURT:  Okay.  Good morning.

22            MS. RYAN:  Good morning.

23            THE COURT:  And who is with you?  Who is that?

24            MS. RYAN:  Your Honor, this is Deputy Warden

25  Bartholomew.  He's the one witness that we would intend to
```

1   call, if need be.

2          THE COURT:  Okay.  The record should reflect

3   we're on video feed with what prison, Mr. Sonnie?

4          MR. STEPHEN SONNIE:  SCI Phoenix, Your Honor.

5          THE COURT:  SCI Phoenix.

6          MR. SONNIE:  Yes, sir.

7          THE COURT:  And on the video feed is Mr. Gad.  Is

8   that how you pronounce it?

9          MR. AHMED GAD:  Yes, sir.

10         THE COURT:  Okay.  Can you -- can you see?

11  That's me right here.  Can you see us and hear us okay?

12         MR. GAD:  Yes, sir.

13         THE COURT:  Okay.  So where we are in this case,

14  I think it's fair to characterize it as a retaliation case,

15  and that before we get to the substance of the allegations,

16  the Defendants are alleging that the matter should be

17  dismissed as a matter of law because the Plaintiff didn't

18  follow administrative remedies within the prison first.

19  The law requires him to do that.  And I think we've had

20  discussions and various orders issued whereby, I know I

21  have to make the decision as a matter of law, but there's

22  disputed facts that need to be sorted out before I can make

23  that decision.

24         I think that the -- everyone acknowledges that

25  there was a grievance administrative process within the

```
 1   prison, but the dispute is whether that was made available

 2   to the Plaintiff.  So we're going to hear from him, and

 3   then we'll hear from the Defendant's witness.

 4             Have I fairly characterized where we are?

 5             MR. GECKLE:  I think that's spot on, Your Honor.

 6             MS. RYAN:  That's correct, Your Honor.

 7             THE COURT:  All right.  So let's do some

 8   administrative work then.  There's a stipulation that is

 9   signed by both parties' lawyers dated January 6th.  That

10   will be entered into the record.  I know that each side

11   wants to introduce exhibits.  I don't have those exhibits.

12   It's okay.  So Plaintiff wants to introduce what exhibits?

13   Give me numbers.

14             MR. GECKLE:  Your Honor, in the stipulation, we

15   refer to Exhibit 1 through 13.  I'm not sure I'm going to

16   move their admission because I'm not really sure that

17   they're going to help the Court in this case.

18             THE COURT:  All right.

19             MR. GECKLE:  I do have last night --

20             THE COURT:  You decide --

21             MR. GECKLE:  All right.

22             THE COURT:  -- how you want to do it, but if it's

23   1 through 13, it's my understanding that there's no

24   objection from the Defense, right?

