**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AHMED GAD,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | **No. 18-cv-3900** |
| | : | |
| **NORTHAMPTON COUNTY, <u>ET AL.</u>,** | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

<u>**MEMORANDUM OPINION**</u>

Goldberg, J.                                                   September 28, 2021

      The issue pending before me in this prisoner civil rights case is whether Plaintiff, Ahmed Gad, exhausted his administrative remedies within the prison in which he was housed prior to filing the above-captioned lawsuit.  I previously denied a motion for summary judgment filed by Defendants Northampton County, Classifications Coordinator John Harman, Correctional Officer John Colarusso, Correctional Officer Jonathon Glovas, Correctional Officer Jackie McNair, and Correctional Officer Kyle Wene (collectively, "Defendants") so that I could first resolve this exhaustion issue.  Following an evidentiary hearing and supplemental briefing, I conclude that exhaustion requirements have been met and, consequently, Defendants' motion for summary judgment will be denied.

**I.     <u>PROCEDURAL BACKGROUND</u>**

      On September 11, 2018, Plaintiff filed suit, alleging that while he was incarcerated at Northampton County Prison (the "Prison"), Defendants violated his constitutional rights, prevented him from freely practicing his Muslim faith, and subjected him to unnecessary and excessive force.  Plaintiff brought a claim under 42 U.S.C. § 1983 for cruel and unusual

punishment in violation of the Eighth Amendment (Count I), a "catch-all" claim in accordance with the Fourteenth Amendment (also Count I), a violation of the Religious Land Use and Institutionalized Persons Act (Count II), and a violation of the First Amendment's Free Exercise clause (Count III).

On January 13, 2020, Defendants filed a motion for summary judgment on all claims, asserting an affirmative defense that Plaintiff failed to exhaust his administrative remedies. Although Plaintiff conceded that he did not properly utilize the Prison's grievance system for any of his claims prior to filing suit, he asserted that the Prison's administrative process was "unavailable," and thus he was relieved from satisfying the exhaustion requirement. Ross v. Blake, 136 S. Ct. 1850, 1860 (2016) (holding that an inmate does not have to exhaust an administrative remedy that is incapable of use). I therefore denied Defendant's motion for summary judgment without prejudice and held an evidentiary hearing on the issue of unavailability of the administrative process, during which Plaintiff and Northampton County Prison Deputy Warden, Mark Bartholomew, testified.

## II.   LEGAL STANDARD

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under section 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). Failure to exhaust is an affirmative defense that a defendant must plead and prove. Small v. Camden Cnty., 728 F.3d 265, 268 (3d Cir. 2013).

However, even if an inmate fails to exhaust their administrative remedies, they still may be permitted to file suit in federal court if they establish that such remedies were "unavailable" to them. Rinaldi v. United States, 904 F.3d 257, 268 (3d Cir. 2018). Once a defendant meets their burden of proving that an inmate plaintiff failed to exhaust, the burden shifts back to the plaintiff to prove that the process was unavailable to them. Id. "A prison grievance process is unavailable— and thus may be deemed exhausted—in three circumstances: (1) when the remedy 'operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) when it is 'so opaque that it becomes, practically speaking, incapable of use'; and (3) 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" Hardy v. Shaikh, 959 F.3d 578, 584 (3d Cir. 2020) (quoting Ross, 136 S. Ct. at 1859-60.).   Whether an inmate has exhausted their administrative remedies is a question of law to be decided by the court through an evidentiary hearing, "even if that determination requires the resolution of disputed facts." Small, 728 F.3d at 269 (judges may resolve factual disputes relevant to exhaustion without participation of a jury).

