**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AHMED GAD,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | **No. 18-cv-3900** |
| | : | |
| **NORTHAMPTON COUNTY, <u>ET AL.</u>,** | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

**Goldberg, J.**                                                                 **February 15, 2023**

<u>**MEMORANDUM OPINION**</u>

Plaintiff Ahmed Gad alleges that while incarcerated at the Northampton County Prison, Defendants interfered with his ability to practice his Muslim religion, which required him to bathe and pray at specific times of day.[1] Plaintiff further alleges that Defendants improperly placed him in solitary confinement for approximately five months because his fellow inmates in general population complained that his religious rituals were causing a disturbance. Plaintiff has brought civil rights claims pursuant to 42 U.S.C. § 1983 for retaliation and cruel and unusual punishment in violation of the First and Eighth Amendments, respectively (Count I), a violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") (Count II), and a violation of the First Amendment's Free Exercise clause (Count III).[2]

---

[1] Defendants are Northampton County, Classifications Coordinator John Harman, and Correctional Officers John Colarusso, Jonathan Glovas, Jackie McNair, and Kyle Wene (collectively, "Defendants").

[2] I previously denied Defendants' motion for summary judgment without prejudice so that I could first resolve whether Plaintiff had exhausted his administrative remedies before pursuing his claims as required by the Prison Litigation Reform Act ("PLRA"). (ECF No. 61). Following an evidentiary hearing, I found that Plaintiff had either exhausted or was excused from exhausting his administrative remedies for all but one of his claims. I dismissed the claim Plaintiff had not exhausted (a § 1983 claim against Officer Glovas for allegedly permitting another inmate into Plaintiff's cell to assault him) and allowed Defendants

Presently before me is Defendants' Motion for Summary Judgment (ECF No. 79).  For the reasons that follow, Defendants' Motion will be denied as to Plaintiff's Eighth Amendment claim but granted as to all remaining claims.

## I.    STATEMENT OF FACTS[3]

The following facts are taken from the parties' Statements of Facts ("SOF") together with the exhibits of record.  Most of the pertinent facts are not in dispute.  As will be specified below, Plaintiff essentially agrees with Defendants' version of the facts but adds additional facts which he maintains warrant submission to a jury.

### A.    Plaintiff's Religious Beliefs

Plaintiff's Muslim faith requires that he pray five times a day.  (Pl.'s Statement of Additional Facts ("Pl.'s SOAF") ¶ 1, ECF No. 84.)  Plaintiff believes that if he were not allowed to pray five times a day, he would no longer consider himself to be a Muslim.  (Id. ¶ 2.)  Plaintiff asserts that prior to praying, the Muslim faith requires a ritual called Wudu, which entails washing one's face, hands, arms, and feet.  (Id. ¶ 3.)

### B.    Plaintiff's Incarceration and Conflicts With Other Inmates

Plaintiff was incarcerated at Northampton County Prison (the "Prison") from June 6, 2017 through April 4, 2018 as a result of a state court criminal conviction and sentence.  (Defs.' SOF ¶¶ 2–3, ECF No. 80.)  On June 29, 2017, while being housed in the Prison's B-Tier, Plaintiff was assaulted by another inmate.  (Id. ¶¶ 4–5.)   Thereafter, a "keep separate" order was instituted to

---

to file a renewed motion for summary judgment on the remaining claims.  In his response brief to the present motion, Plaintiff concedes dismissal of his substantive due process claim under the Fourteenth Amendment, as well as any potential Monell claim against Northampton County.

[3]    Plaintiff filed one document that first lists his response to Defendants' statement of facts, and then lists his "statement of additional facts which preclude summary judgment."  (ECF No. 84.)  The first list will be referred to as "Pl.'s Resp." and the second list will be referred to as "Pl.'s SOAF" (statement of additional facts).

keep Plaintiff and the other inmate apart and Plaintiff was moved to G-Tier.  (Id. ¶¶ 6–7.) Defendants additionally contend that Plaintiff was relocated because "per [correctional officer] Lombardo[,] [Plaintiff was] a constant issue."  (Id. ¶ 8; Ex. D.)

Plaintiff agrees that he was moved to G-Tier because of the cellmate conflict but contends that the conflict was not his fault, but rather it was "due to [his] desire to properly practice his Muslim faith."  (Pl.'s Resp. to Defs.' SOF ("Pl.'s Resp.") ¶¶ 7–9, ECF No. 84.)  Plaintiff also acknowledges that other inmates complained about his praying ritual, particularly that he washed his feet in the sink.  (Pl.'s SOAF ¶ 4.)  According to Plaintiff, none of the correctional officers intervened to tell the other inmates that Plaintiff must be allowed to pray.  (Id. ¶ 6.)