25             MS. RYAN:  That's correct, Your Honor.
```

1      THE COURT:  And correspondingly, Defense may

2  introduce Exhibits 1 through 7.

3      MS. RYAN:  Your Honor, Mr. Geckle and I had

4  discussed after the stipulation that there would be

5  additional exhibits, Defense Exhibits 1 through 11.

6      THE COURT:  Any objection, Mr. Geckle, for 1

7  through 11 being admitted?

8      MR. GECKLE:  What -- and were they in the book

9  here?

10      MS. RYAN:  Correct.

11      MR. GECKLE:  Okay.  No.  No -- no objection, Your

12  Honor.

13      THE COURT:  All right, so just to make it go a

14  little smoother with the witnesses, all of Plaintiff's

15  exhibits that you want to introduce, and use are admitted,

16  and same thing with Defense.

17    (Plaintiff's Exhibits 1 to 13 entered into evidence.)

18      (Defendant's Exhibits 1 to 11 entered into evidence.)

19      MS. RYAN:  Thank you, Your Honor.

20      THE COURT:  And at the end of the day, you'll

21  tell me which ones you want me to consider.  Any other

22  administrative matter before we put the Plaintiff under

23  oath?

24      MR. GECKLE:  Last night, Ms. Ryan was kind enough

25  to email me over all the request slips that Mr. Gad had

1  filed while he was in Northampton County Prison during the

2  relevant time period.  And there might be a couple of those

3  that I might -- that I might use as well.

4          THE COURT:  Okay.

5          MS. RYAN:  And Your Honor, just for

6  clarification, those would be Defense Exhibit 11.

7          THE COURT:  Okay.

8          MS. RYAN:  You have a copy of all Defense

9  exhibits I have handed up to your clerk prior to when we

10 began.

11         THE COURT:  Is that what these are?

12         THE CLERK:  That's it.

13         THE COURT:  Okay.  Swear in the witness.

14         THE CLERK:  Yes, sir.  Good morning, Mr. Gad.

15                 AHMED GAD,

16 called as a witness on behalf of the plaintiff, having been

17 first duly sworn, testified as follows:

18             (The Witness is Sworn)

19         THE PLAINTIFF:  Yes, sir.

20         THE CLERK:  And would you please state your name.

21         THE PLAINTIFF:  My name is Ahmed Gad.

22         THE CLERK:  Thank you.

23         THE COURT:  And do we all agree -- well, I'm not

24 going to guess.  What's the -- I guess the burden to prove

25 that the administrative process was available to the

1  Plaintiff is on the Plaintiff?  Is that accurate?

2         MR. GECKLE:  Well, it's -- they have -- the

3  Defendant has the burden to prove that the administrative

4  remedies were not exhausted, which I pretty much stipulated

5  to that, you know, he did not file, the -- the process.

6         THE COURT:  Right.

7         MR. GECKLE:  Once they carry that burden, the

8  burden then shifts to me to show that the administrative

9  remedies were not available to him as that phrase has been

10 interpreted by the Third Circuit and the Supreme Court.

11        THE COURT:  Okay.  And that's -- that's all

12 preponderance statements, right?

13        MR. GECKLE:  Yes, sir.

14        THE COURT:  Agreed?

15        MS. RYAN:  Correct, Your Honor.  I'm in

16 agreement.

17        THE COURT:  Agree?

18        MS. RYAN:  Yes.

19        MR. GECKLE:  So for today's purposes, it's

20 Plaintiff's burden.

21        THE COURT:  Understood.  Go ahead.

22        MR. GECKLE:  Your Honor, can I examine him from

23 the counsel table?

24        THE COURT:  Wherever you're comfortable.

25        MR. GECKLE:  All right.

1                         PLAINTIFF'S EVIDENCE

2                         DIRECT EXAMINATION

3    BY MR. GECKLE:

4    Q.   Mr. Gad, good morning, sir.

5    A.   Good morning, sir.

6    Q.   Can you hear me all right?

7    A.   Yes, sir.

8    Q.   All right, very good.  All right, so Mr. Gad, just to

9    lay some background, I think it might be helpful for all of

10   us, we're here to talk about some circumstances concerning

11   your incarceration at the Northampton County Prison between

12   June 6th, 2017, and April 4th, 2018.  Right?

13   A.   Yes, sir.

14   Q.   All right.  I understand you ended up going back to

15   Northampton sometime later on, but we're only concerned

16   with June 6th, '17 to 4/4/2018, all right?

17   A.   All right.

18   Q.   All right.  And in your amended complaint, Mr. Gad,

19   you -- you raise a few issues, which I want to talk about.

20   But first, before I get into that, let me ask you this, you

21   practice the Muslim faith, sir?

22   A.   Yes.

23   Q.   All right.

24   A.   I'm Muslim, sir.

25   Q.   All right.  And are part of the tenets of the practice

1   of the Muslim faith, do those tenets require you to wash at

2   a certain time or a certain way?

3   A.   Yes.  Yes, sir.

4   Q.   Explain just briefly to Judge Goldberg because we're

5   not going to get into this too much today, but what -- as

6   far as your Muslim faith goes, what are the requirements

7   with regards to washing?

8   A.   Well, when I have to wash, I have to wash my mouth, my

9   nose, my face, my feet, my hands to the elbow, and like I

10  have to be clean before I pray.  So, and you're asking me

11  to explain how -- how to wash, right?

12  Q.   Well, no, not in a lot of --

13           THE COURT:  We don't need to do that.

14           MR. GECKLE:  I'm sorry?

15           THE COURT:  We don't need to do that.  It's not

16  at issue today.

17           MR. GECKLE:  All right.

18  BY MR. GECKLE:

19  Q.   And you said you have to do that before you pray.  Are

20  there certain times when you're supposed to pray?

21  A.   Yes, there are certain times.  Every prayer has to be

22  right on time.

23  Q.   And when is that?

24  A.   As of now, like Fajr, which is the first prayer,

25  that's like at 5:00 -- about 5:30.  And Dhuhr is at 1:03.

1  The Asr is at 5 o'clock, and the -- something like 5:02,

2  5:02.  The Maghrib is at at 7:35.  And the Isha is at 8:15.

3  Q.  All right.  Now, we discussed that you first were

4  admitted into Northampton County Prison on June 6th.  Your

5  complaint alleges that around -- beginning in late June,

6  you were denied the opportunity to wash, right?  Can you

7  tell -- can you tell His Honor briefly about that, how you

8  were denied the opportunity to wash?

9          THE COURT:  Why are we doing -- I mean, I know

10 there's some background necessary, but that's not at issue

11 today.

12         MR. GECKLE:  All right.  All right.  I'll move on

13 then, Your -- I --

14         THE COURT:  It's alleged -- it's pled that he was

15 denied the opportunity.  That's for another day.  Let's --

16 let's -- why don't we get to the grievance?

17         MR. GECKLE:  All right.

18 BY MR. GECKLE:

19 Q.  When you were being denied the opportunity to pray,

20 did you bring that to the attention of anyone in the

21 prison?

22 A.  Yes, I talked to the COO and I talked to the

23 lieutenant, and they refused.  They said I have to do it in

24 the shower.  So I can't do it in the shower because most of

25 the time like about (inaudible) they lock us in at times --

1   different times.   How am I going to be able to do it in

2   the (inaudible) which is at  5 o'clock in the morning.  It

3   doesn't make sense.  They open the door at 6:30 in the

4   morning.  So at -- they lock us in again at 12 o'clock and

5   like 2 or 3 o'clock.  So it's impossible to be able to do

6   that.  I asked for a grievance.  They refused to give me

7   any grievance, and the CO told me that -- that it's order

8   from the lieutenant you can only do it in the shower and I

9   told (overlapping) --

10             THE COURT:  Okay.  Okay.

11             MR. GECKLE:  All right.

12             THE COURT:  Next question.

13   BY MR. GECKLE:

14   Q.   What -- did you file any paperwork?  Did you file

15   either a grievance or a -- any kind of request to staff?

16   A.   They used to bring me only -- only request slips

17   sometimes.  Sometimes they said it was only going to hand

18   me a request slip and they give me that paper -- white

19   paper.  Sometimes they say we have both of them.  I asked

20   for a grievance.  I want to request that I want grievance.

21   They never give me formal grievance, and I had the

22   grievance on the tablet but in the first grievance --

23   Q.   Well --

24   A.   -- (inaudible) there was no tablet.  You can hear me?

25   Q.   I can hear you, but I want you to slow down just a

1    little bit.  Talk a little slower.

2    A.   Oh, I'm sorry.

3          THE COURT:  Just let your lawyer ask questions.

4    Okay?  So what was your question?

5    BY MR. GECKLE:

6    Q.   My question is without telling us who you talked to

7    about this, what kind of paperwork did you put in about

8    your being denied the ability to wash in accordance with

9    your religion?

10   A.   It was (inaudible) because I have no other form.

11         THE COURT:  His question -- you need to listen to

12   the questions and answer them concisely.  Your lawyer asked

13   you what type of paperwork did you put in to complain.

14   What's your answer?

15   BY MR. GECKLE:

16   A.   A request slip, sir.

17   Q.   All right.

18         THE COURT:  I didn't hear the answer.  What was

19   it?

20         MR. GECKLE:  A request slip, Your Honor.  And --