## III.   DISCUSSION

Plaintiff was incarcerated at Northampton County Prison from June 6, 2017 through April 4, 2018.  (Joint Appendix ("JA") at 224, ECF No. 74-1-74-11.)[1] In his Amended Complaint, Plaintiff alleges two circumstances in which Defendants allegedly violated his rights: (1) Plaintiff was not permitted to practice his Muslim faith and suffered retaliation when he attempted to do so, and (2) he was subject to unnecessary and excessive force by Defendant Correctional Officer Kyle Wene.[2]

---

[1]     The facts herein are derived from Plaintiff's Amended Complaint, the facts elicited during the evidentiary hearing, and the parties' joint appendix.

[2]     Plaintiff had also alleged that he was subject to unnecessary and excessive force when Defendant Correctional Officer Johnathon Glovas permitted another inmate into Plaintiff's cell to assault him. However, in his latest briefing, Plaintiff concedes that he has not met his burden to show that he exhausted

To determine whether the Prison's grievance system was available to Plaintiff, I will first detail the Prison's grievance process and then outline Plaintiff's attempted use of that process for each claim.

A. Northampton County Prison's Grievance Process

Where inmates experience conditions of confinement that they believe violate their rights, the Prison has published guidance for its grievance process in two locations: (1) the grievance flow chart and (2) the inmate handbook.  (JA at 73, 131, 249.)  The grievance flow chart is a single-page document that is posted on every housing unit.  (Id. at 249.)  It outlines two avenues for complaining of the conditions of confinement, both of which begin by filing an inmate grievance form.  (Id. at 131, 249.)  Inmate grievance forms can only be obtained by requesting and receiving one from a shift supervisor.  (Id. at 259.)[3]

Pursuant to the flow chart's first option, once an inmate files the grievance form, a Prison grievance supervisor has ten days to render a decision, and then the inmate has five days to appeal.  (Id. at 131.)  Once the appeal is filed, a Deputy Warden of Classification has twenty-one days to render a decision, after which the inmate may appeal within three days of that decision.  (Id.)  The appeal then goes to the Grievance Review Board, which is composed of a "Jail Advisory Board Member, the Warden, or designee."  (Id.)  A decision at this level is final.  (Id.)

The flow chart directs an alternative path for grieving an "emergency or life-threatening situation."  (Id.)  In such instances, the inmate is instructed to file their inmate grievance form

---

this third claim and that the record is devoid of evidence that Plaintiff attempted to grieve this incident. (Pl.'s Supp. Br. at 6, ECF No. 73.)  Because Plaintiff does not press that the exception to the exhaustion requirement applies to this third complaint, this claim will be dismissed for failure to exhaust.
[3]      During the evidentiary hearing, the parties used the term "shift supervisor" and "lieutenant" interchangeably.  (JA at 42, 259–60.)  For the sake of clarity, I will use "shift supervisor" only.

directly with the Director of Corrections or Prison Advisory Board. (Id.)[4]  The chart indicates that under this path, a decision by the Director is final.  (Id.)

In addition to the grievance flow chart, the Prison's grievance process is also outlined in the inmate handbook.  (Id. at 115, 249.)  Plaintiff confirmed receiving and reading the inmate handbook.  (Id. at 240.)  Unlike the grievance flow chart, the handbook instructs that the grievance process begins when an inmate submits a "request slip" to a shift supervisor.  (Id. at 115.)  The handbook advises that if the inmate and shift supervisor are unable to resolve the issue, the shift supervisor will provide the inmate with a grievance form to complete and submit.  (Id.)  Grievance forms will be answered in a timely manner by way of a written response from the Grievance Supervisor.  (Id.)  Thereafter, inmates may appeal the Grievance Supervisor's decision to the Deputy Warden of Classification or their designee.  (Id.)

During the evidentiary hearing, Northampton County Prison Deputy Warden Mark Bartholomew testified about the grievance process at the Prison.  (Id. at 246-52.)  In his current role, he is involved in the second step, i.e., the appeals process.  (Id. at 247.)  In his prior position, Bartholomew worked as the Prison's Corrections Treatment Coordinator, during which he was the first point of contact in the inmate grievance process and received the grievance forms.  (Id. at 246-47.)  He explained that, despite the instructions listed in the inmate handbook and on the grievance flow chart, inmates can, and commonly have, initiated the grievance process by writing down their complaint on a blank sheet of paper or on a request slip.  (Id. at 248-51.)