On July 24, 2017, Plaintiff was moved again, this time to K-Tier, due to similar issues with other inmates.  (Defs.' SOF ¶ 9.)  While Plaintiff was on K-Tier, twenty-seven request slips were submitted by other inmates on the housing block because the entire tier wanted Plaintiff removed. (Id. ¶ 11.)  The inmates complained that Plaintiff was causing disturbances and that having him on their tier "could potentially cause a physical altercation in the near future due to [their] lack of patience with Plaintiff."  (Id. ¶¶ 12–13.)  As a result, Plaintiff was transferred to administrative segregation on E-Tier on October 17, 2017.  (Id. ¶¶ 11, 15, 16.)  Then, on November 17, 2017, Plaintiff requested to be placed in protective custody due to issues with his cellmate.  (Id. ¶ 18.) Several days later, Defendant Classifications Coordinator John Harman decided to place Plaintiff in protective custody, effective that day.  (Id. ¶¶ 20, 22.)  Plaintiff remained in protective custody through April 4, 2018, when he was transferred to a state correctional institution.  (Pl.'s SOAF ¶ 24.)

As detailed above, prior to being removed from general population, Plaintiff was housed on three different tiers in the prison.  (Defs.' SOF ¶ 24.)  Plaintiff acknowledges that he was moved

between each tier and eventually placed in protective custody, in part, due to conflicts between him and other inmates. (Pl.'s Resp. ¶¶ 25–26.) However, Plaintiff insists that these conflicts were due to the fact that the other inmates "[did not tolerate his] way of practicing his Muslim religion." (Pl.'s Resp. ¶¶ 25–26.) To support this contention, Plaintiff cites an Investigative Report written by Investigator Horvath from the Northampton Department of Corrections regarding an investigation he conducted on Plaintiff's behalf. (Pl.'s Ex. 1 at Northampton 00002, ECF No. 84-1.) According to the Report, as Investigator Horvath was conducting his investigation, he ran into Defendant Harman. (Id.) Investigator Horvath asked Defendant Harman why Plaintiff was in protective custody, and Defendant Harman responded that "[Plaintiff's] former cellmates in B[-Tier] and other housing units did not tolerate [Plaintiff's] way of practicing his Muslim religion, which caused friction. For [Plaintiff's] safety, [Defendant] Harman moved him." (Id.)

### C.   Plaintiff's Interactions with the Individual Correctional Officers

Plaintiff alleges that he was subjected to religious discrimination not only from other inmates within the prison, but from correctional officers themselves. Specifically, Plaintiff testified that before he was moved to protective custody he was told by "various correctional officers" that he could not perform his washing rituals anywhere other than the shower, stating that this was "an order from the lieutenant." (Pl.'s SOAF ¶¶ 7, 9.) Because Plaintiff did not have regular access to a shower, this prevented him from washing five times per day before praying as required. (Id. ¶ 8.) However, Defendants respond and Plaintiff admits that once Plaintiff was in protective custody, he was alone in his cell and was allowed to wash in the sink before praying. (Pl.'s Resp. ¶¶ 60–63.)

Below is a summary of Plaintiff's additional factual allegations against each individual Defendant.

1.    <u>Defendant Classifications Coordinator Harman</u>

Defendant Harman was a Classifications Coordinator at Northampton while Plaintiff was housed in protective custody.  (Defs.' SOF ¶ 55.)  As a Classifications Coordinator, Harman was responsible for classifying inmates into custody levels and coordinating where they were housed within the prison.  (Defs.' Ex. H, Deposition Transcript of John Harman, Jr. ("Harman Dep.") at 5:23–9:13, ECF No. 80-8.)  Harman's responsibilities included deciding whether to place inmates in administrative segregation, disciplinary segregation, or protective custody based on a variety of factors including their current charges, past convictions, and any misconducts they previously received within the prison.  (<u>Id.</u>)  Harman would also consider whether an inmate was a risk to themselves or others when deciding where they should be housed.  (<u>Id.</u>)

Plaintiff asserts that Harman moved Plaintiff to protective custody because of his religion. (Pl.'s Resp. ¶¶ 7–9.)  In support, Plaintiff cites to the portion of Investigator Horvath's report in which Harman was asked why Plaintiff was moved to protective custody and Harman stated that the other inmates on B-Tier "did not tolerate [Plaintiff's] way of practicing his Muslim religion, which caused friction."  (Pl.'s Ex. 1 at Northampton 00002.)  Defendants maintain that Harman did not move Plaintiff to protective custody, or take any action against Plaintiff, because of his religion. (Defs.' SOF ¶ 58.)  Harman testified in his deposition that he moved Plaintiff to protective custody because he received multiple phone calls from correctional officers who stated that Plaintiff was "not getting along with other inmates."  (Harman Dep. at 18:22–19:19.)  Accordingly, Harman maintains that he moved Plaintiff to protective custody for safety reasons.  (Defs.' SOF ¶¶ 23–27.)