21         THE COURT:  A request slip.  Okay.

22         MR. GECKLE:  -- they're -- they're attached --

23         THE COURT:  It's --

24         MR. GECKLE:  -- as  11 in the -- in the binder,

25   sir.

1              THE COURT:  Thank you.

2    BY MR. GECKLE:

3    Q.   All right, now beyond a request slip, did you ever put

4    in a written grievance form?  Do you know what a written

5    grievance form is?

6    A.   I -- I know a grievance form what is it, but I never

7    had one.  I never could get one, so I can't do it.  It has

8    to be on a grievance form.  I asked for the grievance form.

9    They never give me one.  They refuse it.  They always said

10   -- first thing they said, you have to go to the super -- to

11   the lieutenant.  I talked to the lieutenant.  He say, let

12   me see what I can do, and I never got one.  And whenever I

13   asked can I get one?  Oh, yeah, I'll go get, we don't have

14   it, this kind of thing.  That's why I never filed any

15   grievance.  And I filed the grievances while I was upstate.

16   Like, I'm in the hole now because I filed a grievance

17   against the CO.

18   Q.   All right.  Well --

19   A.   So, why --

20              THE COURT:  Hold on.  Hold on.

21              MR. GECKLE:  We're not -- we're not talking --

22              THE COURT:  You need --

23              MR. GECKLE:  -- about upstate.  We're talking

24   about --

25              THE COURT:  You need to answer your lawyer's

1   questions.

2          MR. GECKLE:  All right.

3          THE COURT:  And only --

4          THE PLAINTIFF:  I'm sorry.

5          THE COURT:  -- the questions that are asked.  Go

6   ahead.

7   BY MR. GECKLE:

8   Q.   All right.  Is it fair to say, Mr. Gad, then, that you

9   never did file a grievance concerning your inability to --

10  to wash in accordance with your religion?

11  A.   No, sir.  I (overlapping) --

12  Q.   Did you ask -- did you ever -- did you ask for a

13  grievance form?

14  A.   Yes, sir.

15  Q.   All right.  And who did you ask --

16  A.   Because I ask --

17  Q.   Who did you ask to try to get a grievance form?

18  A.   All -- all the -- all the COs.  All the COs, which

19  there were (inaudible) I did ask them.  I asked the

20  lieutenant.  I asked a lot of -- every -- everybody I can

21  see in front of me over there and at no time did it come.

22  Q.   And how many times would you say you asked for

23  grievance forms in order to file a grievance about being

24  denied the -- the ability to wash the way you needed to

25  wash?

1  A.   Yes, many times.  Many times.  Like I can say like 20

2  times at least -- at least 20 times.  Maybe like 50 times

3  I've been asking.

4  Q.   All right.  Now, there's another incident that's

5  discussed or that you allege in your amended complaint

6  about being punched by a CO Wenie (phonetic) on or around

7  December 17th, 2017.  Did you ever file a request slip

8  concerning that incident?

9  A.   Concerning what, sir?

10 Q.   Concerning the incident where you were punched by

11 Corrections Officer Wenie.

12 A.   Yes, sir, I did.

13 Q.   All right.

14 A.   Yes, I -- I did file -- I did write a request because

15 that's what happened.  I did also write that (inaudible)

16 sometimes I need it as a request --

17 Q.   Slow -- slow down.

18 Al   -- that (inaudible).

19 Q.   Slow down a little bit, Mr. Gad, all right?

20        THE COURT:  I'm trying to help you here, counsel.

21        MR. GECKLE:  I'm sorry, sir?

22        THE COURT:  I'm trying to help you.

23        MR. GECKLE:  I know.

24        THE COURT:  You know.  Sir, you've got a really

25 good lawyer, okay?  Listen to his questions and answer them

1  concisely.  Go ahead.

2         THE PLAINTIFF:  So sometimes you said --

3         MR. GECKLE:  All right.  Hold on.  Stop, stop,

4  stop.  Please.  I mean, you're doing fine.  But as His

5  Honor says, let me try to get you through this.

6  BY MR. GECKLE:

7  Q.  So as a result of that request slip that you filed

8  about being punched by CO Wenie, was there an investigation

9  conducted?

10  A.  They took me to the office.  They pulled me down from

11  my cell to the office of -- of the -- I think war -- I

12  don't remember the name -- Warner or something like that.

13  And -- warning, warden.  So I went over there, and he first

14  -- he was like -- he don't believe me and was looking at me

15  like I'm a liar.  And then he look on the (inaudible) and

16  once he saw him punching me on my rib, he stand up and he

17  said I'm sorry, and he asked the CO to get the -- the

18  handcuffs off my hand.  And he said if he did it again, let

19  me know.  I said he already did it twice and I've been

20  writing.  I don't know why nobody got my request slips or

21  writing stuff.

22  Q.  All right.  The answer to the question is you did file

23  a request slip about being punched by CO Wenie.

24  A.  Yes, sir.

25  Q.  All right.  Did you ever file a grievance?

1   A.    I couldn't get the grievance form.

2   Q.    Why couldn't you get a --

3   A.    I've been trying.

4   Q.    Why could you not get a grievance form?  What

5   happened?

6   A.    Because they never give -- they -- they always say

7   talk to the lieutenant, and the lieutenant is the one who

8   can give it to you.  And whenever you find a lieutenant and

9   I ask him from behind the door because I am locked.

10  Sometimes they don't answer, they neglect, and if they

11  answer, they say let me see what can I do or what I can do,

12  and they leave, and they never send me one.

13  Q.    All right.  And there's one other incident I want to

14  cover.  You allege in your amended complaint that on

15  January 20th, 2018, the Corrections Officer Gorger

16  (phonetic) opened the door to your cell and ordered another

17  inmate to assault you.  Did you ever file any kind of

18  request -- request to staff, slip, about that incident?

19  A.    Yes, sir.

20  Q.    All right.

21  A.    I did.

22  Q.    Did you ever file any grievance form about that

23  incident?

24  A.    I couldn't get it, sir.

25  Q.    And why not?

1    A.    No.

2    Q.    What did you -- what did you do to try to get a

3    grievance form?

4    A.    I'll be talking to COs, the lieutenants, to everybody.

5    Nobody wouldn't give it to me.

6    Q.    Is the only way that you can get a grievance form is

7    from a CO or a lieutenant?  Do they keep them out in -- in

8    the -- on the block anywhere or do you have to request one

9    and --

10   A.    No, and --

11   Q.    -- and be given one?

12   A.    No, because she -- I asked the CO.  The CO said I

13   can't -- I don't have it.  You have to ask the lieutenant.

14   The lieutenant give it to you.  The lieutenant is not on

15   the block.  The lieutenant just can come one time during

16   the day or during the night.  You have to be waiting in

17   front of the door looking for him when he come.  And when

18   he come, I yell from my door.  I said LT, lieutenant,

19   please, can I get the grievance form?  Sometimes he tell me

20   let me see what can I do.  Sometimes he don't even answer

21   me.  He look at me like I'm crazy, and he leave.

22         MR. GECKLE:  Your Honor, those are all the

23   questions I have of Mr. Gad.  I might want to refer to a

24   couple of exhibits, but that's all I have for him.

25         MS. RYAN:  If I may, Your Honor.

1                          CROSS-EXAMINATION

2     BY MS. RYAN:

3     Q.    Good morning, Mr. Gad.  Can you hear me okay?

4     A.    Yes, ma'am.

5     Q.    Okay.

6              THE COURT:  Hold on for one second.  This is the

7     lawyer for the -- the prison personnel.  Listen to her

8     question.  Wait till she's done asking the question until

9     you answer, and answer only what she asks, okay?

10             THE PLAINTIFF:  Yes, sir.

11             THE COURT:  Go ahead.

12             MS. RYAN:  Thank you, Your Honor.

13    BY MS. RYAN:

14    Q.    Mr. Gad, what are you currently incarcerated for?

15             MR. GECKLE:  Objection.

16             THE PLAINTIFF:  Simple assault.  Simple assault,

17    perjury, criminal solicitation to commit perjury, and

18    intimidation of the witness.

19    BY MS. RYAN:

20    Q.    And what is perjury?

21    A.    It's -- it's lying.  To say -- to not to say the

22    truth.

23    Q.    Okay.  Mr. Gad, did you review your amended complaint

24    before it was filed with your attorney?

25    A.    Sorry, ma'am, I can't understand.

1    Q.    It's okay.  Did you review your amended complaint with

2    Mr. Geckle, your attorney, before it was filed?

3    A.    At least can you speak some English?  I can't

4    understand what you mean when you said (inaudible).  Can I

5    -- you said my lawyer what?

6    Q.    Did you review your complaints with your attorney

7    before you filed an amended complaint?

8    A.    Yes, my lawyer called me and he talked to me.

9    Q.    Were you truthful with your attorney when you spoke

10   with him about your complaints?

11   A.    I what with my attorney?

12   Q.    Were you truthful with him?

13   A.    Yes.  Sure.

14   Q.    Are you aware then that on Paragraph 20 on Page 6 --

15         MS. RYAN:  And Your Honor, this is Exhibit 2 for

16   the Defense.

17   BY MS. RYAN:

18   Q    -- that you state that you did file a grievance

19   regarding the instances you complain about?

20   A.    No, I never -- I never had my grievance.  How it say

21   that I did something and I never had it?

22   Q.    Are you aware that that's contained in your amended

23   complaint, that statement?

24   A.    Am I aware of what?

25   Q.    That statement is contained in your amended complaint,

1    are you familiar with that?

2    A.   I don't know.  Maybe it's a mistake, but maybe it's

3    something wrong, but I never have a grievance form, ma'am,

4    to file a grievance.  I know that for sure.

5    Q.   Okay.  And Mr. Gad, before you retained Mr. Geckle,

6    did you file your own complaint regarding these matters?

7    A.   Yes.  Yes.  Somebody give me -- huh?

8    Q.   Go ahead.

9    A.   Yes.  Yes, I filed my own complaint.

10   Q.   And were you truthful when you wrote your answers in

11   your complaint?

12   A.   Yes.

13   Q.   Are you aware that on Page 6 of your complaint, this

14   is Defense Exhibit 1, you state --

15   A.   This is what?

16          MR. GECKLE:  Which paragraph are we talking

17   about?

18   BY MS. RYAN:

19   Q.   Page 7 of your complaint.

20          MR. GECKLE:  Which paragraph?

21          MS. RYAN:  It is Paragraph E, about a third of

22   the way down the page.

23          MR. GECKLE:  Which?  I'm sorry, on which number?

24          MS. RYAN:  Page 7 of 11.

25          MR. GECKLE:  There's no numbers on these pages.

1          MS. RYAN:  Okay.  It's Section E and Section D.

2          MR. GECKLE:  Yeah, but what number?  They go like

3    Roman Numeral I, II, III, IV.

4          MS. RYAN:  VII.

5          MR. GECKLE:  Thank you.

6          MS. RYAN:  You're welcome.  Sorry.

7          MR. GECKLE:  Got it.

8    BY MS. RYAN:

9    Q.   Are you aware that you indicated on your complaint

10   that you filed a grievance regarding these matters?

11   A.   Like I told you, ma'am, I (inaudible) but if I -- if I

12   -- if I say that in my complaint, I think it's like

13   misunderstanding.

14   Q.   Okay.

15   A.   Because -- because I don't have that -- the complaint

16   in front of me, but I really didn't get any grievance in

17   the -- in the -- in the -- the Northampton County.  They

18   never give it to me, and if you have a problem

19   (overlapping) --

20          THE COURT:  Okay, okay, okay, okay.

21          THE PLAINTIFF:  All right.

22          THE COURT:  You've answered the question.  You

23   said it was a misunderstanding if it's written there.

24          THE PLAINTIFF:  Exactly.

25   ///

1   BY MS. RYAN:

2   Q.   Mr. Gad, you said you wrote request slips regarding

3   the behavior you complain about in your complaint, correct?

4   A.   A request slip?  Yes.

5   Q.   Correct.  A request slip?

6   A.   Yes.  Yeah, I wrote request slips, all the request

7   slips.

8   Q.   Did you have any --

9   A.   Many of them.

10  Q.   -- trouble getting a request slip?

11  A.   Did I have any copy of it you mean?

12  Q.   Did you have any trouble getting a request slip?

13  A.   A lot of trouble, a lot of trouble.  It's not easy to

14  get it.  Like I said before, sometimes they give you a

15  blank paper.  Sometimes they out of everything.

16  Q.   Okay, so sometimes if they didn't have request slips,

17  they would give you a blank piece of paper.

18  A.   Yes.

19  Q.   Did you ever try --

20  A.   And sometime --

21  Q.   Go ahead.

22  A.   Sorry?

23  Q.   I'll let you finish.

24  A.   And sometimes they gave blank paper.  Sometimes they

25  out of everything.

1   Q.   Mr. Gad, did you receive the inmate handbook?

2   A.   Yes, sir.  Yes, ma'am.

3   Q.   And did you familiarize yourself with the inmate

4   handbook?

5   A.   Did I what?

6   Q.   Did you familiarize yourself with it?  Did you read

7   it?

8   A.   I -- yeah, I read it.

9   Q.   Okay.  And did you read the whole thing?

10  A.   Did I read what, ma'am?  I'm sorry.

11  Q.   Did you read the whole thing?

12  A.   I think I read a lot of it.  I'm sure that I read a

13  lot of it when I got it.

14  Q.   Okay.  Do you have any reason to disbelieve me if I

15  read straight from the handbook?

16  A.   So I have to read the --

17           THE COURT:  Just so you're going to -- Go ahead.

18           MS. RYAN:  Looking on Page -- Exhibit, Your

19  Honor, 6, Page 42 of 55, Section 710 titled Jail Advisory

20  Board.

21  BY MS. RYAN:

22  Q.   It states here that, "The Jail Advisory Board serves a

23  vital role in improving the quality of life for the inmate

24  population.  The Jail Advisory Board is considered an

25  integral part of the inmate grievance process."  Did you

1  ever write the Jail Advisory Board regarding your

2  complaints contained -- pertaining to the officers at

3  Northampton County?

4  A.   You told -- you said did I ever write to the division

5  wardens?

6  Q.   To the Jail Advisory Board.

7  A.   I not seen that.  The procedure was to the shift

8  supervisor, the division wardens, and to the

9  superintendent.  I wrote a few of them, and I wrote to the

10  lieutenants and to everybody.  Remember, I wrote to

11  everybody.

12  Q.   Okay.  And Mr. Gad, my question is just simply did you

13  write to the Jail Advisory Board.

14  A.   Advisory Board?

15  Q.   Correct.

16  A.   No, I -- I -- I -- because if I -- if I write to the

17  Advisory Board, I have to go through the first steps of the

18  grievance.  I didn't get the grievance, ma'am.

19  Q.   Okay.  Did you ever write to the director of

20  corrections --

21  A.   Oh, yeah.

22  Q.   -- regarding your complaints.

23  A.   The super -- the director, yes.  I wrote to the

24  superintendent.  I wrote to the division wardens.    I

25  wrote to the -- I wrote to everybody in the jail.  I wrote

1   to the classification.  I wrote to the case manager.  I

2   wrote to the (overlapping) --

3            THE COURT:  Stop, stop, stop, stop.  She asked

4   you did you -- did you write to the director.  And you --

5            THE PLAINTIFF:  Yes, sir.

6            THE COURT:  And -- and you -- then you answered

7   questions that weren't asked.  The answer is yes.

8            THE PLAINTIFF:  Yes, sir.

9            THE COURT:  What's the next question?  Stop

10  adding information that you're not being asked about.  The

11  answer to the question is yes.

12           MS. RYAN:  Thank you, Your Honor.

13  BY MS. RYAN:

14  Q.   Mr. Gad, the period of time that you were incarcerated

15  from June 6th of 2017 to April 4th of 2018 wasn't the only

16  time you were incarcerated at Northampton County, correct?

17  A.   I'm sorry, you talk too fast.  I don't understand you.

18  Can you please talk slowly so I can understand you?

19  Q.   Absolutely.  The time period of June 6th, 2017, to

20  April 4th of 2018 wasn't the only time you were

21  incarcerated at Northampton County Prison, correct?

22  A.   Yes, ma'am.

23  Q.   Okay.  And you had other issues after -- during that

24  second incarceration, correct?

25  A.   Do I have other issues during this time of

1   incerceration?

2   Q.    During your second period of incarceration at

3   Northampton County Prison.

4   A.    Yes, yes, yes.

5   Q.    Okay.  And did you complain about those instances?

6   A.    Yes, ma'am.  I complained.

7   Q.    Did you file a grievance?

8   A.    I tried.  I couldn't get it.

9   Q.    Did you complain about not getting a grievance form?

10  A.    Yes, ma'am.  It's saved on the tablet.

11  Q.    Okay.  And you would agree with me that part of the

12  reason you brought this lawsuit is because you feel that

13  the correctional officers threatened you, correct?

14  A.    The correctional officers what?

15  Q.    Threatened you.

16  A.    Threatened me?

17  Q.    Correct.

18  A.    I think it's more than that.

19  Q.    Okay.  Did -- do you --

20  A.    Than just threaten.

21  Q.    Did you complain because you did not feel safe because

22  of their treatment?

23  A.    I complained that one -- one -- that the (inaudible).

24  Another time I remember I complained that he was -- he was

25  going to kick me in my face while I'm eating with his shoes

1  or his feet.  Another time, I complained -- I complained

2  about a lot of things, ma'am.  You say threatening.  It's

3  more than that.  It had to be about calling me names.  I

4  complained about making fun of me and -- and -- and

5  discriminating me between me and all the inmates.  I

6  complained about preventing me from praying and practicing

7  my religion.  Giving -- other things.  It's not only

8  threatening.

9  Q.   Did you consider that to be an emergency that you

10 wanted attention right away?

11 A.   Did I what?

12 Q.   Did you consider those situations an emergency?

13 A.   Emergency?

14 Q.   Yes.

15 A.   Yes, it is an emergency, true, because -- yeah.  I

16 took outside medication right now because what happened to

17 me.

18           MS. RYAN:  I have nothing further, Your Honor.

19           THE COURT:  Any redirect?

20           MR. GECKLE:  No, Your Honor.

21           THE COURT:  Okay.  So I'm going to then -- Mr.

22 Sonnie -- tell Mr. Sonnie to thank the prison, and we

23 can move on to the next witness.  I don't think he needs to

24 -- do you want him to stay for the rest of the proceeding

25 or --