Inmates can submit their writings in the anonymous mailboxes on each unit, the contents of which are picked up by a grievance supervisor on a daily basis.  (Id. at 249.)  Deputy Warden Bartholomew represented that it is a common occurrence for Prison officials to receive sheets of

---

[4]      The flow chart specifically directs inmates to file emergency complaints with the "Director of Corrections," but the Prison often uses "Prison Advisory Board" and "Director of Corrections" interchangeably to describe the same option. (Def.'s Supp. Br. at 8, ECF No. 74).

paper, request slips, or letters entitled "grievance," and the Prison treats these documents as grievances, which begin the review process.  (<u>Id.</u> at 249-50.)  Alternatively, in the case of emergencies, inmates can follow the aforementioned process by writing to the Prison Advisory Board. (<u>Id.</u>)  Bartholomew additionally explained that inmates have a third option of writing a letter directly to the Jail Advisory Board and placing it in the anonymous mailboxes or in a mailbox directed to the Jail Advisory Board for immediate review.  (<u>Id.</u> at 249.)

B.  <u>Inability to Practice His Faith</u>

Plaintiff alleges that the Prison did not allow him to practice his Muslim faith and that they retaliated against him for doing so. With respect to exhaustion of his administrative remedies for these complaints, Plaintiff alleges that the Prison's grievance process was unavailable to him because Prison officials consistently thwarted his attempts to execute the process.  Defendants respond that the record is devoid of any evidentiary support for such argument.

Because the parties dispute whether the record evidence establishes that the Prison officials thwarted Plaintiff's ability to grieve his complaints about religious discrimination, as directed by the Third Circuit, I will resolve any factual disputes on the record before me without the participation of a jury.  <u>Small</u>, 728 F.3d at 271 ("[T]he District Court did not err by acting as the fact finder because exhaustion constitutes a preliminary issue for which no right to a jury trial exists.").[5]

Plaintiff testified that on November 19, 2017, he filed an inmate request form, but not the required grievance form, outlining his complaints about his inability to practice his religion.  (JA at 138-39.)  In relevant part, Plaintiff requested to be transferred from a segregated housing unit to general population, stating:

---

[5]    I do not reach the merits of Plaintiff's underlying claims, and, thus, resolution of the exhaustion issues is not "bound up with the merits of the underlying dispute."  <u>Small</u>, 728 F.3d at 271 (citing <u>Messa v. Goord</u>, 652 F.3d 305, 308-09 (2d Cir. 2011)).

Please Mr. Harman, I didn't do anything to be in here in [the segregated housing unit]. I didn't fight anybody or even threat [sic] anybody. I know some people hate me because of my culture or my religion but that is ignorant people and I always try to ignore them or talk to the CO if they try to make troubles. Even here in [the segregated housing unit] there is a lot of people making fun of me and bother me because of my religion or my praying. I just complain about someone to the lutenant. [sic] . . . I specifically request: to treat me fairly and legally. I been transferred from block to another because I practice my religion. . . . I didn't do anything to be in [the segregated housing unit]. All what I did is praying in my cell. I know it bothers some people cause I have to wake up early in the morning and use the sink and pray []. I am really sorry I don't mean it and I will try [my] best to be very slow and quite [sic] in my movement.

(Id.)