2.    <u>Defendant Correctional Officer Wene</u>

At his deposition, Plaintiff testified that while he was escorted through the Prison, Defendant Correctional Officer Wene punched him with a closed fist in the ribs such that he almost

5

fell over.  (Pl.'s Resp. ¶ 53.)   A December 11, 2017 medical report reflects that Plaintiff sought treatment after this incident and complained that a correctional officer had punched him, that he continued to feel pain near his right rib, and experienced shortness of breath while sleeping.  (Pl.'s Ex. 2.)  Plaintiff admits that he did not suffer any broken ribs from the alleged attack and an x-ray report in the record reflects this fact.  (Defs.' SOF ¶ 54, Ex. S.)  Wene maintains that he did not punch Plaintiff.  (Id. ¶ 53.)  Defendants cite an "Incident Report" filled out by Wene to support this proposition, which states that around early December 2017, Wene was escorting the inmates in protective custody from recreation back to E-Tier when a "code red" was called on B-Tier. (Defs.' Ex. K, Incident Report at Northampton 00028, ECF No. 80-11.)  The report states that Wene was attempting to rush the protective custody inmates back inside so that he could respond to the code when Plaintiff walked out of line to talk to another inmate.  (Id.)  In the report, Plaintiff admitted to walking out of line, and "Officer Wene admit[ted] to putting his hand[s] on [Plaintiff] to continue to move [Plaintiff] from K-Tier."  (Id.)  Another officer who witnessed the incident also completed an incident report which stated: "I did not see any pushing or shoving by Officer Wene [while he was escorting Plaintiff to E-Tier.]"  (Id.)

### 3.     Defendant Correctional Officers Colarusso, McNair, and Glovas

In addition to being placed in solitary confinement and being punched by Wene, Plaintiff alleges he was subjected to other forms of religious discrimination at the hands of several individual correctional officers.  Defendant Correctional Officers Colarusso, McNair, and Glovas worked on E-Tier while Plaintiff was housed in protective custody.  (Defs.' SOF ¶¶ 34, 40, 47.) Defendants maintain and Plaintiff does not dispute that none of the three officers knew why Plaintiff was placed in protective custody.  (Id. ¶¶ 35, 41, 48.)  Plaintiff also does not dispute that the officers were not aware of any grievances filed by Plaintiff regarding his ability to practice his

religion, issues between him and Wene, or any interference with his cell condition.  (Id. ¶¶ 36, 42, 48.)

Plaintiff testified that Officer Colarusso called him a terrorist because he is Muslim, and that Colarusso would kick his food.  (Pl.'s SOAF ¶¶ 11–12.)  During Plaintiff's deposition, when asked how Colarusso prevented him from practicing his religion freely, Plaintiff responded:

> Q.  What did Colarusso do?
> A.  I just said.
> Q.  So it was just pretty much him saying mean things to you?
> A.  [Calling me] [g]ay, and terrorist, and camel, and all this, laughing with the other inmates about me.
> Q.  And that prevented --
> A.  Kicking the food with his feet in my cell when I drop something from my tray like a piece of cheese or something, that's my cheese here, with his feet.  It's hate.
> Q.  And that prevented you from being able to practice your religion freely?
> A.  Is this preventing me from practicing my religion?  No, it didn't prevent me from practicing my religion, this stuff, but it show me a lot of discrimination and hate because I'm practicing my religion.

(Defs.' Ex. E, Deposition Transcript of Ahmed F. Gad ("Gad Dep.") at 98:4–99:15, ECF No. 80-5.)

Defendants dispute these allegations and maintain that Colarusso did not take any affirmative action against Plaintiff because of his religion.  (Defs.' SOF ¶¶ 37–38).  Colarusso testified at his deposition that he had no knowledge of anyone calling Plaintiff a terrorist.  (Defs.' Ex. N, Deposition Transcript of John Colarusso ("Colarusso Dep.") at 17:15–18:1, ECF No. 80-14.)

Regarding other correctional officers, Plaintiff testified that Officer McNair refused to turn on his cell lights when he asked, claiming that the light switch was broken.  (Pl.'s SOAF ¶ 15; Gad Dep. at 106:16–108:14.)  Plaintiff also stated that he did not have access to a clock while in protective custody.  (Id.)  Because he needed to pray at specific times of day, he would ask McNair to provide him with the time of day, but McNair did not respond to his questions.  (Pl.'s SOAF ¶

16, Gad Dep. at 106:16–108:14.)  During his deposition, McNair testified that he did not turn off the lights in Plaintiff's cell, and that he "has no opinion" on the Muslim faith, but he "respect[s] it." (Defs.' SOF ¶ 49; Defs.' Ex. R, Deposition Transcript of Jackie McNair ("McNair Dep.") at 12:20–14:5, ECF No. 80-18.)  Defendants also generally contend that "McNair did not take action against Plaintiff because of his religion." (Defs.' SOF ¶ 50.)