```
 1            MR. GECKLE:  I don't think that's necessary, Your

 2   Honor.

 3            THE COURT:  All right.  All right, thank you, Mr.

 4   Sonnie.  Thank you, sir.

 5            THE PLAINTIFF:  Thank you.  Thank you, sir.

 6                      (Witness excused.)

 7            THE COURT:  All right, call your witness, please.

 8            MS. RYAN:  Yes, Your Honor.

 9            THE COURT:  Can he -- he can -- let me see.  I

10   guess you can go over.  Okay.

11            MS. RYAN:  The Defense calls --

12            THE COURT:  Go ahead.

13            MS. RYAN:  Deputy Warden Mark Bartholomew.  And

14   Your Honor, may I approach with the Defense exhibits for

15   the witness --

16            THE COURT:  Uh-huh.  Uh-huh.

17            MS. RYAN:  -- so he has a copy?

18            THE CLERK:  Good morning, sir.

19            MR. BARTHOLOMEW:  Good morning.

20            THE CLERK:  Please raise your right hand.

21                      MARK BARTHOLOMEW,

22   called as a witness on behalf of the defendants, having

23   been first duly sworn, testified as follows:

24                      (The Witness is Sworn)

25            THE WITNESS:  I do.
```

 1            THE CLERK:  And please state your name.

 2            THE WITNESS:  Mark Bartholomew.

 3            THE CLERK:  Thank you.

 4            MR. GECKLE:  I'm sorry, sir, what's your last

 5   name again?

 6            THE COURT:  Say your last name and spell it for

 7   Mr. Geckle, please.

 8            THE WITNESS:  Bartholomew, B-A-R-T-H-O-L-O-M-E-W.

 9            MR. GECKLE:  Thank you.

10            MS. RYAN:  May I proceed, Your Honor?

11                       DEFENDANT'S EVIDENCE

12                       DIRECT EXAMINATION

13   BY MS. RYAN:

14   Q.   Deputy Warden Bartholomew, how long have you been

15   deputy warden?

16   A.   Since June 18th of 2018.

17   Q.   And where are you the deputy warden?

18   A.   Northampton County Department of Corrections.

19   Q.   Before you were deputy warden, did you hold another

20   position with Northampton County Prison?

21   A.   Yes, I was the corrections treatment coordinator.

22   Q.   Okay.  Now, what was your job role in that earlier

23   position?

24   A.   I was a grading supervisor.

25   Q.   What does that mean?

1   A.   I was the -- I was the individual who the initial

2   grievance process would be sent to.  I would be the first

3   person to receive an inmate's grievance.

4   Q.   Okay.  And as deputy warden, do you have any role

5   regarding the grievance process?

6   A.   Yes, I do.  I'm the second step.  I'm the appeals step

7   of the grievance process.

8   Q.   Okay.  So you're pretty familiar with the grievance

9   process overall, then, correct?

10  A.   Yes.

11  Q.   Okay.  I'm not going to go into too much detail about

12  -- questions for you about what the grievance process is.

13  But are there alternatives to the standard grievance

14  process?

15  A.   Yes.

16  Q.   And what are they?

17  A.   If an inmate makes -- submit a request to a shift

18  supervisor, to any staff member to -- to request a

19  grievance, the requests slips are available on all units.

20  Q.   Okay.  And I want to direct your attention to the

21  inmate handbook.  It's in that black notebook that you

22  have, Exhibit 6.  And I believe it will be Page 42 of 55.

23  Section 710.  Can you describe to His Honor what role the

24  Jail Advisory Board has in the grievance process?

25  A.   The Jail Advisory Board is the final step of the

1  grievance process.  However, the Jail Advisory Board also

2  acts in an emergency situation where an inmate may write

3  directly to the Advisory Board if they feel the situation

4  is dire or an emergency situation.

5  Q.   Would an inmate need to utilize the grievance form to

6  do that?

7  A.   Absolutely not.

8  Q.   If they had blank paper, could they use that?

9  A.   Yes.

10  Q.   Could they use a request slip?

11  A.   Yes.

12        THE COURT:  How does that blank piece of paper

13  get to the Advisory Board?  So what I'm thinking is suppose

14  an alleged emergency regarding, and this is a hypothetical

15  obviously, regarding a threat of death or serious bodily

16  harm from a supervising officer, how does -- about a

17  supervising corrections officer in that block, how does the

18  prisoner bypass the person who he thinks is threatening him

19  and get it to the Advisory Board?

20        THE WITNESS:  There is an anonymous mailbox for

21  all grievances on a unit that are picked up by the

22  grievance supervisor on a daily basis.  They are placed and

23  the officer never touches a grievance once it's given to an

24  inmate.

25        THE COURT:  Got it.  That makes sense.  Go ahead.

1  BY MS. RYAN:

2  Q.   And other than the inmate handbook, other -- other

3  ways that an inmate would be made aware of the grievance

4  process?

5  A.   Yes, the grievance process, the flow chart is posted

6  on every unit as well as the synopsis of the grievance

7  process.

8  Q.   Okay.  And you mentioned a flow chart.  Is that

9  Exhibit 7 in that notebook in front of you?

10 A.   Yes, it is.

11 Q.   Okay.  And we see to the right that looks like the

12 standard grievance process; is that correct?

13 A.   Correct.

14 Q.   What do we see on the left?

15 A.   The left is the ability to submit a -- a grievance

16 directly to the Prison Advisory Board in an emergency

17 situation.

18 Q.   Okay.  And how would an inmate go about doing that?

19 A.   They would simply write a letter.  That letter is

20 delivered.  If they give us an emergency, it would be

21 addressed -- they can either put in the grievance box or

22 the mailbox directly to the Advisory Board.  At that point,

23 that would be delivered to the director of corrections, and

24 they would ensure that the Advisory Board receive that

25 immediately.

1    Q.    Okay.  Does that need to be on a formal grievance

2    form?

3    A.    No.

4    Q.    If an inmate had paper, could they write to the

5    director that way?

6    A.    Yes.

7    Q.    Could they use a request slip?

8    A.    Yes.

9    Q.    Have you seen inmates do that?

10   A.    Yes.

11   Q.    During your time as the initial step of the grievance

12   process from the jail's perspective, did you ever receive a

13   request slip titled grievance?

14   A.    Yes.

15   Q.    Did you treat that like a grievance?

16   A.    Absolutely.

17   Q.    Did you ever receive just a written letter titled

18   grievance?

19   A.    Yes.

20   Q.    Did you treat that as a grievance?

21   A.    Yes.

22   Q.    Is that a common occurrence at Northampton County

23   Jail?

24   A.    Yes, it is.

25   Q.    Is it -- based on your experience, is it fairly common

 1  that inmates know that they can do that?

 2  A.   Yes.

 3  Q.   Can an inmate write a complaint about not receiving

 4  grievance forms?

 5  A.   They can submit a request slip, yes, they could about

 6  not receiving a grievance.

 7  Q.   Have you ever received such a request slip?

 8  A.   Yes.

 9  Q.   Deputy Warden, are you familiar with Mr. Gad?

10  A.   Yes.

11  Q.   Are you familiar with his complaints that are alleged

12  against officers at Northampton County Prison?

13  A.   Yes.

14  Q.   The -- he mentioned a bunch of request slips that he

15  had forwarded.  Mr. Gad mentioned request slips that he had

16  sent and letters that he had written.  Does the prison

17  maintain those records?

18  A.   Yes.

19  Q.   Where do they maintain them?

20  A.   In the classification and treatment files.

21  Q.   Prior to today's hearing, did you have an opportunity

22  to review those?

23  A.   Yes.

24  Q.   Okay.  And specifically, Mr. Gad's inmate treatment

25  file.

1   A.   Yes.

2   Q.   Okay.  I want you to turn to Exhibit D-11.  It should

3   be the last exhibit in your notebook.  Do those documents

4   look familiar to you?

5   A.   Yes, those are the jail request slips.

6   Q.   And whose request slips are they?

7   A.   Ahmed Gad.

8   Q.   Are they part of the treatment file that you reviewed

9   prior to today's hearing?

10  A.   Yes.

11  Q.   Can you take a moment to look through them and see if

12  any of the request slips here complain about Mr. Gad's

13  inability to receive a grievance form?

14          THE COURT:  You've looked -- you've looked

15  through that before, right?

16          THE WITNESS:  Yes, I've looked through these.

17          MR. GECKLE:  I'll stipulate that none of them do,

18  Your Honor.

19          THE COURT:  Is that right, none of them do,

20  right?

21          THE WITNESS:  No.

22          THE COURT:  Okay.

23          MR. GECKLE:  Not in those exhibits.

24          MS. RYAN:  And I'm going -- Your Honor, may I

25  approach with Plaintiff's exhibits?  I know we don't have a

1  separate binder of them.

2  BY MS. RYAN:

3  Q.   And, Warden, I've handed you a stack that we're going

4  to identify collectively as Plaintiff 1 through 13.  If you

5  could take a moment to see if you're familiar with what

6  those are.

7  A.   Excuse me.  You said what they are?

8  Q.   Correct.  Are you familiar with what those are?

9  A.   Yes.

10 Q.   What are they?

11 A.   These are request slips that are now available that we

12 initiate the use of tablets through GTL for inmates on the

13 unit to communicate.

14 Q.   Okay.  Was that available during Mr. Gad's

15 incarceration from April 6th of 2017 -- or excuse me, June

16 6th of 2017 to April 4th of 2018?

17 A.   No, they were not.

18 Q.   Okay.  So this would have been after his initial

19 incarceration at Northampton County.

20 A.   Correct.

21 Q.   And are you familiar with when Mr. Gad filed his

22 complaint?

23 A.   I am not.

24 Q.   Okay.  If you could look -- before we get to those, if

25 we could go to the Defense exhibits, Exhibit 1.  Do you

1   have any reason to disbelieve that that's Mr. Gad's

2   complaint?

3   A.    I'm sorry?

4   Q.    Do you have any reason to doubt that that's Mr. Gad's

5   complaint?

6   A.    No.

7   Q.    Okay.  Is there any notation regarding one that was

8   filed?

9   A.    It was received by the Department of Corrections it

10  appears on October 16th, 2018.

11  Q.    Okay, and that would be during Mr. Gad's second

12  incarceration?

13  A.    I believe so.  He may not have been back in the

14  institution yet at that point.  I am unsure of the dates of

15  the second incarceration.

16  Q.    Okay.  When do the tablet requests begin date-wise?

17  A.    November of 2018.

18  Q.    Okay.  And do any of those tablet requests mention the

19  officers named as defendants in this lawsuit?

20  A.    The first one does.  The first one does.  And he's

21  advised on what procedure to follow if he feels he was on

22  -- or he -- if you have -- if you have a complaint, it

23  directs him where to go and the process to use

24  (overlapping) --