During the evidentiary hearing, Plaintiff testified that Prison officials consistently refused to provide him with grievance forms to further pursue his grievance. (Id. at 227, 231-34.) He recounted:

> Q.     … [D]id you ever put in a written grievance form? Do you know what a written grievance form is?
> A.     I – I know a grievance form what is it, but I never had one. I never could get one, so I can't do it. It has to be a grievance form. I asked for the grievance form. They never give me one. They refuse it. They always said – first thing they said, you have to go to the super – to the lieutenant. I talked to the lieutenant. He say, let me see what I can do, and I never got one. And whenever I asked can I get one? Oh, yeah, I'll go get, we don't have it, this kind of thing. That's why I never filed any grievance. . . .
> Q.     Did you ever file a grievance?
> A.     I couldn't get the grievance form.
> Q.     Why couldn't you get a –
> A.     I've been trying.
> Q.     Why could you not get a grievance form? What happened?
> A.     Because they never give – they – they always say talk to the lieutenant, and the lieutenant is the one who can give it to you. And whenever you find a lieutenant and I ask him from behind the door because I am locked. Sometimes they don't answer, they neglect, and if they answer, they say let me see what I can do or what I can do, and they leave, and they never send me one.

(Id. at 229, 232-33.) Regarding his complaints about being prevented from washing in preparation for his prayers, Plaintiff stated that he asked for grievance forms on twenty to fifty occasions. (Id. at 230-31.)

Defendants contend that there is no evidence in the record of Plaintiff's requests for grievance forms other than his own testimony, which they argue is not enough to carry his burden to prove the process was unavailable.  Deputy Warden Bartholomew testified that none of the request slips Plaintiff submitted to the Prison during the relevant period of incarceration include complaints of an inability to obtain grievance forms. (Id. at 252.)[6] Defendants maintain that Plaintiff's purported support for his claims that he was denied access to grievance forms is limited to self-serving statements that have been rejected in similar cases, such as Garcia v. PrimeCare Med., Inc., No. 08-3589, 2012 WL 3704800, at *6 (E.D. Pa. Aug. 28, 2012) (rejecting inmate's "one generalized snippet of deposition testimony" as evidence to excuse his failure to exhaust his administrative remedies).  Defendants press that the only complaints in the record about obtaining grievance forms were submitted by Plaintiff during a later period of incarceration and pertained to alleged mistreatment not relevant to the claims in his Amended Complaint. (JA at 255-258.) Defendants point to these later complaints as evidence that Plaintiff in fact knew how to complain about access to grievance forms and argue he therefore should have done so for his complaints of religious discrimination.  (Id. at 242-43.)

Defendants also contend that Plaintiff failed to take advantage of the numerous available alternatives to the standard grievance process offered by the Prison.  Deputy Warden Bartholomew testified that there are multiple avenues inmates can take to initiate the grievance process, including: (1) submitting a request slip to a shift supervisor to request a grievance form (Id. at 247); (2) submitting a request slip entitled "grievance" that the Prison would treat as if it were a formal grievance form (Id. at 250); (3) using a request slip or blank piece of paper to write to the

---

[6]      Plaintiff was transferred outside of the Prison in April of 2018 for a period of approximately seven months and returned in November of 2018. (JA at 181-82.) Defendants refer to the period of June of 2017 through April of 2018 as "the relevant period of incarceration" in their briefing to distinguish between complaints Plaintiff made during the time frame alleged in his Amended Complaint and complaints he made after he returned to the Prison.

Jail Advisory Board in an emergency (Id. at 248); or (4) using a request slip or blank piece of paper to write to the Prison Advisory Board in an emergency (Id. at 249.)

Lastly, Defendants assert that Plaintiff did not take advantage of his right to appeal the decisions for the request slips he submitted and received responses to. (Id. at 271.) Therefore, Defendants suggest, the administrative process was available to Plaintiff for his complaints of religious discrimination, but he failed to take the necessary steps to advance through all required phases of the process.