Plaintiff also claims that Officer Glovas "told other inmates to put their genitals in Plaintiff's food."  (Pl.'s SOAF ¶ 14.)  In his deposition, Glovas testified that he never tampered with Plaintiff's food and never took any action against Plaintiff due to his religion.  (Defs.' SOF ¶¶ 43–44; Ex. O, Deposition Transcript of Johnathan Glovas ("Glovas Dep.") at 18:15-18:19.)

### D.    Northampton County Prison Policies

Northampton County Prison has a policy by which inmates may be placed in restrictive housing units if an inmate is, or has been, potentially dangerous to other inmates, staff, or himself. (Id. ¶ 28.)  Inmates are placed in protective custody to provide secure and safe housing for those inmates who require a higher degree of supervision than those housed in the general population. (Id. ¶ 29.)  Citing Defendants Harman's and Colarusso's depositions, Plaintiff states that inmates in protective custody are locked in their cells for twenty-two to twenty-three hours a day.  (Pl.'s SOAF ¶ 27.)

Northampton County Prison's policy indicates that inmates housed in protective custody are permitted to practice their religion and participate in the religious services of their choosing, and any inmate requests for accommodations are directed to the Prison's Chaplin.  (Defs.' SOF ¶¶ 31–33.)  While Plaintiff acknowledges this policy, he claims that he was not permitted to "adequately practice" his Muslim faith.  (Pl.'s Resp. ¶ 31.)

Based on all of the above facts, Plaintiff brings claims for retaliation and cruel and unusual punishment in violation of the First and Eighth Amendments.  He additionally brings claims under RLUIPA and the Free Exercise clause, arguing that Defendants prevented him from freely practicing his Muslim faith.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view the evidence in the light most favorable to the non-moving party.  Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment.  Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  Id. at 322.

9

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1)(A).

## III. DISCUSSION

To re-cap, Plaintiff claims that: (1) Defendant Wene violated his Eighth Amendment right to be free from excessive force, (2) all Defendants retaliated against him for practicing his religious beliefs, and (3) all Defendants violated his right to freely practice his religion when they placed him in solitary confinement in response to inmate complaints about his allegedly disruptive prayer rituals.

### A. Plaintiff's Claims Are Not Barred by the Prison Litigation Reform Act

As a threshold matter, Defendants argue that Plaintiff's constitutional claims for emotional and mental injuries are barred by the Prison Litigation Reform Act ("PLRA") because he has not also established that he suffered any physical injury.  In 1955, Congress enacted the PLRA in an effort to reduce potentially frivolous lawsuits filed by prisoners challenging the conditions of their confinement.  The PLRA contains a "limitation on recovery" provision which provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury[.]" 42 U.S.C. § 1997(e).  The United States Court of Appeals for the Third Circuit has interpreted this provision to preclude the recovery of compensatory damages for any claims that do not include physical harm.  Allah v. Al-Hafeez, 226 F.3d 247, 250–51 (3d Cir. 2000).  However, the Third Circuit has found that "certain absolute constitutional rights may be vindicated

by an award of nominal damages in the absence of any showing of injury warranting compensatory damages." Id. Punitive damages may also be awarded based solely on a constitutional violation, and not based on any emotional or mental distress suffered, and those claims are likewise not barred by § 1997(e). Id.

Plaintiff concedes that he has not established that he suffered any physical injury as a result of his inability to freely practice his religion. (Pl.'s Br. p. 6–10.) But he argues that this is not fatal to his claims because he can still recover nominal damages, and potentially punitive damages if he demonstrates that Defendants' conduct involved reckless or callous indifference to his rights. Plaintiff is correct that, if I were to find that his claims were worthy of submission to a jury, the physical harm requirement under the PLRA would not be a complete bar to relief. Both nominal and punitive damages would still be available to him, assuming a jury found that he had established all other elements of his claims. Thus, I will not dismiss his constitutional claims based solely on the physical harm requirement under the PLRA.

**B.      Plaintiff's Section 1983 Claims Against the Individual Defendants**

To state a claim under Section 1983, a plaintiff must demonstrate the defendant, acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). I will first address Plaintiff's Eighth Amendment claim against Officer Wene, and then address his First Amendment retaliation claims against the remaining individual Defendants.

1.      Plaintiff's Eighth Amendment Claim Against Defendant Wene

While the Second Amended Complaint pleads an Eighth Amendment claim against "all Defendant corrections officers" (Sec. Am. Compl. ¶ 24, ECF No. 47), Plaintiff's brief in opposition to summary judgment makes it clear that this claim is only against Wene. (Pl.'s Br. at 12, ECF No. 83.) ("Plaintiff's Eighth Amendment claim concerns his allegation of the use of excessive

force by Defendant Corrections Officer Wene.")  For the reasons set forth below, I will dismiss Plaintiff's Eighth Amendment claim against all Defendants except for Wene.