25  Q.    Okay.  Where was he directed to go?

1  A.   He was directed to speak with his shift supervisor --

2  Q.   Okay.

3  A.   -- or lieutenant.

4  Q.   And you said that first Exhibit P-1 is the only one

5  that mentions the officers named in this -- in this

6  complaint.

7  A.   Yes, I believe so.

8  Q.   Do those tablet requests complain about anything other

9  than correctional officers?

10 A.   He does request grievances on them.

11 Q.   Okay.  So he -- strike that.

12      They contained complaints that Mr. Gad couldn't obtain

13 a grievance form.

14 A.   Correct.

15         THE COURT:  So there's a written record that he

16 has where the Plaintiff is requesting a grievance form?

17         MS. RYAN:  Correct, Your Honor.

18         THE COURT:  Okay.  So, what -- so, how does that

19 square with your position?

20         MS. RYAN:  Your Honor, it is after this incident

21 and doesn't --

22         THE COURT:  And what -- this incident being what?

23         MS. RYAN:  The allegations contained in this

24 incident, Your Honor, are from June of --

25         THE COURT:  This incident is what?  What's the

1    incident?

2            MS. RYAN:  The incident of allegations contained

3    in the complaint.  Mr. Gad alleges that that occurred from

4    June 6th of 2018 to April 4th of 20 -- or excuse me, June

5    6th of 2017 to April 4th of 2018.

6            THE COURT:  And -- and that notation is after

7    that?

8            MS. RYAN:  Correct, Your Honor.  Regarding other

9    officers.

10           MR. GECKLE:  These are all documents submitted

11   through a tablet, which an inmate has access to now but an

12   inmate did not have access to during the -- the relevant --

13   the period relevant to the incidents alleged in the -- in

14   the amended complaint.

15           THE COURT:  And so we're all talking the same

16   language, the incidents being requests to be able to bathe

17   but not --

18           MS. RYAN:  Correct, Your Honor.

19           THE COURT:  -- being allowed.  Is -- is what Mr.

20   Geckle said accurate?

21           MS. RYAN:  Yes, Your Honor.  This is after --

22           THE COURT:  No, he said -- he said that the

23   requests after were through a tablet, which is, what, like

24   an iPad?

25           MS. RYAN:  Correct, Your Honor.

1                THE COURT:  Okay.

2                MS. RYAN:  So rather than --

3                THE COURT:  But before that, during the time

4    period of the request, which I should write down, so I

5    don't forget, the time period of the complaints are what,

6    again, counsel?

7                MR. GECKLE:  June --

8                THE COURT:  I'm -- I'm speaking to Defense

9    counsel.

10               MR. GECKLE:  Oh, sorry.

11               MS. RYAN:  The time frame of the allegations,

12   Your Honor, are from June 6th of 2017 to April 4th of 2018.

13               THE COURT:  Is he right that there's no tablet

14   available during that time period?

15               MS. RYAN:  The tablets were not yet used by

16   Northampton County Prison.

17               THE COURT:  Okay.

18               MS. RYAN:  So they have paper request slips,

19   which were discussed in Exhibit 11.  Those pertain to all

20   the requests --

21               THE COURT:  Right.

22               MS. RYAN:  -- that Mr. Gad wrote.

23               THE COURT:  So your position is from June 6th,

24   '17, to April 4, '18, that's when he was being denied his

25   rights, and there's nothing in the files regarding a

 1  request to grieve.

 2          MS. RYAN:  Correct, Your Honor.

 3          THE COURT:  Okay.  Go ahead.

 4  BY MS. RYAN:

 5  Q.   Based on the complaints at -- in his second

 6  incarceration, are you familiar if anybody ever addressed

 7  those?

 8  A.   Yes, he was directed to a lieutenant.  The lieutenants

 9  will be on the unit on a daily basis on ever shift.  Case

10  managers on the unit, numerous people are on the unit.

11  And, yes, they would address his concerns, if needed.

12          MS. RYAN:  I have nothing further, Your Honor.

13          THE COURT:  Cross?

14                       CROSS-EXAMINATION

15  BY MR. GECKLE:

16  Q.   Mr. Bartholomew, if you could in the exhibit book in

17  front of you go to Exhibit 6 again, in fact, at page 42 of

18  45 for that exhibit.  Are you with me, sir?  All right,

19  this was discussed on your direct exam.  Item 710, Jail

20  Advisory Board.  Is there anything in there -- is the word

21  "grievance" ever mentioned in 710, Jail Advisory Board?

22  A.   Yes.

23  Q.   Well, it's mentioned.  It says that, "The Jail

24  Advisory Board is considered an integral part of the inmate

25  -- inmate grievance process," right?

 1  A.    Correct.

 2  Q.    But there's nothing in there about having to file a

 3  grievance.

 4  A.    No.

 5  Q.    All right.  And if you turn the page to 7 -- Item 711,

 6  711, that one says, "The Department allows an inmate to

 7  file a grievance, to file a disputable matter while in our

 8  custody.  Inmates are to request -- are to complete a

 9  request slip to the shift supervisor to attempt to resolve

10  the complaint.  And if they -- if you and a shift

11  supervisor aren't able to come to a resolution, you will --

12  they will provide the grievance form," right?

13  A.    Correct.

14  Q.    And you said that the request slips are available

15  where on the blocks or where are they available?

16  A.    Request slips are available on the unit.

17  Q.    All right.  But the grievance forms are not.

18  A.    No, they are not.

19  Q.    The only way to get a grievance form is for who to

20  give it to him?

21  A.    A shift supervisor.

22  Q.    All right.  That would be a sergeant or above?

23  A.    We do not have sergeants.  It's corrections officer

24  directly to a lieutenant.  So it would be a lieutenant.

25  Q.    A lieutenant or above.  And are lieutenants on the

1  unit all the time, every day?

2  A.   I'm sorry?

3  Q.   Are lieutenants, like, on the unit?  How often are

4  lieutenants --

5  A.   Yes, a lieutenant on every -- a lieutenant is required

6  to tour each unit on every shift.  So there are three

7  different shifts.  So at least three times per day.

8  Q.   All right.  Otherwise, there's no way -- if you don't

9  catch the lieutenant as he's coming through during that

10  shift, then you've lost your chance to get a grievance.

11  A.   No.

12  Q.   Well, he's the only one that can give it to you.

13  A.   The inmate can simply submit a request slip and put it

14  in the mailbox to a lieutenant and that mail is picked up

15  every evening.  So he -- the request slip could have gotten

16  to the lieutenant, and the lieutenant would have known to

17  provide a grievance or speak to the inmate to resolve the

18  situation.

19  Q.   All right.  If you flip to Exhibit 11 -- I'm sorry,

20  not 11, Exhibit 7, the next exhibit in that binder, sir.

21  And this is a grievance appeal system flow chart, right?

22  And you said that --

23  A.   Correct.

24  Q.   -- that is -- that's also available to -- or that's on

25  every unit?

1    A.    Correct.

2    Q.    It's posted somewhere?

3    A.    Correct.

4    Q.    In that appeal system flow chart, it doesn't say

5    anything about request slips.  It just says you've got to

6    file a grievance -- it starts with filing a grievance.

7    That's at the top.

8              THE COURT:  What's your question?

9    BY MR. GECKLE:

10   Q.    Is there -- is there anything -- is there anything on

11   that grievance appeal system flow chart, anything there

12   that mentions a request slip?

13   A.    No.

14   Q.    Oopsie daisy.  I've got too much paper.  This one is

15   dated the 19th.  All right, if you could turn to the last

16   (sneeze) excuse me, the last exhibit, Exhibit 11, and at

17   the bottom of the -- there's multiple pages there.  At the

18   bottom, they're Bates stamped.  If you could go to the page

19   that's Bates stamped Northampton 36.

20   A.    I'm sorry, I --

21   Q.    Exhibit 11, it's the last exhibit.

22   A.    Okay.

23   Q.    And then turn to the one -- it's -- it's -- I think

24   they're in sequential order.  It's Bates stamp 36.

25              THE COURT:  The Bates stamp is the number at the

1   bottom.

2            MR. GECKLE:  I'm sorry, yes.

3            THE COURT:  You got it?

4            THE WITNESS:  Yes.

5            THE COURT:  What's your question?

6   BY MR. GECKLE:

7   Q.   Have you ever -- did you review that before testifying

8   earlier today?

9   A.   Yes.

10  Q.   All right, that's a request slip, right?

11  A.   Correct.

12  Q.   And it says, "I specifically request to treat me

13  fairly and legally."  And then it goes on about two-thirds

14  of the way down, it says, "All I want -- all what I did is

15  praying in my cell.  I know it bothers some people because

16  I have to wake up early in the morning and use the sink and

17  pray."  Did you -- would that -- you were not the -- you

18  didn't have the same job you have now back then.  But would

19  that be considered a -- you know, would somebody be given a

20  grievance or would that be looked into?

21  A.   Absolutely.

22  Q.   How would it be looked into?

23  A.   At this point, I would have -- if there's an issue

24  with where he's housed, it would have been addressed with

25  Mr. Harmon (phonetic), the classification coordinator.  If

1  it was a religious situation, it would have been -- at this

2  time, it would have been addressed to our chaplain to meet

3  with Mr. Gad and speak to Mr. Gad to -- to meet his

4  religious accommodations.

5  Q.   And when you say it would have been addressed by

6  Harmon, he would have initiated some kind of -- he would

7  have completed some kind of incident report or what would

8  he have done?

9  A.   No, an incident report wouldn't have been done.  This

10 request would have most likely been forwarded to the

11 chaplain because is it -- it's speaking of his religious

12 needs.  And the chaplain, at that point, would have been

13 able to meet with Mr. Gad and try to address his religious

14 needs.

15 Q.   Well, how is the chaplain going to prevent other

16 inmates or other COs from ridiculing him or bothering him

17 because he wants to pray and wash at a certain time?

18 A.   I -- well, I believe the reason -- the issue here is

19 is his religion that he was looking to get the chaplain to

20 address because I don't necessarily understand every

21 religion as Mr. Harmon, and we would have addressed it with

22 someone who would understand or assisted him with -- with

23 his situation.

24 Q.   All right.  But you would agree with me that on

25 November 19, 2017, he did file a request slip concerning

1  problems he was having with his washing and praying.

2  A.   Yes.

3  Q.   And for it to go any further than that, he would have

4  had to file a grievance.