The Third Circuit has recognized that a prison's failure to provide an inmate with a requested grievance form may render the grievance process unavailable and, thus, may excuse an inmate's failure to exhaust. Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003). Since Mitchell, other courts have excused civil rights inmate plaintiffs from exhausting their remedies in instances where prison officials refused to provide requested grievance forms. See Banks v. One or More Unknown Named Confidential Informants of Fed. Prison Camp Canaan, No. 06-1127, 2008 WL 2563355, at *5 (M.D. Pa. June 24, 2008) ("[Plaintiff] repeatedly states that defendants 'obstructed' the grievance procedure and 'refused' to provide him with the materials needed to complete the exhaustion process. . . . Accordingly, the court finds that [plaintiff] has set forth a compelling reason to excuse compliance with the exhaustion requirement for a number of his claims."). In Brock v. Kenton Cty., KY, 93 F. App'x 793 (6th Cir. 2004), the court explained:

> [A] grievance procedure is not "available" even if one exists on paper if the defendant prison officials somehow prevent a prisoner from using it. See, e.g., . . . Miller v. Norris, 247 F.3d 736, 740 (8th Cir.2001) (finding allegations that prison officials failed to respond to his written requests for grievance forms were sufficient to raise an inference that the prisoner had exhausted his "available" administrative remedies); Arnold v. Goetz, 245 F.Supp.2d 527, 538–39 (S.D. N.Y. 2003) (finding a prisoner who was told that an inmate grievance process existed, but who was frustrated by officials in his attempts to learn how to use it, did not have recourse to an "available" administrative remedy); Davis v. Milwaukee Co., 225 F.Supp.2d 967, 976 (E.D. Wis. 2002) (holding that when the record established that the defendants interfered with the inmates ability to exhaust in three ways such grievance procedure might have been "unavailable"). However, as these cases

reflect, the prisoner must make some affirmative efforts to comply with the administrative procedure. The procedure becomes "unavailable" because prison officials have somehow thwarted the inmates attempts at exhaustion.

Id. at 798.

The Third Circuit has also held that a prison's administrative remedies are rendered unavailable when the prison fails to timely respond to an inmate's grievance. Jackson v. Carter, 813 Fed. Appx. 820, 824 (3d Cir. 2020) (finding administrative remedies were unavailable when prisoner's complaint went unanswered by the prison).

I conclude that the record before me reflects Plaintiff's affirmative efforts to comply with the Prison's administrative process and the Defendants' thwarting of those efforts. For that reason, this situation can be distinguished from Garcia, a case relied upon by Defendants. In Garcia, the court rejected the inmate plaintiff's "one generalized snippet of deposition testimony" that he requested inmate grievance forms "all the time," and concluded that the record simply did not support his "self-serving" assertion that the administrative process was unavailable to him. Id. at *6. The court noted that during the relevant time, the plaintiff filed fourteen other inmate communications, none of which referenced the allegedly deficient medical care about which his federal lawsuit was filed. Id. The court further highlighted that, even if plaintiff was denied access to grievance forms, inmate grievance forms were not the exclusive way for inmates to complain about prison treatment. Id. at *7. The court concluded that although the plaintiff testified "in general terms" that he was denied access to the administrative process, "all of the other evidence in the record suggest[ed] otherwise." Id. at *8.

Here, in contrast to Garcia, there is more than a "generalized snippet" of testimony regarding Plaintiff's attempts to grieve his complaints. As noted above, at least three times during the evidentiary hearing, Plaintiff detailed how Prison officials repeatedly refused his twenty to fifty requests for grievance forms, and I credit that those requests were in fact made. (JA at 227,

231, 233.)[7] Additionally, the record establishes that Plaintiff not only requested grievance forms on multiple occasions, he also made an affirmative effort to comply with the administrative procedure by initiating the grievance process for the very issue that he is presently litigating.  It is uncontested that, in his November 19, 2017 inmate request submission, Plaintiff outlined his inability to practice his faith and the retaliation he faced for attempting to do so.  (JA at 138-39, 263-64.)   Importantly, on that request slip, the "Block Officer Reply" is left blank which is indicative of inaction by the Prison. (Id. at 138-139.)  There is also no decision from a Grievance Supervisor in the record before me regarding an appeals process in accordance with the Prison's official Grievance Review System. (Id. at 115.)[8]  Plaintiff could not be expected to appeal a