The Eighth Amendment protects prisoners from cruel and unusual punishment.  Watson v. Wingard, 782 F. Appx. 214, 216 (3d Cir. 2019).  The use of force is actionable if it amounts to "an unnecessary and wanton infliction of pain."  Smith v. Price, 610 F. Appx. 113, 115 (3d Cir. 2015). Whether the force rises to such a level is determined by "whether [it] was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Id.  In conducting this analysis, courts evaluate the following factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response."  Id. at 115–16 (quoting Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009)).

Plaintiff alleges that Wene punched him in the ribs while escorting the protective custody inmates from recreation back to E-Tier.  In addition to his own testimony, Plaintiff cites the December 11, 2017 medical report which reflects that he sought treatment after the incident.  (Pl.'s Ex. 2.)  Defendants dispute that Wene punched Plaintiff, and they point to the two incident reports in the record to support this contention.  In the first incident report, authored by Wene himself, Wene denied that he "punched" Plaintiff, but admitted that he "put his hands on [Plaintiff]" in order to get him back in line as he was escorting the protective custody inmates from recreation back to E-Tier.  Another correctional officer who witnessed the incident stated in a separate report that he did not see any pushing or shoving by Wene.

12

Because the record contains minimal but sufficient evidence to suggest that Plaintiff's version of the incident could be true if believed, I find that Plaintiff's Eighth Amendment claim against Defendant Wene warrants submission to a jury.

2.      Plaintiff's First Amendment Retaliation Claims

"In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Thomas v. Indep. Twp., 463 F.3d 285, 296 (3d Cir. 2006). A plaintiff must first show that the defendant had knowledge of their protected activity to demonstrate that such activity was "a substantial or motivating factor" in its disciplinary action. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493–94 (3d Cir. 2002).

Plaintiff's retaliation claims fall into two categories: (1) claims against Defendants Colarusso, Glovas, and McNair; and (2) claims against Defendant Harman.

Plaintiff alleges that Officers Colarusso, Glovas, and McNair retaliated against him for practicing his religion while they were staffed on the protective custody unit when Plaintiff was housed there. Specifically, Plaintiff alleges that Colarusso, Glovas, and McNair retaliated against him in the form of: calling him a terrorist, kicking his food and instructing other inmates to place their genitals in his food, refusing to turn on the lights when Plaintiff requested, and refusing to provide him with the time of day so he knew when to pray. (Pl.'s Br. at p. 10.) In response, Defendants argue that Plaintiff has failed to establish that Colarusso, Glovas, and McNair had knowledge of Plaintiff's constitutionally protected activity. In support, Defendants cite to the three officers' depositions in which all three testified they had no knowledge of Plaintiff's previous complaints regarding his ability to practice his religion and did not know why Plaintiff had been placed in protective custody. (Defs.' SOF ¶¶ 35, 41, 48.)

There is no evidence that Colarusso, Glovas, or McNair had knowledge of the issues Plaintiff had in general population with correctional officers and other inmates regarding his ability to practice his religion.  It is undisputed that Colarusso, Glovas, and McNair worked in a separate area of the Prison and each testified that they were not informed of the reason Plaintiff was transferred to their unit.[4]  Accordingly, Plaintiff has failed to establish a retaliation claim against Defendants Colarusso, Glovas, and McNair, and those claims will be dismissed.[5]

As for Defendant Harman, as the Classifications Coordinator at the Prison, Harman made the ultimate decision to place Plaintiff in protective custody in response to the conflicts that arose between him and the other inmates in general population.  Plaintiff alleges that this amounted to retaliation.  Harman relies on the "same decision defense," arguing that he would have made the same decision absent any retaliatory motive.  Under the "same decision defense," a defendant can defeat a retaliation claim if they demonstrate that the decision was made for reasons reasonably related to a legitimate penological interest, and therefore, it would have been made even absent the protected conduct.  Quiero v. Ott, 799 F. Appx. 144, 146–47 (3d Cir. 2020).  Prison administrators should be afforded "wide-ranging deference in the adoption and execution of policies and practices

---

[4]    While Plaintiff's retaliation claims against Colarusso, Glovas, and McNair fail on the knowledge requirement alone, they are also insufficient because the majority of his allegations do not amount to constitutional violations.  For example, calling a prisoner a terrorist and not responding to their question about the time of day do not amount to constitutional violations.  Jones v. Luzerne County Corr. Facility, 2010 U.S. Dist. LEXIS 86430, at *20 (M.D. Pa. 2010) (harsh words spoken to a prisoner by a correctional officer do not amount to a violation of the prisoner's civil rights); Monn v. Gettysburg Area School Dist., 2013 WL 1345501, at *4 (M.D. Pa. 2013) ("[g]enerally, a failure to act . . . is not a retaliatory or adverse action.").

[5]    Plaintiff appears to have abandoned his retaliation claim against Wene, as he does not press it in his brief.  Regardless, the record is clear that Wene was not staffed on E-Tier when Plaintiff was in protective custody, and Wene had no knowledge of the complaints Plaintiff made regarding his ability to practice his religion in general population or elsewhere. (Defs.' SOF ¶¶ 51–52.)  Thus, for the same reason the claim against the remaining individual defendants was dismissed, any retaliation claim against Wene will be dismissed as well.

that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Allah, 226 F.3d at 535.