5  A.   Yes.

6  Q.   Which he would need to get from a lieutenant.

7  A.   Correct.

8  Q.   12/3/17.  All right, if you -- in the same exhibit, if

9  you turn back a couple pages to the number on the bottom

10  that's 29, Northampton 29.  All right, that's an inmate

11  request slip?

12  A.   Correct.

13  Q.   It's dated December 3rd, 2017?

14  A.   Correct.

15  Q.   And does it not make a complaint about Officer Wenie

16  putting his hands on him?

17  A.   Correct.

18  Q.   Pushing him.

19  A.   Correct.

20  Q.   For no reason.

21  A.   Correct.

22  Q.   And what would happen with that after -- after that

23  slip was received?

24  A.   That slip would have been immediately forwarded to the

25  investigator and -- and to review the slip and interview

1  Mr. Gad and make sure his safety.  The -- the lieutenants

2  at that point would have been addressed also to ensure that

3  there were no issues, and that Mr. Wenie would not be on

4  the unit or if there was a separation that would have been

5  required or be needed between the officer and the inmate.

6  Q.   But that -- you know, that's the start of the

7  grievance process, and after that, he would have to get a

8  grievance from a lieutenant.

9  A.   It's a situation where when an officer puts his hands

10  on an inmate, I consider that an emergency.  That would

11  have been addressed directly with our investigator, and he

12  would have looked into it immediately without having to

13  even use the grievance process.

14  Q.   Well, I can represent to you that it was investigated,

15  but what we're here -- what I want to know about is how

16  does he exhaust the grievance -- the administrative

17  grievance process if he -- you know, once he files that

18  request slip?  He's got to get -- the only way he can

19  complete the grievance process is to get a grievance slip

20  from a lieutenant.

21  A.   No, he can simply write another request and put

22  grievance on it or write me a letter with a grievance

23  because at this point in time, it would have came directly

24  to me.

25          MR. GECKLE:  He doesn't have the -- the

1  Plaintiff's exhibits, right?

2            MS. RYAN:  He does.  I gave him --

3            MR. GECKLE:  He does?

4            MS. RYAN:  -- my copy.

5            MR. GECKLE:  All right.

6  BY MR. GECKLE:

7  Q.   You have -- you have Plaintiff's exhibits up there?

8  A.   I have the Plaintiff's exhibits (inaudible).

9            MR. GECKLE:  All right.  Is that -- that's them,

10 right?

11           MS. RYAN:  Uh-huh.

12           MR. GECKLE:  All right.

13 BY MR. GECKLE:

14 Q.   If you can go to the Exhibit 1.  All right, now these

15 -- this is dated December 17th, 2018.  So this would have

16 been when the tablet system was being used, right?

17 A.   Correct.

18 Q.   Where an inmate could ask for a grievance --

19 A.   Correct.

20 Q.   -- right on a tablet, right?

21 A.   Correct.

22 Q.   All right.  And in this request, Mr. Gad says, "Since

23 there's no grievance today when we came back from Jumoa

24 (phonetic) prayer, Officer McNair locked me in my cell

25 before everybody else, even my cellie.  He opened again for

1  him one more time because he locked me before him.  Why is

2  the hate and discrimination?"  And that was addressed by

3  John Harmon?

4  A.   Yes.

5  Q.   And what was -- what was his response?

6  A.   If you have a complaint concerning an officer, please

7  contact the shift lieutenant.

8  Q.   Why didn't somebody just give him a grievance form?

9  A.   He didn't ask for one.  Just because he has a

10 complaint against an officer doesn't necessarily make it a

11 grievance.

12 Q.   Well, he specifically requests since there is no

13 grievance today.

14 A.   Because the -- the grievance process is intended to be

15 a last resort.  We would have been -- we would intend to

16 try to resolve all these situations prior to we got --

17 elevating to the grievance process.

18 Q.   All right.  If you could turn to the next one, Exhibit

19 2.  This is dated December 17th, 2018.  All right.  Can you

20 read the summary of the -- summary of request?

21 A.   I already sent request.  The lieutenant never get it

22 back and get a response.  I need a grievance form, please.

23 Q.   All right.  And that was assigned to John Harmon,

24 also, right?

25 A.   Correct.

1  Q.   And what was his response?

2  A.   I can't assist you with this request.  It has nothing

3  to do with this department.

4  Q.   Did he say anything to him?  Did he give him like

5  information about, you know, flag down a lieutenant, find a

6  lieutenant?

7  A.   Yeah, when he grieved it, when he sent the same

8  request the day before on Exhibit 1, he said -- it's the

9  exact same date.

10  Q.   And what did he say -- I mean what -- what is the --

11  I'm not sure what submitted now or submitted new means, but

12  doesn't it say from Gad, I already sent a grievance or I

13  already sent a request to lieutenant.  No response back.

14  Please, I need a grievance form?

15  A.   Yes, that's what it says.

16  Q.   If you could go to the next one, it's dated May 5th,

17  2019.  And this is the equivalent of an inmate request

18  slip, right?

19  A.   May 5th -- Exhibit 3?

20  Q.   Yes, sir.

21  A.   Yes.

22  Q.   And these documents are the equivalent of the old

23  request slips.

24  A.   Yes, and they also can use a request slip in writing.

25  We still do provide written request slips.

1  Q.   All right, but he was using the tablet now.

2  A.   Correct.

3  Q.   And what's -- what's his request on May 5th, 2019?

4  A.   I tried to get a grievance, but I couldn't because

5  there's a lot of funny thing going on, like I am trying to

6  take my med at night like it's supposed to be and I used to

7  take upstate.  Also, I am Muslim and fasting.

8  Q.   All right.  And was he -- was he given a grievance?

9  That was addressed by Alice Flavelle (phonetic).

10 A.   No.

11 Q.   He was told, I think, to send the request to a

12 lieutenant, right?

13 A.   He would have been advised on that to submit a medical

14 request -- a request because the medical procedure is not

15 part of the grievance process.

16 Q.   Well --

17 A.   Medical concerned because of privacy laws.

18 Q.   Well, the response he was given was please send a

19 request to a lieutenant to address your concerns and to

20 obtain a grievance form if the matter cannot be resolved.

21 A.   Right.

22 Q.   So he's getting the runaround.  So he didn't get a

23 grievance form.

24 A.   Not that I'm aware of.

25 Q.   All right.  The next one, Number 4.

1          THE COURT:  How many -- how many are you going to

2    go through?

3          MR. GECKLE:  Your Honor, I'll just refer to them

4    later.  I mean I --

5          THE COURT:  I mean, if they're in -- you can do

6    it, but if they're in evidence --

7          MR. GECKLE:  I'll -- then --

8          THE COURT:  -- you can -- you know, we're going

9    to -- we're going to make -- we're going to do a little

10   briefing.  You can refer to them in your briefing.

11         MR. GECKLE:  All right, very good.  Do I have

12   anything further for you, Mr. Bartholomew?  Thank you, Mr.

13   Bartholomew.

14         THE COURT:  Any --

15         MR. GECKLE:  I have no further questions.

16         THE COURT:  Any redirect?

17         MS. RYAN:  Just briefly, Your Honor.

18                    REDIRECT EXAMINATION

19   BY MS. RYAN:

20   Q.   You said that some request slips can be treated as

21   grievances, correct?

22   A.   Correct.

23   Q.   They have to be titled as a grievance?

24   A.   It is (inaudible) title of a grievance, it will be --

25   it will be title (inaudible) as a grievance, yes.

1  Q.   Okay, but that doesn't exhaust the grievance process,

2  correct?

3  A.   I'm sorry?

4  Q.   That doesn't exhaust a grievance process.

5  A.   No.

6  Q.   What would be the next step?

7  A.   If he --

8          THE COURT:  Isn't that in the stipulation?

9          MS. RYAN:  Yes, Your Honor.

10 BY MS. RYAN:

11 A.   He could appeal, or he could just write a letter.

12         THE COURT:  This is in your stipulation.  Why are

13 you asking?  I read -- it's of record already.

14         MS. RYAN:  Yes, Your Honor.

15         THE COURT:  Right?

16 BY MS. RYAN:

17 Q.   When you reviewed Mr. Gad's inmate treatment record

18 between June 6th of 2017 and April 4th of 2018, did you see

19 an appeal regarding any of the request slips that he

20 forwarded during that time frame?

21 A.   No.

22 Q.   Did you see any letters to the Prison Advisory Board?

23 A.   No.

24 Q.   Did you see any letters to the director of

25 corrections?

1  A.   No.

2            MS. RYAN:  I have nothing further.

3            MR. GECKLE:  Just one, Your Honor.

4            THE COURT:  Go ahead.

5                     RECROSS-EXAMINATION

6  BY MR. GECKLE:

7  Q.   Bottom line, sir, if an inmate cannot get a grievance

8  form, he cannot exhaust the grievance system.

9            THE COURT:  That's a good question to end on.

10 What's the answer?

11           THE WITNESS:  Incorrect.

12 BY MR. GECKLE:

13 Q.   How can he -- how can he exhaust -- how can he exhaust

14 the system without taking the first step?

15 A.   He simply could have put a request slip in an envelope

16 and place it in the grievance box that's located on every

17 unit, and it would have been picked up by the -- only by

18 the grievance supervisor, who would have treated it as a

19 grievance and reviewed it as a grievance.

20           THE COURT:  Okay.

21 BY MR. GECKLE:

22 Q.   That's not what your policy says, though, sir.

23           MR. GECKLE:  I'm sorry, I'll save that for

24 argument.

25           THE COURT:  No.  That's okay.  Ask your question.

1   Go ahead.

2   BY MR. GECKLE:

3   Q.   That's not what your -- that's not what the policy

4   says, though, sir.  If you go to Exhibit 6.

5   A.   Okay.

6   Q.   Page 43 of 45 of that exhibit, that specifically

7   refers to having to file a grievance, does it not?  If the

8   -- if the request slip -- if the issue raised in the

9   request slip is not resolved, they will provide a grievance

10  form for you to complete and submit.  So --

11          THE COURT:  That's what it says.  That's your

12  question, right?  Okay.

13  BY MR. GECKLE:

14  Q.   So would you find that -- as an inmate, would you find

15  that confusing, the -- the -- to read that and now to hear

16  your testimony say, no, you don't have to file a grievance.

17  Just put it -- put it in a slip, and we'll -- we'll get to

18  the bottom of it.

19          MS. RYAN:  Your Honor, I'm going to object to

20  that being speculation.

21          THE COURT:  Yeah, just rephrase it.  I know what

22  he's trying to get at.  Just phrase it a little

23  differently.  I think -- I think the question is do you

24  find that confusing?

25          MR. GECKLE:  Opaque.