---

[7]        Defendants attempt to bolster their argument that I should not believe Plaintiff's testimony because he was incarcerated for perjury and because he contradicted himself in his Amended Complaint. I do not find this persuasive or relevant in light of Plaintiff's definitive testimony throughout the evidentiary hearing that he asked for grievance forms on multiple occasions. (JA at 227, 231, 233.)

[8]        To support their contention that Plaintiff received an appealable decision from the Prison regarding his complaints of religious discrimination, Defendants cite to the December 20, 2017 Investigative Report written and signed by Investigator Horvath discussed later in this opinion. (JA at 279-80) (the "Report"). Upon my review of the Report, I find that it does not adequately address Plaintiff's complaints of religious discrimination such that his failure to appeal it should defeat his claim.  First, the decision was not issued by a Grievance Supervisor on the correct form (No. NCP-168) as directed by the Prison's Grievance Appeal System Flowchart, and therefore the appeals process was not triggered. (Id. at 131.)  Second, the Report does not directly address the issues outlined in Plaintiff's November 19, 2017 inmate request slip, but rather cites various other complaints of alleged misconduct.   The only portion of the Report that references religious discrimination is a passing reference made by Defendant Harman during the meeting discussed in the Report when explaining why Plaintiff was transferred to Protective Custody.  ("Inmate Gad questioned why he was in protective custody (PC) when he did not ask to be placed there. Classification Coordinator John Harman happened to be walking by the interview room and I caught his attention. He entered the room and I advised him of GAD's PC concern. Harman related that GAD's former cellmates in B2 and other housing units did not tolerate GAD's way of practicing his Muslim religion, which caused friction. For GAD's safety, Harman moved him." (Id.)  Because the Report does not cite Plaintiff's November 19, 2017 inmate request slip, nor does it directly address Defendants' alleged misconduct of preventing Plaintiff from washing and praying, I find that it does not constitute a decision regarding Plaintiff's complaints of religious discrimination that Plaintiff should have pursued further by filing an appeal.
        I also note that, even if the Report were construed to be a decision regarding Plaintiff's claims for religious discrimination, Plaintiff still would not be required to appeal it because, as explained below in Section C of this opinion, the Report is a final decision on the merits from the Prison's ultimate administrative authority under Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000).  See Section C., infra. Accordingly, whether the Report adequately addresses Plaintiff's complaints of religious discrimination is ultimately immaterial to the exhaustion analysis, because he would not be required to appeal the decision either way.

decision that he never received.  Furthermore, Deputy Warden Bartholomew confirmed at the evidentiary hearing that for the process to continue past Plaintiff's submitting of the request slip if the Prison decided not to treat it as a grievance, he would need to file a formal grievance form which he could only get from a shift supervisor.  (Id. at 263-64.)  Yet there is no evidence before me that a formal grievance form was supplied to Plaintiff.

As explained above, there are two ways to initiate the standard grievance process at Northampton County Prison: (1) file a formal grievance form that only a shift supervisor can provide to you, or (2) detail your grievance on an inmate request slip or blank sheet of paper and the Prison will treat it as if it was a formal grievance.  Plaintiff attempted to utilize both of these options by repeatedly asking for grievance forms, as well as filing an inmate request slip detailing his complaints that, based on Bartholomew's testimony, should have been treated as a formal grievance.  But Defendants never gave Plaintiff a formal grievance form, and they never responded to his November 19, 2017 request slip with a decision that he could appeal.