Harman maintains that he placed Plaintiff in protective custody for his own safety, and that "removing an inmate who is a constant source of conflict is reasonably related to the penological interest of maintaining safety within the prison." (Defs.' Br. at p. 7.) There is ample evidence in the record that Harman would have placed Plaintiff in protective custody even absent the protected conduct. It is undisputed that Plaintiff experienced conflicts on every housing block he lived on before ultimately being placed in protective custody. Most notably, at one point, Plaintiff's entire housing block demanded that he be removed. Plaintiff presses that Harman all but admitted to Investigator Horvath that the relocation was because Plaintiff's fellow inmates "did not tolerate his way of practicing his Muslim religion." (Pl.'s Ex. 1 at Northampton 00002.) However, Harman's statement to Investigator Horvath was simply an explanation of the factual circumstances that led to the safety risk which prompted Plaintiff's relocation. There is nothing in the record to suggest that Harman harbored any animus towards Muslims generally, or Plaintiff specifically because of his religion. Ultimately, I find that no reasonable juror could conclude that Harman's placement of Plaintiff in solitary confinement was not reasonably related to the legitimate penological interest of maintaining order and safety within the prison. McGrath v. Johnson, 155 F. Supp. 2d 294, 303 (E.D. Pa. 2001), aff'd, 35 F. Appx. 357 (3d Cir. 2002) (retaliation claim dismissed where prison's adjustment of inmate's custody level was reasonably related to legitimate penological interest in maintaining safety). Plaintiff's retaliation claim against Harman will therefore be dismissed.

C.      Plaintiff's RLUIPA Claim

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") "protects institutionalized persons who are unable to freely attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).  Section 3 of RLUIPA states that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person:
>
> > (1) is in furtherance of a compelling governmental interest; and
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

To establish a *prima facie* case under RLUIPA, a plaintiff must show that: "(1) his exercise of religion is grounded in a sincerely held religious belief, and (2) the institution's policy or official practice 'substantially burdened' that exercise of religion."  Watson v. Christo, No. 16-cv-433, 2019 WL 1324941, at *4 (D. Del. Mar. 25, 2019), aff'd, 837 F. Appx. 877 (3d Cir. 2020) (citing § 2000cc-5(7)(A), 2(b)).  If Plaintiff can make this *prima facie* showing, the burden shifts to the government to show that its policy or practice was: (1) in furtherance of a compelling governmental interest; and (2) the least restrictive means of furthering that compelling governmental interest.  Id.

The Third Circuit has defined "substantial burden" in the RLUIPA context as follows:

> For the purposes of RLUIPA, a "substantial burden" exists where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007).

Here, Defendants do not challenge the sincerity of Plaintiff's religious beliefs. Accordingly, I must determine whether Plaintiff has demonstrated that Defendants' actions "substantially burdened" his ability to exercise his religion.[6]

    1.   Substantial Burden

Plaintiff alleges that Defendants substantially burdened his religious practices by not allowing him to perform his bathing ritual in the sink when he was in general population, and then ultimately relocating him to protective custody because of his religious practices. Defendants respond generally that none of the correctional officers "interfere[d] with Plaintiff's ability to practice his Muslim faith[,]" highlighting that Plaintiff admits he was able to wash in his sink before praying once he was in protective custody. (Defs.' Br. at p. 5).

I find that Plaintiff has established a *prima facie* case under RLUIPA. Plaintiff testified that when he was in general population, his cellmates complained to the correctional officers about him performing his bathing ritual in the sink. (Defs.' Ex. E, Gad Dep. at 79–80). This prompted the correctional officers to tell Plaintiff that he could not use the sink, and that he had to perform his bathing ritual in the shower, to which he had limited access. Defendants' refusal to allow Plaintiff to perform his bathing ritual in the sink substantially burdened his ability to practice his religion because he could not pray five times per day as required. Defendants' ultimate decision to place Plaintiff in protective custody also substantially burdened his ability to practice his religion. Defendants make much of the fact that once Plaintiff was in protective custody, he was

---

[6]    Defendants maintain that RLUIPA does not permit claims against officials in their individual capacities because Congress's spending power cannot be used to subject individual defendants to liability in private causes of action. The Third Circuit has held that non-recipients of federal funds, such as the individual defendants in this case, cannot be subject to private liability for monetary damages. Sharp v. Johnson, 669 F.3d 144, 154 (3d Cir. 2012). Thus, Plaintiff's RLUIPA claim against all Defendants other than the County will be dismissed.

able to wash in the sink (presumably because he no longer had any cellmates to complain about his rituals) and, thus, he was able to practice his religion. But the very fact that Defendants placed Plaintiff in protective custody demonstrates that Plaintiff was "forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit." Washington, 497 F.3d at 280. Emphasizing the fact that Plaintiff could finally practice his religion once he was in protective custody ignores the fact that Defendants forced him to forfeit a benefit otherwise generally available to other inmates (not being locked in a cell for twenty-three hours a day) in order to exercise that right. This conduct falls within the Third Circuit's definition of "substantial burden" under RLUIPA.