```
 1                THE COURT:  That instruction confusion.

 2                THE WITNESS:  No.

 3                THE COURT:  Okay.

 4                MR. GECKLE:  I have nothing further, Your Honor.

 5     I'll save everything for argument.

 6                THE COURT:  Thank you, sir.

 7                THE WITNESS:  Thank you.

 8                     (Witness excused.)

 9                THE COURT:  All right, here's what I propose,

10     since we have a very discreet issue, propose subject to

11     discussion amongst counsel, I'm going to pick a number, ten

12     pages, simultaneous submissions, 30 days.  You -- since

13     there's -- counsel don't really have a quibble with each

14     other as to exhibits, usually I'd say any -- you can't

15     refer to an exhibit in your submission unless it's been

16     referred to in testimony but that's okay.  If there's an

17     exhibit that you both agree would be admissible, as said in

18     the stipulation, you can refer to it even though neither

19     one of these witnesses did not.

20                On the issue that I'm not going to repeat, we all

21     know what it is, ten pages.  We'll order the transcript

22     forthwith.  Why don't we say 30 days from receipt of the

23     transcript, simultaneous submissions, and references to the

24     transcript and/or exhibits, direct references to both on

25     the issue.  I -- I mean, it's a pretty clear issue.  You
```

1    know, I want to look at the exhibits a little more

2    carefully.  Probably would get you -- once I'm really

3    proficient in the record and have read your briefs,

4    probably would get you on the phone for 15 minutes, ask

5    some pointed questions, and then I'll decide.  Is that

6    acceptable to you, Mr. Geckle?

7          MR. GECKLE:  Acceptable to the Plaintiff, Your

8    Honor.

9          THE COURT:  Defense?

10         MS. RYAN:  Yes, Your Honor.

11         THE COURT:  Great.  Okay.  Jenna (phonetic), does

12   that sound like a good plan to you?

13         THE CLERK:  Yes, sir.

14         THE COURT:  All right, everyone agrees.  Thank

15   you for your time, everybody.

16         MS. RYAN:  Your Honor, would you like me to mark

17   my copy of Plaintiff's exhibits so that we have a --

18         THE COURT:  I'm sorry?

19         MS. RYAN:  Would you like me to mark Plaintiff's

20   exhibits that I --

21         THE COURT:  Yeah, well, you're going -- you're

22   going to both submit -- I mean, I don't want to give you

23   more work, but both -- you know, there's -- there's -- I

24   don't know what exhibits were marked and you don't want to

25   use.  So submit an appendix of exhibits that both sides

1 | want into evidence.

2 | MS. RYAN: Yes, Your Honor.

3 | THE COURT: And then other exhibits that you

4 | referred to that you don't want to use, those go to the

5 | side so we don't have the clutter. Does that work?

6 | MS. RYAN: Yes, Your Honor.

7 | MR. GECKLE: Works.

8 | THE COURT: Okay. All right, thank you very

9 | much.

10 | MR. GECKLE: Thank you. Very good to see you,

11 | Your Honor. It's very good.

12 | THE COURT: Okay. All right. You as well.

13 | Thank you.

14 | MR. GECKLE: Very good --

15 | THE COURT: Did you take this from the panel?

16 | MR. GECKLE: I did, yeah.

17 | THE COURT: Thank you. Appreciate it.

18 | MR. GECKLE: Very good to be back in the --

19 | MS. RYAN: David said to say hello. David

20 | MacMain.

21 | THE COURT: David MacMain.

22 | MS. RYAN: Uh-huh.

23 | THE COURT: Okay. Everyone is in a good mood

24 | because we have nice weather. All right. (Inaudible) see

25 | everybody.

```
 1              MR. GECKLE:  I'm thrilled to be back here.

 2              MS. RYAN:  Have a nice day, Your Honor.

 3              THE COURT:  Okay.

 4              MR. GECKLE:  I'm just thrilled to be in here.  I

 5    just --

 6              MS. RYAN.  I'm with you.  I'm just glad to be in

 7    a courtroom.

 8              (Proceedings adjourned at 11:15 a.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    CERTIFICATION

2

3        I, Wendy K. Sawyer, court approved transcriber,

4    certify, that the foregoing is a correct transcript

5    from the official electronic sound recording of the

6    proceedings in the above-entitled matter.

7

8    April 17, 2021

9    Date

10

11                    Wendy K. Sawyer

12        _____

13        Wendy K. Sawyer, Transcriber

14        FOOTHILL TRANSCRIPTION COMPANY

15

16

17

18

19

20

21

22

23

24

25
```