Finding that Plaintiff has shown sufficient evidence that the Prison thwarted his ability to grieve his complaints through their standard grievance process, I next turn to Defendants' argument that he should have utilized the alternative options available to him.   I am not persuaded by Defendants' argument that Plaintiff should have filed emergency letters with either the Prison Advisory Board or the Jail Advisory Board in order to fully exhaust his claims.  The Prison's own policies suggest that inmates should only write to the Prison Advisory Board if they are in some sort of immediate danger.  (JA at 131 ("In the event of an emergency or life-threatening situation, forward directly to Director of Corrections").)  Defendants' refusal to allow Plaintiff to wash before praying and subsequent decision to relocate him to segregated housing was a past event at the time he filed his inmate request slip, not a present emergency.  And although Plaintiff testified that he considered the situation to be an emergency, he also testified that his complaints did not

boil down to just "threats" from officers, but also included "discrimination between me and all the inmates." (Id. at 244.) Plaintiff's testimony suggests his complaints were about the discriminatory conduct he faced when he was denied the opportunity to wash before praying. This does not constitute a life-threatening emergency.

With respect to Defendants' argument that Plaintiff should have written to the Jail Advisory Board, I further note that this alternative is not found in either the Grievance Appeal System flow chart or the Grievance Review System section of the inmate handbook. (JA at 115, 131.) Rather, it appears in one small section of the inmate handbook under "Jail Advisory Board" in which inmates are told they "may" write to the Jail Advisory Board "if a situation arises that [they] wish to bring to [the Board's] collective attention." (Id. at 114.) Inmates should not be required to exhaust this option in addition to the Prison's formal grievance system. Plaintiff met his burden of complying with the Prison's administrative remedy scheme by filing his grievance on an inmate request slip in accordance with the Prison's official grievance policy, which is sufficient to satisfy the exhaustion requirement under the PLRA.

In short, I will be guided by the reasoning in Mitchell and the cases that followed that have excused an inmate's exhaustion requirement where prison officials refused to provide inmates with requested grievance forms or otherwise frustrated their ability to advance through the appeals process for their complaints. Based on the record before me, I find that Plaintiff made repeated requests for grievance forms that Defendants ignored. Plaintiff also attempted to initiate the grievance process in his November 19, 2017 request slip, but Defendants did not provide him with a response or a formal grievance form to further pursue his complaint, essentially causing the remedy to "operate as a simple dead end." Hardy, 959 F.3d at 584. For these reasons, I conclude that Plaintiff has met his burden to prove that the Prison's grievance process was unavailable to him for these claims. Therefore, Plaintiff is excused from exhausting his remedies and will be

permitted to proceed to resolution on the merits of his claims of being prevented from practicing his religion and facing retaliation for attempting to do so.[9]

C.   Excessive Force by Defendant Correctional Officer Wene

With regard to the alleged assault by Officer Wene, Plaintiff contends that because he filed a complaint that was investigated by the Prison, he is relieved from utilizing the grievance process. Defendants respond that while Plaintiff may have initiated the grievance process for the alleged assault by Officer Wene, Plaintiff did not complete the necessary and remaining steps to fully exhaust his claim.

The record establishes that on December 3, 2017, Plaintiff filed an inmate request form concerning an alleged incident of excessive force by Officer Wene.  (JA at 134.)  Plaintiff addressed the form to the Prison's Director and Warden and stated, "Please I need your help.  If you please tell Officer Wene not to put his hands on me because he pushed me twice for no reason[.]  [H]e can just talk . . ."  (Id.)

Deputy Warden Bartholomew testified that when an inmate complains about an officer placing his hands on them, the request is treated as an emergency and addressed directly by investigators. (JA at 264-65.) He also testified that these types of complaints are "looked into [] immediately without having to even use the grievance process." (Id.)  The record further reflects that Northampton County Department of Corrections investigated Plaintiff's written complaints about Officer Wene having pushed and punched him.  (Id. at 279-80.)[10]  In an Investigative Report

---

[9]     Plaintiff also argues that he should be excused from the exhaustion requirement because the Prison's grievance processes were confusing.  Because I conclude that Plaintiff is excused on alternative grounds, I will not reach this argument.