2.    Least Restrictive Means

Because I have found that Plaintiff has met his burden in establishing a *prima facie* case under RLUIPA, the burden now shifts to Defendants to prove that imposing such a burden on Plaintiff's religious exercise was the least restrictive means of furthering a compelling governmental interest. Defendants argue that the Prison's policy of removing inmates from general population who create a dangerous environment and placing them in protective custody furthers the compelling governmental interest of maintaining safety and security. Defendants maintain that there is ample undisputed evidence that Plaintiff had conflicts with other inmates, with one escalating to the point of every inmate on the housing block demanding that Plaintiff be removed. There is also evidence that these conflicts created a potentially dangerous environment, as the inmates on K-Tier told correctional officers that if Plaintiff remained on the block, there could be "a physical altercation in the near future." (Defs.' SOF ¶¶ 12–13.) Defendants also highlight the efforts they made to find an appropriate place for Plaintiff before he was ultimately placed in protective custody. The record reflects that Defendants relocated him several times

within general population, and it was only after those efforts failed that the decision was made to place him in protective custody.

Courts should afford great deference to prison authorities' choices regarding policies that implicate security.  Washington, 497 F.3d at 283 (citing Cutter, 544 U.S. at 710) ("[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety.") (emphasis removed).  The United States Supreme Court has stressed that context matters when evaluating a safety related regulation challenged under this standard, and courts should be "mindful of the urgency of discipline, order, safety and security in penal institutions and . . . apply the Act's standard with due deference to prison administrators' experience and expertise."  Cutter, 544 U.S. at 710.

There are several ways a plaintiff may defeat summary judgment under the least restrictive means analysis.  Sometimes, a policy may easily satisfy the "compelling interest" prong, but fail the "least restrictive means" prong because the policy either appears to be arbitrarily applied or other circumstances suggest the policy is not actually designed to achieve the defendant's articulated interest.  For example, in Washington v. Klem, the Third Circuit found that a prison policy limiting the number of books a prisoner could keep in their cell was not the least restrictive way of furthering the prison's interest in maintaining health and safety.  In Washington, the prisoner plaintiff's religion required him to read four different "Afro-centric" books per day.  497 F.3d at 275.  The prison limited the amount of property an inmate could store in their cell "for security, hygiene and safety reasons."  Id.  The prison's policy allowed inmates to have four records center boxes worth of storage space, but with respect to publications specifically, inmates were permitted to keep only ten books in their cell.  Id.  The plaintiff brought a RULIPA claim

against the prison, arguing that the ten-book limitation substantially burdened his ability to practice his religion. Id. at 276.

The Third Circuit found that while the prison had a legitimate compelling interest in protecting the health and safety of inmates, it failed to articulate how the ten-book limitation furthered that interest. Id. at 284. The court noted that the ten-book limitation arbitrarily limited the property an inmate could possess when considered alongside other prison regulations – particularly the policy allowing inmates to maintain four records boxes worth of property. Id. at 285. While inmates were permitted those four records boxes of space, for whatever reason, an inmate could not fill the boxes with more than ten books, although they could fill them with other kinds of property. Id. Inmates were no less likely to hide contraband in their other property, and the policy did not meaningfully decrease the risks of fire hazards because other potentially flammable property was still permitted. Id. The court concluded that the ten-book limitation, while presented as furthering the interests of health and safety, was not the least restrictive means of doing so. Id.

While plaintiffs are not required to suggest alternatives,[7] a defendant's failure to explain why they have not implemented viable alternatives that have proven to be successful under similar circumstances can constitute a failure to establish that a defendant was using the least restrictive means. Williams v. Sec'y Pennsylvania Dep't of Corr., 450 F. Appx. 191, 192 (3d Cir. 2011). In Williams, the prisoner plaintiff, a practicing Muslim, was working in the prison kitchen when he entered an unauthorized area of the kitchen to commence prayer. Id. The prison disciplined him for the misconduct, and he lost his job. Id. The plaintiff brought a RLUIPA claim against the

---

[7]   See Washington v. Klem, 497 F.3d at 284–85 ("[t]his discussion occurred in the District Court against the backdrop of an incorrect assumption that [the plaintiff] had the burden to prove that there were other less restrictive means available. . . RLUIPA, however, mandates that the Government has the burden to prove that its policy is the least restrictive means.").

prison, arguing that the prison's conduct substantially burdened his ability to practice his religion. Id. at 195.  Plaintiff argued that less restrictive alternatives were available, noting that the prison could have afforded Muslim inmates a designated room in the kitchen for prayer as it had done in the past during the month of Ramadan.  Id. at 196.  The district court dismissed his claim and the Third Circuit reversed, finding that summary judgment was inappropriate because "a reasonable factfinder could find that a designated prayer room in the kitchen is the least restrictive means of furthering the compelling government interest of maintaining order and security."  Id.; see also Warsoldier v. Woodford, 418 F.3d 989, 1001 (9th Cir. 2005) (finding prison's hair grooming policy was not least restrictive means of achieving safety interests because "[defendant] makes no attempt to explain why prisons in other jurisdictions and its own women's prison are able to meet the same compelling interests of prison safety and security without requiring short hair or permitting a religious exemption.").