[10]    The relevant portion of the December 20, 2017 Investigative Report states, "According to [Plaintiff], Officer Kyle Wene recently punched him on the right side.  [Plaintiff] spoke with Lieutenant Jason Werley about the incident.  Officer Lou Donatelli was present.  It was determined that Wene had pushed [Plaintiff], who was refusing to move.  No punch was thrown.  The incident was documented." (JA at 280.)

dated December 20, 2017, the Prison concluded that Plaintiff's complaints were unsubstantiated. (Id.)  The Report was reviewed and signed by the Director of Corrections on December 27, 2017, and the investigation was closed.  (Id.)

Courts have held that an inmate's exhaustion requirement is satisfied when their complaint is reviewed and decided by the prison's highest authority. Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000).   The circumstances of Plaintiff's complaints and the Prison's completed investigation are similar to the facts detailed in Camp v. Brennan. In Camp, the Third Circuit considered whether an inmate plaintiff exhausted his remedies in attempting to utilize his prison's grievance system.  Id.  There, the inmate established that his written complaints about correctional officers' use of excessive force had been submitted and that the prison's "ultimate administrative authority" had "fully examined [his complaints] *on the merits*" and determined that the inmate's complaints were meritless.  Id. (emphasis in original).  The Third Circuit concluded that because his complaint had been reviewed and faced a determination by the prison's highest authority, the inmate was not required to jump through additional administrative hoops to receive the same answer.  Id.  Thus, the Third Circuit concluded that the inmate satisfied his exhaustion requirement and was permitted to seek court intervention.  Id.

Similarly, here, Plaintiff submitted written complaints about Officer Wene's having allegedly pushed and punched him.  Within a month of submitting his complaints, the Department of Corrections investigated the incidents, detailed them in an Investigative Report, concluded that such allegations were unsubstantiated, and closed the case.  The Investigative Report was reviewed and signed off by the Prison's Director of Corrections, who is, according to one of the suggested grievance paths outlined on the Prison's grievance flow chart, the final stage of review for emergency and life-threatening complaints.  (JA at 249.) Indeed, Deputy Warden Bartholomew

confirmed that inmate complaints about officers pushing or punching inmates are treated as emergencies and investigated immediately. (Id. at 264-65.)

Like the plaintiff in Camp, Plaintiff here already received a substantive determination from the Prison's highest level of review.  Requiring Plaintiff to jump through additional hoops to reach the same response would "not advance the statutory goal of avoiding unnecessary interference in prison administration." Reyes v. Smith, 810 F.3d 654, 658 (9th Cir. 2016).  "When prison officials opt not to enforce a procedural rule but instead decide an inmate's grievance on the merits, the purposes of the PLRA exhaustion requirement have been fully served: prison officials have had a fair opportunity to correct any claimed deprivation and an administrative record supporting the prison's decision has been developed." Id.; see also Maddox v. Love, 655 F.3d 709, 722 (7th Cir. 2011) ("Where prison officials address an inmate's grievance on the merits without rejecting it on procedural grounds, the grievance has served its function of alerting the state and inviting corrective action, and defendants cannot rely on the failure to exhaust defense.").

Because the Prison's Director of Corrections reviewed and issued a final determination on Plaintiff's complaints, I conclude that Plaintiff has satisfied the exhaustion requirement for his claim of excessive force against Officer Wene.  Therefore, Plaintiff may proceed to a resolution on the merits of this claim.

## IV.    **CONCLUSION**

For the foregoing reasons, Plaintiff is excused from exhausting his claims for being unable to practice his Muslim faith and facing retaliation for attempting to do so.  Plaintiff has also exhausted his claims for excessive force by Officer Wene.  Thus, he may proceed to resolution on the merits of both claims.   An appropriate order follows.