        Here, I find that Defendants' policy of removing inmates from general population who pose security risks was the least restrictive means of furthering their interest in maintaining safety. Defendants certainly have a compelling interest in maintaining order and safety within the Prison. And unlike the arbitrary ten-book policy in Williams, removing inmates from general population who create a dangerous environment is clearly designed to further that interest.  Indeed, the safety risk posed by Plaintiff's presence in general population was eliminated once he was separated from the other inmates.  Moreover, although Plaintiff is not required to suggest other ways the Prison could have handled his situation, he has not advanced any alternatives and I cannot conceive of any.  In contrast to Washington and other similar cases where courts had feasible alternatives to point to which were proven to be successful, this case involved a uniquely challenging set of circumstances.  Nonetheless, Defendants have the burden to demonstrate that they explored and

ultimately rejected other options.  And they have met that burden by detailing, through undisputed evidence, the extensive efforts they made before placing Plaintiff in protective custody. Defendants relocated Plaintiff to three different housing blocks – but when the same problem kept recurring, they placed him in protective custody as a last resort.  In short, Plaintiff's conduct caused significant disturbances among his fellow inmates no matter where Defendants placed him in general population, and prison officials simply could not continue to risk keeping him around other inmates.  The obvious and seemingly only option was to relocate Plaintiff into a unit by himself.

As noted above, I must keep in mind the deference owed to prison administrators when evaluating the particularly difficult situation Defendants faced in this case.  Based on the record before me, I find there is no genuine dispute of material fact that: (1) Defendants relocated Plaintiff in furtherance of the compelling governmental interest of prison order and safety, and (2) relocation was the least restrictive means of furthering that interest.

### D.      Plaintiff's Free Exercise Claim

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." Vo v. Wetzel, No. 22-cv-1210, 2022 WL 1467978, at *2 (3d Cir. May 10, 2022).  However, for prisoners, this right is limited.  Williams v. Sec'y Pennsylvania Dep't of Corr., 450 F. Appx. 191, 194 (3d Cir. 2011).  To establish a violation of the Free Exercise clause, a prisoner plaintiff must show that "defendants prevented him from engaging in his religion without any justification reasonably related to legitimate penological interests." Id. (citing Turner v. Safley, 482 U.S. 78, 87 (1987)).  Courts weigh the following four Turner factors to determine if a restriction is reasonably related to legitimate penological interests:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it....  Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right.  Third, a court must take into account the costs that accommodating the right

would impose on other inmates, guards, and prison resources generally.... [F]ourth, a court must consider whether there are alternatives to the regulation that fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests.

Williams, 450 F. Appx. at 194–95 (quoting DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000)).

Plaintiff bears the burden of persuasion for this inquiry. Overton v. Bazzetta, 539 U.S. 126, 132 (2003). Moreover, courts are instructed to provide great deference to prison administrators regarding decisions about policies that concern safety and security in their institutions. Id.

The Turner standard is "much less demanding" than the strict scrutiny standard applied to RLUIPA claims. Watson v. Christo, 2019 WL 1324941 at *6. As discussed above, Defendants have shown that their decision to relocate Plaintiff satisfies the far more rigorous standard under RLUIPA. Accordingly, Defendants have also met the less demanding standard under Turner – that their policy of relocating inmates who pose security risks is reasonably related to their legitimate penological interest in maintaining safety within the Prison. Thus, Plaintiff's free exercise claim will be dismissed.

### E.     Plaintiff's Punitive Damages Claim

Plaintiff lastly seeks punitive damages. Punitive damages may be awarded in Section 1983 cases "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983).

As an initial note, punitive damages cannot be recovered against a municipality or officers acting in their official capacity. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 263 (1981). However, punitive damages may be assessed against a defendant in their personal capacity. Plaintiff accuses Wene of punching him without warning or justification, which could be

characterized as malicious in nature.  Ultimately, whether Plaintiff's allegations amount to "reckless or callous indifference" to his federal rights is a question more appropriately determined by a jury.  Southersby Dev. Corp. v. Borough of Jefferson Hills, 852 F. Supp.2d 616, 637 (W.D. Pa. 2012) (noting that "whether or not the plaintiff is entitled to punitive damages is typically a question of fact for the jury to resolve.").

## IV.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment will be granted in part and denied in part as detailed in this Opinion.  An appropriate Order follows.